# APPENDIX D

house, where he was caught outside by James Roane and stabbed a number of times until he died for the sin of being a rival in the drug business.

You will hear testimony from a Ms. Pam Williams, very crucial and important testimony, short testimony, but very crucial and important testimony, that on January 14th and 15th, 1992, she went with members of this conspiracy, with New York Boyz "C.O.," "O," James Roane, and "V," to purchase firearms. She purchased two semi-automatic 9mm Tec-9 type firearms and a 9mm handgun, a Glock. And she gave it to those people in return for some money and some cocaine. They wanted guns. And those guns, ladies and gentlemen, and her story play a very important role in this trial and are a very important point of evidence that you need to remember.

She gave those guns on the day she bought them to Cory Johnson, James Roane, and "V." They took those guns back to their housekeeper, Denise Berkley, and got -- and this testimony is important, too, from Denise Berkley, who will tell you -- a little black Salem Lights bag, dark blue or black you will hear it described by a number of different witnesses. And they put their guns in there with their bullets, and sometimes their cocaine. And that's where they stored it until they needed their guns. "Papoose" Davis, who by the way is Dorothy Armstrong's brother, will tell you that he stored those guns for them on occasion and would get a little crack cocaine in return for them.

His testimony will lead you to the next murder, which is the murder on January 14th, 1992 of Peyton Maurice Johnson. Peyton Maurice Johnson, like Doug Moody, committed the sin of being a rival in the drug business. And he needed to be killed by this conspiracy because of that. "Papoose" Davis and a number of the other witnesses will tell you that on that day, James Roane had been looking for Peyton Maurice Johnson. And he found Peyton Maurice Johnson and came and got the guns and came and got "E.B.," and came and got "O," and that they burst into a house in Newtowne where Peyton Maurice Johnson was sitting after James Roane had gone in to determine that indeed Peyton Maurice Johnson was there. A couple of minutes later, "C.O." or "O" burst in and blew him away, shot him 15 times, killed him as he sat on the sofa in furtherance of their drug distribution activities. A turf war, ladies and gentlemen.

That testimony will be underlined by the testimony of another participant in this story, Mr.

THE COURT: I don't think they care one way or the other.

MR. BAUGH: I don't think they know about it.

THE COURT: I'll tell you what, let's go on and stop for lunch now, come back in at 1:30.

MR. VICK: We will be ready with the police officers.

THE COURT: If we exhaust them, we do.

(In Open Court.).

THE COURT: Ladies and gentlemen of the jury, we are going to stop for lunch and let you go now. Come back at 1:30 and we will get started back in the afternoon session. Everyone remain seated while the jury leaves the courtroom.

(The jury left the courtroom.)

All right, Mr. Marshal, remove the defendants.

(The defendants were removed from the courtroom.)

All right, we will be in recess until 1:30.

(Luncheon recess taken from 12:30 p.m. to 1:30 p.m.)

THE COURT: All right. Let's bring in the jury, please.

(The jury entered the courtroom.)

Call your next witness.

MR. PARCELL: Officer David Burt.

DAVID BURT, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q Sir, would you please state your name?

A David E. Burt.

Q Your occupation?

A Police officer for the City of Richmond.

Q How long have you been a police officer?

A Since November of 1989.

Q Were you employed as a Richmond City Police Officer on January 14th, 1992?

A Yes, sir, I was.

Q Did you have occasion to be logged on a call at approximately 8 o'clock p.m. that evening?

A That's correct.

Q Tell the jury where you went and what you found when you got there.

A I received the first call to respond to the 1000 block of Kinney street on a shooting call. Shortly after arriving in that area, a second call came in stating to respond to the 1200 block of West Clay Street, and I would find my victim inside of an

apartment.

Q    What did you do, basically, on the second communication?

A    I responded to the 1200 block of Clay Street.

Q    Would you please tell the ladies and gentlemen of the jury what if anything you found when you got there?

A    Yes.  At that time the door was slightly ajar. I pushed it open and the room was completely dark. There was nothing, no type of lighting in the room at that time.  And I could see from the lights from my flashlight a male on the couch.

Q    At that point in time what did you do next?

A    I entered the room, myself and another officer, and we approached him.  He was not breathing.  I could tell that he had been possibly shot a number of times.

Q    At that point in time, did you notify the Detective Division and maintain the crime scene until they got there?

A    Yes.

Q    I'm going to have you shown 20-1 and ask whether or not that is the person you found when you arrived at that address.

        (Photograph proffered to counsel and to witness.)

A    Yes, sir.

Q    Were you able to determine that person's name?

A    Yes, sir.

Q    That was what?

A    Peyton Maurice Johnson.

Q    That will be Government Exhibit 20-1, sir.

        THE COURT:  It will be admitted.

        MR. PARCELL:  Pass the witness.

        THE COURT:  Any questions, Mr. Geary?

        MR. GEARY:  No.

        MR. McGARVEY:  Yes, sir, just briefly.

                CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Sir, did you happen to discover whether or not the electricity was on in the house?

A    No, sir, I didn't.

Q    Just that the lights were out?

A    That's correct.

Q    And with respect to this house, did you notice any liquor in the house?

A    That was not recovered until the forensic unit arrived at the scene.

Q    Okay.  Were you present when the forensic unit arrived?

A    Yes, sir, I was.

Q    Did you notice a number of bottles of liquor in

the house?

A Well, I did not at that time.

Q All right. Sir, this house is what is commonly referred to as a nip joint; is that correct?

A Possibly.

Q What's a nip joint?

A A place where maybe illegal alcohol is sold.

Q Did you say illegal alcohol?

A Yes.

Q And did you find any drugs, cocaine specifically, in the house?

A No, sir, I did not myself.

Q Were you present when someone else found drugs in the house?

A Yes, sir.

Q Can you give the ladies and gentlemen an estimate of the quantity that was found?

A I don't recall.

Q You don't recall. Did you find any paraphernalia or did anybody in your presence find any paraphernalia for either smoking or using cocaine in the house?

A Yes, sir.

Q Okay. What was that, pipes, what?

A I don't recall exactly what the items were.

Q Thank you.

THE COURT: Any questions from Roane's counsel?

MR. BAUGH: No questions, Your Honor.

MR. WAGNER: No questions, Your Honor.

THE COURT: All right. Thank you, officer. You may stand down.

(Witness stood aside.)

Call your next witness.

MR. PARCELL: Detective Thomas Searles, please.

THOMAS SEARLES, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q Sir, would you please state your name?

A Thomas R. Searles. I'm a detective.

Q With whom?

A The Richmond Police Department.

Q Your present assignment?

A Present assignment is assigned to the Forensic Science Unit.

Q How long have you been a police officer?

A For 18 years.

what's that number?

A    That's an accession number for his case record so we have a way to file it and a way to find it.

Q    With regard to 4-1, is that a photograph of the victim as he came to the morgue?

A    It is.

Q    4-2 is what?

A    This is a photograph of the right side of his shoulder, the right side of his face, and the right lateral neck to show the distribution of stab wounds over those areas.

Q    4-3?

A    4-3 is a photograph showing first of all who he is, because it shows his face.  And secondly, showing the location -- first of all, showing not only the location of where his stab wounds are, but also that they are stab wounds as opposed to cuts, as opposed to gunshot wounds, or other kinds of injury.  It also shows the lethal stab wound right here.

Q    4-4?

A    4-4 is a photograph of the body from behind, above and to the right to show, now that the hair has been shaved, to show the distribution of stab wounds to the scalp and the right neck, the back of the right neck, and the right shoulder.

2069

         MR. PARCELL:  You may return to your seat, ma'am.

         MR. PARCELL:  We move that 4-1, 2, 3, 4. I'll ask it to remain here.

BY MR. PARCELL:

Q    Doctor, based on your review of that autopsy report and your examination, were you able to determine what type of instrument was used in this killing?

A    A sharp blade was used.

Q    Was there any indication of its width or depth?

A    Yes, this was a sharp blade.  One edge was blunt, which means that when you look at the stab wounds, one end is sharper than the other.  And what that tells us is that this is a single-edged blade. When looking at the wounds in their totality and looking for the most frequent measurement, what it tells you is that the most frequent size of the stab wound is three-quarters of an inch, which in all probability indicates that the blade is close to three-quarters of an inch or is three-quarters of an inch in its width.

Q    You indicated that this victim had two stab wounds to his skull which actually penetrated the brain.

2070

A    That's correct.

Q    Can you give us an idea of how much force was

used to insert that weapon and remove it once it entered the brain?

A    These entered through the vault of the skull, the thick part.  So this would take moderate to severe force to penetrate the skull.

Q    Would it take  --  what are the chances of that instrument being stuck inside that cavity on injury?

A    Sometimes blades get stuck in the skull.

Q    How much force would be used to remove it?

A    Moderate to severe force.

MR. PARCELL:  No further questions in regard to this murder.  We will go to the Moody one next, Judge.  But we can have cross-examination for these folks now.

THE COURT:  No.  I think it might be better if we just went through the whole thing.

BY MR. PARCELL:

Q    Did you have occasion to perform the autopsy on an individual by the name of Kareem Abdul Hakim, also known as Douglas Moody?

A    I did.

Q    During the course of your examination of that body, did you make certain findings and put them in the form of an autopsy report?

A    I did.

Q    Also, did you take photographs of this victim as you proceeded with your examination?

A    I did.

Q    Have you reviewed those photographs in preparation for your testimony today?

A    I have.

Q    Did you select certain photographs to assist you in your testimony for that autopsy?

A    I did.

THE COURT:  Mr. Parcell, let her describe her findings utilizing the photographs.

MR. PARCELL:  I was waiting for counsel to review the exhibits before I begin my questioning.

BY MR. PARCELL:

Q    Government Exhibit 11, is that document familiar to you?

A    This is a copy of the final autopsy report which I prepared on Mr. Hakim and which I have certified as a true copy of the original report.

MR. PARCELL:  That will be Government Exhibit 11.

THE COURT:  It will be admitted.

BY MR. PARCELL:

Q    I'll ask you to approach  --

MR. McGARVEY:  I would have an objection prior, and I request the Court's permission to approach the bench, or at the Court's convenience.

(At Bench.)

MR. McGARVEY: Judge, the only problem I have with the report, I think this should be redacted. It is hearsay. It is a rendition of what -- that it is possibly related to other murders. That's the only problem I have.

MR. PARCELL: I have no objection.

MR. McGARVEY: Anything that is hearsay.

THE COURT: All right.

MR. McGARVEY: That would apply to the first autopsy report as well.

THE COURT: They are willing to remove it. There is no problem.

MR. PARCELL: I'll remove it and restamp this Government Exhibit 11.

(Witness approached easel.)

BY MR. PARCELL:

Q    What do those photographs mean to you?

A    These were taken for the same reason that the other gentleman's were. Namely, to show who he is, to document the kinds of injuries that he had and

2073

didn't have, and to show the distribution of those injuries. In the totality, if you look at all these photographs at once, this gentleman has three types of injury. He has stab injury, he has gunshot injury, and he has blunt force injury. What that means is he got beat on with something hard. The first photograph of the right side of his right upper shoulder and face shows abrasion, which is blunt force injury to the right side of his head.

Now, if we look here at the second photograph, which shows the top of his head and his forehead, we can see that he has abrasion and a cut here around the left eye. And if we look at the left arm on this surface, on the lateral surface, there is a patterned abrasion which is indicative of an impact by a weapon, some edges of which would make these tracks. So whatever it was had edges on it.

So we have blunt force injury to the right face, to the left brow, to the left forehead, the left cheek, and the left arm. Here is the left arm in detail that shows that pattern. And the left eye, showing more detail of that abrasion there to his cheek and of his lid. So that's one kind of injury.

The second kind of injuries are stab wounds. Of the stab wounds, he had stabs and cuts that totaled

2074

in total number 18. These were caused by a blade that was single edged in that the stab wounds, these wounds, if you will look at them, show one blunt edge and one sharp edge, telling us that this is a single-edged blade. The most frequent measurement of these wounds along their surface was five-eighths to

three-quarters inches, so the blade is in that range. Of these injuries that are stab wounds, one, two, three, four, five, six that we can see well here, of those, this one and one other perforated through the chest wall into the left lung causing hemorrhage to the left chest space. There were other cuts. There were cuts to the left forehead, the anterior neck, and the left lateral chest. Then he himself had cuts to the hand, which would be characterized as defensive-type cuts.

The third kind of injury, we said he had blunt force injury, he has stab injury, and he has gunshot injury. The gunshot injury is to his right upper back. Here is one gunshot entrance hole at the upper part of his right back shoulder and a second gunshot injury just below the right shoulder blade. The bullets that entered these gunshot entrance holes penetrated the right lung, and they caused extensive hemorrhage into the left chest space.

Q    Ma'am, based on your examination, were you able to determine what the cause of death was, whether it was the stab wounds or the gunshot wounds?
A    The stab wounds and the gunshots are, to me, equally lethal. Either one of these injuries was sufficient to account for his death and both of them caused lethal hemorrhage into the chest space.
Q    As you continued your examination of him, did you have occasion to remove those bullets from his body?
A    I did.
Q    They were submitted to Ms. Anne Jones for ballistics testing?
A    Yes.
        MR. PARCELL:  I would ask that she be allowed to resume the stand. And I'll need Government Exhibit 16. I move the introduction of Government Exhibit 12-1, 2, 3, 4, and 5.
        THE COURT:  It will be admitted.
BY MR. PARCELL:
Q    Dr. Fierro, in regard to your job as a Medical Examiner, as Mr. Cooley affectionately calls you, you are not "Quincy" on TV; you are the person that makes scientific findings or makes the cause of death report. In other words, you don't actually solve the homicide or the cause of death by force, you just report your scientific findings; is that correct?
A    The taxpayers paid me to figure out what killed people, not who did it.
Q    I ask you to examine that item and identify it if you can.
A    This bullet is the bullet that I recovered in the right front chest of Mr. Hakim. At the time of

Q How many times did you see "Whitey" jump on his head?

A I came at the end of it. I picked the dude up and took him home.

Q How badly hurt was he?

A He was unconscious.

MR. WHITE: Objection. He is not a

2110

doctor.

THE COURT: Overruled.

BY MR. VICK:

Q You may answer.

A He was unconscious.

MR. WHITE: Objection. We haven't established any relevance to any distribution of anything in connection with this.

THE COURT: Overruled.

BY MR. VICK:

Q Did you ever have a conversation with "Whitey" concerning the sale of cocaine?

A Yes, I have.

Q Could you tell the ladies and gentlemen of the jury about that conversation?

A Well, he was saying that he was eventually going to sew up the city.

Q In what regard?

A In the drug distribution --

MR. BAUGH: Objection, conclusion.

THE COURT: Sustained.

BY MR. VICK:

Q I direct your attention, Mr. Smithers, -- let me back up first. Exactly what did he say to you; give us the exact words that he said when you talked

2111

to "Whitey" about cocaine.

A He said eventually, you know --

MR. WHITE: This has been asked and answered.

THE COURT: Overruled.

THE WITNESS: He said eventually he was going to have the city sewed up because they were making big bucks.

BY MR. VICK:

Q I direct your attention to January 14th, 1992. Did you have occasion to be in your residence in the evening hours of that night?

A Yes, I was.

Q When Peyton Maurice Johnson was murdered?

A Yes, I was.

Q Could you tell the ladies and gentlemen of the jury exactly what occurred that evening?

A Well, I just got home and there was a knock on the door. It was Maurice. I said, "Sit down." He was waiting for a telephone call, to speak to his

girl. I told him to come in, so he sat down. A few moments later I heard a knock on the door. It was "J.R." He came in and he left out. I mean he asked was the club open. I said no, it wasn't open yet.

Q  All right. If we could get the easel. You have had occasion in anticipation of your testimony here today to see a diagram of that residence; is that correct?

A  Yes.

(Easel displayed.)

Q  I'm going to show you what has been previously marked Government Exhibit 18 and see if that is a diagram of that residence.

A  Yes, it is.

(Document displayed to jury.)

Q  Now, perhaps it would be easier for Mr. Smithers to come down off the stand for this portion of his testimony.

(Witness approached easel.)

BY MR. VICK:

Q  Using that pointer, if you would, Mr. Smithers, show the ladies and gentlemen of the jury what door you are speaking about when you said "J.R." came through a door.

A  This is where it is. Here is where the front door would have been.

THE COURT: Keep your voice up.

BY MR. VICK:

Q  Where was Peyton Maurice Johnson sitting?

A  Over here.

Q  Was there a back door to this residence, to this room?

A  It went into the club area. But this would have been the back, and this would have been the front door.

Q  Is that the door through which James Roane came?

A  Yes.

Q  When you say he came into the residence, did he come the entire way in the residence?

A  Yes. He came in, you know, he asked was the club open. And I said no, so he left.

Q  All right. Where was Peyton Maurice Johnson at that point?

A  He was sitting here.

Q  Were there lights on in there?

A  Yes. There was a light on this table here.

Q  Did James Roane say anything to Peyton Maurice Johnson when he walked in?

A  Nothing at all.

Q  Did Peyton Maurice Johnson say anything to Roane?

A   Nothing at all.
Q   Where were you?
A   I was sitting here on the loveseat.

2114

Q   What occurred after James Roane left?
A   About two minutes after he left, "O" came in,
him and another guy.
Q   Came in through where?
A   The front door.  They knocked on the front door.
I said, "Come in," and they came in.  They took the
guns and just started shooting Maurice.
Q   What kind of gun?
A   I don't know, some kind of semi-automatic
weapon, I guess.
Q   What color was that gun?
A   It was black, I guess.  You know, once they
started to shoot, I started to move.
Q   Did you actually see that gun fire prior to your
moving?
A   Yes.
Q   Where was that gun fired at?
A   They shot Maurice.
Q   Where was Peyton Maurice sitting at that point
at the time he was shot?
A   In the same spot.
Q   Where was "O" at the point he started firing?
A   Right here in the doorway.
Q   And the other person with "O," could you
describe him for the ladies and gentlemen of the

2115

jury?
A   I couldn't see him because I was moving.
Q   Could you tell the ladies and gentlemen of the
jury how "O" was dressed?
A   He had on a black hooded-like sweatshirt.  And
he was standing in the doorway.
Q   Where were you when "O" came in and started
shooting?
A   I was here when the shooting started.  I went
through this door right here.
Q   And did you hit anything on your way out that
door?
A   Yes, there was a door in between.  I broke the
door down going through there.
Q   What did you do when you went through that
door?
A   I laid on the floor because I thought maybe they
was going to shoot at me, too.
Q   How long was it that you lay on that floor?
A   Until the shooting stopped and then they left --
and seconds later I heard them leave.
Q   Were the lights on at that point?
A   No.
Q   How were the lights out?

Q Did you have an occasion to get drugs from "C.O." again after the time that you have already testified about?

A Yes.

Q All right. And what amount of drugs did you get from him on the second occasion?

A 15 rocks.

Q Where was it that you got those?

A It was in the house or Moore Street.

Q 1212 West Moore Street?

A Yes.

Q Tell us how you got those rocks.

A Well, "V" gave it to me, Anthony Mack. But he couldn't give it to me without "C.O.'s" permission.

Q All right. Where did he go to get those drugs?

A In the back of the house.

Q Did you sell those drugs?

A Yes.

Q What was the arrangement you had with "C.O." about the sale of those drugs?

A Same.

Q All right.

A I give him 200 and I take 100.

Q Did you pay "C.O." for those drugs?

A Yes.

Q How long did it take you to sell them?

A That took me about a day.

Q Do you know an individual by the name of "Nat" Rozier?

A Yes, I do.

Q Have you ever had a conversation with James Roane about "Nat" Rozier?

A Yes.

Q Could you tell the ladies and gentlemen of the jury what James Roane told you about "Nat" Rozier?

A He told me that "Nat" was police and we had to get rid of her.

Q Did he say that about anyone else?

A Yes, he did.

Q Who else?

A Girl named "Dee Dee." I don't know her last name. And "Peaches."

Q Mr. Gaiters, are you familiar with the fact that an individual by the name of Louis Johnson was murdered on January 29th, 1992?

A Yes.

Q Were you present for that murder?

A Yes, I was.

Q Could you tell the ladies and gentlemen of the jury where you had been prior to that murder that evening?

A I was in a house on Poe Street with Sterling

012

Hardy, another guy who I don't know his name and

Louis Johnson.
Q    What were you doing in that house?
A    Selling crack cocaine.
Q    Who were you selling crack cocaine to?
A    Louis Johnson.
Q    Had you seen "J.R." that evening?
A    We seen him that night, the same night that Lewis had left.
Q    So there came a time when you left that house?
A    Yes.
Q    Tell the ladies and gentlemen of the jury what happened when you left that house
A    When we left the house, "J.R." pulled up in a burgundy Regal and Sterling called his name out and that's when he slowed down.  And I hollered to Sterling not to call his name out so loud.  So they pulled off as we was coming down the steps and turned the corner from the alley.  By the time we got down to Catherine and Kinney Street, they came  --  they pulled up behind us.  "J.R." got out the car.
Q    Where was Louis Johnson at this point?
A    He was in no where in sight then.
Q    "J.R." got out the car and what did he do?
A    He walked over to me and he told me to keep the guy in the alley.  I said what guy and I turned

around, there was Louis Johnson coming down the alley.
Q    What did you do?
A    I just turned around and looked at him.
Q    What happened next?
A    Louis Johnson passed me and went across the street on the other side of Kinney.  And that's when "C.O." and "V" got out of the car.
Q    All right.
A    "J.R." had a Mac.
Q    When you say a Mac, what do you mean?
A    A Mac ten, an Uzi.  And he pulled the clip back and stuck it up to his head but the gun wouldn't go off.
Q    Stuck it up to whose head?
A    Louis Johnson 's.
Q    Did you actually see him put it to the head?
A    Yes.
Q    What did "J.R." do?
A    He pulled the trigger but it wouldn't go off.
Q    What happened next?
A    Then Anthony Mack, he fired a gun which was a .38, and he shot  --  he fired the first shot.  Then Lewis turned around, that's when "C.O." started firing.

Q    What kind of gun  --  what color was the gun that Anthony Mack or "V" fired?
A    It was black.
Q    And what kind of gun was it that "C.O." fired?
A    A Glock.
Q    How many times did you see "V" fire?
A    Once.
Q    How many times did you see "C.O." fire?
A    Seven or eight times.
Q    What happened to Louis Johnson?
A    He fell to the ground.
Q    After shooting Louis Johnson, what did "J.R.," "C.O.," and "V" do?
A    They ran back to the car.  Before "J.R." got in the car he hollered to Sterling and told him to get in the car.
Q    Did they leave that scene then?
A    Yes.
Q    What kind of car was it?
A    It was a burgundy Regal.
Q    Do you know whose car that was?
A    I don't know who it belongs to but "V" was driving.
Q    Did you have a gun with you that evening?
A    Yes, sir.

2336

Q    What kind of gun did you have?
A    32.
Q    What did you do after the murder?
A    I ran down to Harrison Street to Sandra 's house.
Q    Sandra Reavis?
A    Yes.
Q    What did you do when you got there?
A    I sat on the porch and she came out on the porch and hollered downstairs, you know, like who the if you can on my porch.  Then she came, when she seen who it was, she came downstairs and I told her I had to hide my [gun|begun].
Q    Did you tell her why you had to hide your [gun|begun]?
A    I said the police was coming and I had a capeas on me.
Q    What did she do?
A    She got the gun and went to the corner of Catherine and Harrison and put it up under a porch.
Q    Do you know why Louis Johnson was murdered?
A    "C.O." thought that he had pulled a gun on him, a shotgun.
Q    When did that occur?
A    I don't know exactly the date, but me and "C.O."

2337

was coming up the street and the guy was trying to  --  Louis Johnson was trying to put the gun in the

with them?

A    I never sold cocaine.

Q    Did you help Curt Thorne when he sold cocaine?

A    Yes.

Q    Based upon your involvement, do you know what the relationship was between "J.R.," "O," and "Whitey" in the sale of cocaine?

MR. GEARY:  She can properly testify to

2547

what she saw and heard.

THE COURT:  Overruled.

THE WITNESS:  Partners.

BY MR. VICK:

Q    What?

A    Partners.

Q    What was Curt Thorne, a partner?

A    He wasn't really a partner.  He was just selling drugs.  He wasn't like they were.

Q    Have you ever seen any of them give orders to Curt?

MR. BAUGH:  Objection to "any of them."

THE COURT:  Sustained.

THE WITNESS:  Yes.

BY MR. VICK:

Q    Who have you seen give orders to Curt?

A    "Whitey" and "O."

Q    What sort of orders?

A    Like when they needed the money.

Q    What would they say to him?

A    Tell him like  --

MR. WHITE:  Objection to "they."

THE COURT:  Overruled.

BY MR. VICK:

Q    Go ahead.

2548

A    Like they would tell him a certain time they would need their money, and when he was to come pick up the drugs, go on up.

Q    Did you know a man by the name of Doug Talley?

A    Yes.

Q    Did Doug Talley -- do you know whether Doug Talley helped "O" or "Whitey" or "J.R." in their drug distribution?

A    No.  Talley used to take them to New York before Linwood did.

Q    And what did he take them to New York for?

A    To pick up some drugs.

Q    What kind of car did Talley drive; do you remember?

A    All I know is it was a gray car.

Q    "Pepsi," do you remember an individual by the name of Doug Moody, "Little Doug," he was called?

A    Yes.

Q    Do you know what happened to him?

A    Yes.
Q    What happened to him?
A    "J.R." killed him.
Q    Were you  --
A    Finished killing him.
Q    Who started killing him?

2549
A    They was in the house.  "Little Doug" jumped out the window.
BY MR. VICK:
Q    Who was in the house?
A    "J.R.," "Whitey."
Q    Were you there?
A    I was on the corner.
Q    In the house where "Little Doug" was killed at?
A    I was on the other side of the street.
Q    Did you hear any shots that night?
A    About two or three.
Q    After you heard those shots, did anyone come out of that house?
A    Did anybody come out?
Q    Right.
A    "J.R." came out, "J.R." and "Whitey."
Q    Where did they go when they came out of that house?
A    Well, Linwood had came  --
Q    I'll withdraw that.  When "J.R." and "Whitey" came out of the house, was it after you heard the shots fired?
A    Uh-huh.
Q    What did they do when they came out of that house?

2550
A    Well, after they came out I didn't have any reason to leave because I was going back in the house.  So I went back in the house to straighten up the house.  Then "J.R.," he came back in the house and asked me for the knife.
Q    What knife?
A    It is a military knife.
Q    All right.  And could you describe that military knife?
A    It had a black handle on it, kind of a big knife.
Q    All right.  Where had you gotten that knife?
A    Well, I got that knife  --  the knife was laying on the table.  They used to bring the knife to Curt for Curt to keep.
Q    Who is they?
A    "Whitey" and "O" and "J.R."
Q    Prior to the night that "Little Doug" was killed, did they ever bring you that knife before?
A    Yes.
          MR. McGARVEY:  I object to "they."  Who

brought it?

BY MR. VICK:

Q   Who brought you that knife?  Was there a particular night where they brought you that knife, where somebody brought you that knife and it was covered with something?

A   Blood.

Q   Who brought you that knife when it was covered with blood?

A   "O."

Q   And was that prior to or after the killing of Doug Moody?

A   That was before.

Q   All right.  On the night of the killing of Doug Moody, did you give that knife to anyone?

A   "J.R."

Q   Did you see "J.R." use that knife that night?

A   I didn't see him use it on him because I had left out the house.

Q   Did "J.R." come back and give you that knife later that night?

A   Yes.

Q   All right.  What did he give you that knife for?

A   He wanted me to get rid of the evidence.  I took and threw it across the fence.

Q   When he gave you that knife back, did it have anything on it?

A   Blood on it.

Q   Is that the same night Doug Moody was killed?

A   Yes.

Q   After Doug Moody was killed, did you go anywhere?

A   Up on Norton Street.

Q   With who?

A   With Linwood, Curt, "J.R.," Sandra.

Q   Do you know whether Sandra Reavis was involved in any way with "J.R.," "C.O.," or "Whitey" in the sale or distribution of cocaine?

A   Yes.

Q   What do you know?  Tell the ladies and gentlemen of the jury.

A   She used to get cocaine from them to sell it.

Q   Did you witness that?

A   What?

Q   You saw that?

A   Yes.

        MR. WAGNER:  I object to "them," Your Honor.  If he would ask specifically who.

        THE COURT:  Mr. Vick, make it specific.

BY MR. VICK:

Q   Specifically, who do you know that Sandra got