**MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙 𝕮𝖔𝖚𝖗𝖙 | District Eastern District of Virginia |
|---|---|
| Name of Movant James H. Roane, Jr. | Prisoner No. 206197    Case No. 92CR68 —3 |
| Place of Confinement Mecklenburg Correctional Center, Boydton, VA | 3:98CV360 |

| UNITED STATES OF AMERICA | v. James Roane |
|---|---|
| | (name under which convicted) |

## MOTION

1. Name and location of court which entered the judgment of conviction under attack <u>United States District Court, Eastern District of Virginia, Richmond, VA</u>

2. Date of judgment of conviction <u>June 1, 1993</u>

3. Length of sentence <u>Death, with concurrent sentences of life imprisonment</u>

4. Nature of offense involved (all counts) <u>CCE Murder, 21 U.S.C.Sec. 848(e) (three counts); engaging in CCE, 21 U.S.C. Sec. 848(a) (one count); conspiracy to possess cocaine base with intent to distribute, 21 U.S.C. Sec. 846 (one count); violence in aid of racketeering, 18 U.S.C. Sec. 1959 (five counts); use of firearm, 18 U.S.C. Sec. 924(c) (four counts); possession of cocaine base with intent to distribute, 21 U.S.C Sec. 841(a)(1) (one count).</u>

5. What was your plea? (Check one)
   (a) Not guilty    XX
   (b) Guilty    ☐
   (c) Nolo contendere    ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   _____

   _____

   _____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury    ☒
   (b) Judge only    ☐

7. Did you testify at the trial?
   Yes ☐ No ☒

8. Did you appeal from the judgment of conviction?
   Yes ☒ No ☐

F I L E D
JUN 1 1998
CLERK, U.S. DISTRICT COURT RICHMOND, VA

R E C E I V E D
JUN – 1 1998
CLERK, U.S. DISTRICT COURT RICHMOND, VA

AO 243 (Rev. 5/85)

9. If you did appeal, answer the following:

    (a) Name of court__U.S. Court of Appeals, Fourth Circuit__

    (b) Result _____Affirmance_____

    (c) Date of result __July 8, 1996 (rehearing denied October 28, 1996, and certiorari denied June 2, 1997)__

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?
Yes ☐ No ☒

11. If your answer to 10 was "yes," give the following information:

    (a)(1) Name of court _____

      (2) Nature of proceeding _____

      (3) Grounds raised_____

      (4) Did you receive an evidentiary hearing on your petition, application or motion?
      Yes ☐ No ☐

      (5) Result_____

      (6) Date of result _____

    (b) As to any second petition, application or motion give the same information:

      (1) Name of court _____

      (2) Nature of proceeding _____

      (3) Grounds raised_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result_____

(6) Date of result _____

(c) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?
(1) First petition, etc.    Yes ☐ No ☐
(2) Second petition, etc.   Yes ☐ No ☐

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

12. State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION: If you fail to set forth all ground in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: Denial of effective assistance of counsel.

Supporting FACTS (state *briefly* without citing cases or law) Trial counsel unreasonably failed to: move for change of venue; conduct an adequate investigation of evidence relating to guilt or innocence; adequately interpose objections to or challenge the government's evidence at the guilt phase; protect Mr. Roane's right to presence during voir dire; conduct an adequate investigation of possible mitigating evidence for use at the sentencing phase; present an adequate mitigation case at the sentencing phase.

B. Ground two:

Discrimination against women in selection of jury.

Supporting FACTS (state *briefly* without citing cases or law): At trial, the prosecution disproportionately exercised peremptory strikes against women. Mr. Roane expects that discovery will demonstrate that there was no neutral rationale for the exercise of peremptory strikes, and that the strikes represented intentional exclusion of female jurors.

C. Ground three: Denial of statutory right to justice without discrimination.

Supporting FACTS (state *briefly* without citing cases or law): African Americans such as Mr. Roane have been disproportionately and discriminatorily selected for prosecution under federal death penalty legislation, in contravention of their right to justice without discrimination.

D. Ground four: _Prosecutorial misconduct_

Supporting FACTS (state *briefly* without citing cases or law): On information and belief, prosecutors in the case: misled the court and defense counsel about whether witnesses were in Witness Protection Program or protective custody; failed to provide defense counsel with exculpatory evidence in the possession of the government; and made use of evidence they knew or should have known was perjurious.

SEE ATTACHMENT

13. If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them: ___

Ineffective assistance of counsel: not presented on appeal because 4th Circuit law precludes raising issue on direct appeal and requires reserving it for Sec. 2255 proceedings. Prosecutorial misconduct: not presented on appeal because information supporting it was not available in the trial record; and further discovery remains necessary. SEE ATTACHMENT

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?
Yes ☐ No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing David P. Baugh, 233 South Cherry St., Richmond, VA 23241
Arnold R. Henderson, 2509 E. Broad Street, Richmond, VA 23223

(b) At arraignment and plea David P. Baugh, 233 South Cherry St., Richmond VA 23241
Arnold R. Henderson, 2509 E. Broad Street, Richmond, VA 23223

(c) At trial David P. Baugh, 233 South Cherry St., Richmond, VA 23241
Arnold R. Henderson, 2509 E. Broad Street, Richmond, VA 23223

(d) At sentencing David P. Baugh, 233 South Cherry St., Richmond, VA 23241
Arnold R. Henderson, 2509 E. Broad Street, Richmond, VA 23223

(e) On appeal David P. Baugh, 223 South Cherry St., Richmond, VA 23241

Seth P. Waxman, 2555 M St., N.W., Washington, D.C. 20037

Scott L. Nelson, 2555 M St., N.W., Washington, D.C. 20037

(f) In any post-conviction proceeding

N/A

(g) On appeal from any adverse ruling in a post-conviction proceeding _____ N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
Yes ☒ No☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

(b) Give date and length of the above sentence: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☐

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

5-29-98
(date)

_____
Signature of Movant

**ATTACHMENT**

12. (continued)[1]

    E.    Ground Five: Juror Misconduct

        Supporting FACTS:  On information and belief, jurors in this case were exposed to extrinsic information that biased their consideration of the case.

    F.    Ground Six: Actual Innocence

        Supporting FACTS:  James Roane is actually innocent of the murder of Douglas Moody, and of the CCE convictions.

    G.    Ground Seven:  Petitioner Roane adopts all additional claims raised by his copetitioners, Richard Tipton and Corey Johnson, to the extent those claims are applicable to him.

---

[1] By order dated May 26, 1998, the Court granted Petitioner a two-week extension, until June 15, 1998, to file his petition under § 2255. In an abundance of caution, in view of the statute of limitations imposed by § 2255, Petitioner is filing this petition on June 1, 1998. Petitioner will file a Memorandum in Support of the petition, containing additional factual material and legal argument, on or before June 15, 1998.

13. (continued)

Ground E (Juror Misconduct) was not presented on appeal

because information supporting it was not available in

the trial record, and further discovery remains

necessary.

Ground F (Actual Innocence) was not presented on appeal

because it relies on information not available in the

trial record.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

MAR 1 5 1999

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
) Criminal No. 92CR68
v. )
) Civil No. 97CV895
JAMES H. ROANE, Jr. )
)
Defendant. )
)

## MOTION OF JAMES H. ROANE, Jr. TO AMEND HIS MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

James H. Roane, Jr., a prisoner in the custody of the United States, under

sentence of death, now being held at Sussex State Prison, Waverly, Virginia, respectfully

requests that he be permitted to amend his Motion to Vacate, Set Aside or Correct Sentence

Pursuant to 28 U.S.C. § 2255. Co-movants Richard Tipton and Corey Johnson amended

their petitions prior to the filing of the government's opposition, and Mr. Roane's

amended motion would incorporate the new grounds for relief contained in the amended

motions of Messrs. Tipton and Johnson, which the government has already addressed in

its opposition.[1] Amendment of the motion will not prejudice the government, will allow

Mr. Roane to present additional grounds for relief, and will avoid the possibility of

inconsistent results between Mr. Roane on one hand, and Messrs. Tipton and Johnson on the

---

[1] Mr. Roane's amended motion asserts that the testimony of Priscilla Greene was
false in a manner not addressed in the amended motions of Messrs' Tipton and Johnson;
*i.e.*, that she lied about her whereabouts on the night Douglas Moody was murdered, and
about who she saw at the scene of that murder. Mr. Roane has no objection to the
government's filing an additional response to that allegation.

other. The government advises counsel for Mr. Roane that it takes no position with regard to this motion to amend.

For the reasons stated, Mr. Roane respectfully requests that the Court accept the attached Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.

Dated: March 15, 1999

Respectfully submitted,

JAMES H. ROANE, Jr.

By: _____

Scott L. Nelson
Paul F. Enzinna
Michael J. Barta (VSB # 30706)
MILLER, CASSIDY, LARROCA
   & LEWIN, L.L.P.
2555 M Street, N.W.
Washington, D.C. 20037
(202) 293-6400

Counsel for James H. Roane, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

UNITED STATES OF AMERICA,

   Plaintiff,

  v.

JAMES H. ROANE, Jr.

   Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Criminal No. 92CR68

Civil No. 97CV895

## <u>ORDER</u>

   This matter is before the Court on the motion of James H. Roane, Jr., for leave to amend his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255. Having shown good cause, the Court hereby GRANTS the motion, and directs that James Roane's Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 be filed with the Clerk of the Court.

   Let the Clerk send a copy of this Order to all counsel of record.

   And it is SO ORDERED.

             _____
             United States District Judge

Dated: _____



RECEIVED

MAR 15 1999

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal No. 92CR68 |
| v. | ) | |
| | ) | Civil No. 97CV895 |
| JAMES H. ROANE, Jr. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AMENDED MOTION OF JAMES H. ROANE, Jr. TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

James H. Roane, Jr., a prisoner in the custody of the United States, under

sentence of death, now being held at Sussex State Prison, Waverly, Virginia, hereby amends

his previous Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255,

and the memorandum in support thereof. Mr. Roane incorporates in this motion and

memorandum (1) the entirety of his initial motion and memorandum in support; (2) each of

the grounds for relief stated by his codefendants, Richard Tipton and Corey Johnson; and (3)

the following grounds for relief:

## I. THE SUBSEQUENT TRIAL OF MR. ROANE'S CODEFENDANT VERNON LANCE THOMAS REVEALED ADDITIONAL FACTS SUPPORTING MR. ROANE'S CLAIMS FOR RELIEF

Vernon Lance Thomas was indicted along with Richard Tipton, Corey

Johnson, and Mr. Roane. However, Thomas' case was severed, and he was tried

separately. United States v. Thomas, No. 9268CR04 (E.D. Va.). The transcript of Mr.

Thomas' trial reveals significant evidence supporting Mr. Roane's claims for relief.



RECEIVED

MAR 1 5 1999

CLERK, U.S. DISTRICT COURT
RICHMOND

### A. Priscilla Greene's Testimony

James Roane received the death penalty for a single murder, that of Douglas Moody. The critical evidence tying Roane to that murder was supplied by Priscilla "Pepsi" Greene.[1] Greene's testimony was particularly crucial in Roane's case. She claimed that Moody was killed "because [Johnson] and [Tipton] and them didn't want [Moody] to work in that area . . . [s]elling cocaine." Trial Transcript, United Staes v. Roane ["Tr."] at 2553. This testimony – the basis for which was never established – was the *only* evidence that Moody was killed in furtherance of the CCE, and is therefore the single piece of evidence supporting Roane's death sentence.

It is readily apparent that Ms. Greene lied at Roane's trial regarding her role as a drug seller. See Richard Tipton's First Amendment to Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 and to Memorandum in Support of Petition at 4-7. At Roane's trial, she stated flatly that she "never sold cocaine." Tr. 2546. However, in the Thomas trial, she admitted her involvement in cocaine sales. Trial Transcript, United States v. Thomas, Exhibit A hereto, at 421-22. Had this information

---

[1] In addition to Ms. Greene, Denise Berkeley also testified that Roane killed Moody. She testified at Roane's trial that on the night of Moody's murder, she and "Mousey" Armstrong had gone to see a man whose name she could not recall, and were smoking crack cocaine with him and another woman in the front apartment of the house where Moody was shot. Tr. 1694-96. At Thomas' trial, Ms. Berkeley recalled that the man in whose apartment she smoked crack that night was Stanley Smithers. Exh. A at 223. Smithers was a witness at Roane's trial, but was never asked about events the night Moody was killed.

In addition to Berkeley and Greene, Robert "Papoose" Davis testified that one or two days before Mr. Moody's murder, he gave Roane a pistol. This pistol was never linked to the Moody murder, nor was there any evidence that Roane used, or even was armed with, *any* pistol at the time of the murder. Davis also stated that on the night Mr. Moody was killed, Roane and Tipton came to Davis' house "running, huffing and puffing," saying "I got him," and that they couldn't stay at Davis' house because it was "hot." Tr. 1896.

been known to the defense, counsel might well have undermined fatally the credibility of this most critical witness. But more importantly, in addition to her lie on this subject, Ms. Greene lied about the Moody murder.

The government theorized that Mr. Moody was shot in an apartment at the back of a house, and that he then leapt through a window, after which James Roane stabbed him. Ms. Greene testified at Roane's trial that on the night of the murder, she was on the corner across the street, when she heard gun shots, after which Roane and Tipton came out of the house. Tr. 2548-49. She testified that she then went back in the house from which Moody, Tipton and Roane had just come, to "straighten up." She claimed that Roane then came in the house and asked her for a knife. Tr. 2550. According to Ms. Greene, she then went back outside, and after Roane "finished killing" Mr. Moody,[2] he asked her to dispose of the knife. Tr. 2548, 2551.

However, Ms. Greene's testimony in the subsequent trial of Vernon Lance Thomas reveals that her testimony against James Roane was not true. Ms. Greene testified at Thomas' trial that prior to the killing, she was in fact *inside* the apartment in which Moody allegedly was shot. Exh. A at 426. In addition, she revealed in Thomas' trial what she had concealed in Roane's – that Curt Thorne was also in the apartment at the time Moody was shot. Ms. Greene claimed that "they excused [her] out of the house," and she went out to the corner. She then heard gunshots, after which *Thorne* ran out of the house, followed by Roane, who "ran up the street." Id. Then, she claimed, Moody jumped out the window, and lay on the porch, while Ms. Greene returned to the

_____

[2] Despite her claim that Roane "finished killing" Mr. Moody, Greene admitted that she did not see Roane use the knife on Mr. Moody. Tr. 2551.

apartment to "clean up." She claimed that while she was "clean[ing] up," Roane asked

her for the knife. Id. at 426-27.

The discrepancies in Ms. Greene's accounts are critical. Her testimony at

Thomas' trial regarding her own and Curt Thorne's presence in the apartment where

Moody was shot would have further undermined her already shaky credibility. Thorne

was Ms. Greene's boyfriend, Tr. 2544, and, as Ms. Greene finally revealed in the Thomas

trial, she helped him sell drugs. Exh. A at 421-22. Ms. Greene's obvious motive to lie –

to prevent exposure of Thorne's and, possibly, her own role in the murder – was hidden

from the defense in Roane's trial. Ms. Greene's credibility is all the more important in

light of the fact that an eyewitness to the Moody murder has come forward to say that

James Roane did not commit the killing. See Declaration of Paul F. Enzinna, Exhibit B

to Reply Memorandum in Support of Motion of James H. Roane, Jr. to Vacate, Set Aside or

Correct Sentence Pursuant to 28 U.S.C. § 2255.

### B.     Prosecutorial Misconduct

Ms. Greene testified in Mr. Thomas' trial on April 28, 1993. It simply

strains credulity to believe that, when she testified at Mr. Roane's trial barely three

months earlier, the government was unaware of her drug selling activities, or that she and

her boyfriend/drug-selling partner Curt Thorne were in the apartment where Douglas

Moody was shot.[3] Moreover, James Roane was sentenced to death *after* Ms. Greene's

_____

[3] In any event, James Roane is entitled to discovery to determine whether the prosecution in fact knew at the time she testified that Ms. Greene's testimony was false. See Bracy v. Gramley, 117 S.Ct. 1793, 1799 (1997) ("[w]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry" (citation omitted)).

testimony in the Thomas case, and after prosecutors unquestionably knew of the discrepancies in her testimony.

"The government violates its duty to deal fairly with a defendant where it either solicits testimony it knew or should have known to be false or allows such testimony to pass uncorrected." United States v. Ellis, 121 F.3d 908, 927 (4th Cir. 1997); United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994). Reversal is required where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Ellis, 121 F.3d at 927 (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)).

There is no question that Ms. Greene's false testimony "could have" affected the judgment of the jury in this case. Ms. Greene claimed that James Roane killed Moody after he and Tipton emerged from the apartment where Moody was shot. Had the jury known that, as Greene testified in the Thomas trial, Greene and her boyfriend – with whom Greene sold cocaine – were in the apartment prior to the killing, and that Greene's boyfriend emerged from the apartment after the shooting, the jury most likely would have discounted her testimony in its entirety. Granted, Denise Berkeley also claimed that Roane stabbed Douglas Moody, but as noted, Ms. Greene's testimony that "[Johnson] and [Tipton] and them didn't want . . . 'Little Doug' to work in that area . . . selling cocaine," Tr. 2553, was the *only* evidence that Moody had been killed "in furtherance" of the alleged CCE. Had the jury known of her changing story, it is at least "reasonably likely" the jury would have found no evidence sufficient to support James Roane's death penalty for this murder.

"The proper role of the criminal prosecutor is not simply to obtain a conviction, but to obtain a *fair* conviction." Brown v. Borg, 951 F.2d 1011, 1015 (9th Cir. 1991) (emphasis in original). Prosecutors have an affirmative duty to come forward and correct misleading testimony, e.g., Brown v. Wainwright, 785 F.2d 1457, 1464 (11th Cir. 1986), and the use of tainted testimony is "viewed seriously and its effects are exceedingly carefully scrutinized." Borg, 951 F.2d at 1015 (citation omitted). This is even more so where the testimony at issue is critical to the government's case. Rickman v. Dutton, 864 F. Supp. 686, 705 (M.D. Tenn. 1994). Ms. Greene's testimony was absolutely central to Mr. Roane's death sentence, and the fact that her testimony was false demands that the sentence be set aside.

## II. THE PROSECUTION VIOLATED 18 U.S.C. § 201(C)(2) BY PURCHASING TESTIMONY FROM COOPERATING WITNESSES

### A. The Prosecution Violated 18 U.S.C. § 201(C)(2)

Section 201(c)(2) of Title 18 of the United States Code punishes:

> Whoever . . . directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing or other proceeding, before any court . . . .

There can be no question that at James Roane's trial, the prosecution gave "anything of value" to key witnesses against Mr. Roane, "for or because of" their testimony. James Roane's death sentence rests on testimony purchased by the prosecution in violation of § 201(c)(2), and must therefore be set aside. United States v. Singleton, No. 97-3178 (10th Cir. July 1, 1998), 144 F.3d 1343, vacated, 144 F.3d 1361 (10th Cir. July 10, 1998),

decision of District Court affirmed, No. 97-3178 (10th Cir. Jan. 8, 1999);[4] United States v. Fraguela, Cr. No. 96-0339 (E.D. La. Aug. 27, 1998), 1998 U.S. Dist. LEXIS 14347; United States v. Lowery, 15 F. Supp.2d 1348 (S.D. Fla. 1998); but see United States v. Reid, 19 F. Supp. 2d 534 (E.D. Va. 1998).

Nearly every fact witness against Mr. Roane received a "thing of value" from the government in exchange for his or her testimony. Some witnesses were immunized, some placed in the Witness Protection Program, and some received governmental assistance in obtaining reduced sentences. The following are merely examples of the tainted testimony against Mr. Roane.

Mr. Roane's death sentence, imposed under 21 U.S.C. § 848(e)(1), is dependent upon a finding that Mr. Roane committed murders while "engaging in or working in furtherance of a continuing criminal enterprise," and the government pinned its claim that the defendants engaged in such a highly-organized "continuing criminal enterprise" in large part upon the testimony of Greg Scott. Scott's testimony concerned events occurring in New York and New Jersey – in which James Roane concededly had no part. In his opening statement, Mr. Vick advised the jury explicitly that the government's CCE case would be proved by evidence of events in New York and New Jersey. Mr. Vick promised that Scott would testify that the "New York Boyz":

> [S]at around in New Jersey, in Trenton, and had meetings
> and discussed what physical acts of retaliation they should
> take against people who had wronged them and decided
> whether it would hurt business to hit this person or whether
> it would not hurt business.

---

[4] A copy of the Tenth Circuit's original decision in Singleton is attached as Exhibit B.

Tr. 789-90. In closing, the government made explicit its theory that "the New York Boyz continued their actions here in the City of Richmond." Tr. 2962. To prove the required element of supervision, the government turned to Greg Scott's testimony, asking the jury to superimpose the New York/New Jersey organization on the Richmond events. Tr. 2983. Prosecutors also turned to Scott's testimony to connect Torrick Brown's murder to racketeering, arguing that other "New York Boyz" joined James Roane in a domestic killing in order to maintain their position in the CCE:

> Remind yourself again of the testimony of Greg Scott.
> Remember what he told you about the New York Boyz?
> . . . [W]hen they got together for protection, each and every
> member of the New York Boyz had to go in on a crime of
> violence or they were no longer a member of the New York
> Boyz.

Tr. 3004; see also Tr. 3005, 3007.

Most critically, James Roane's death sentence is premised entirely on the supposed New York – Richmond connection. The *only* evidence supporting the claim that Douglas Moody was killed in furtherance of the CCE was "Pepsi" Greene's bald assertion – unsupported by any facts – that the killing was drug-related. Tr. 2553. In closing, the government buttressed that testimony with Scott's:

> Remember, Doug Moody worked for Peyton Maurice
> Johnson. They didn't want anyone else operating in their
> territory, *consistent with the testimony of Greg Scott.*

Tr. 2995 (emphasis added).

Moreover, in the penalty phase, the evidence supporting the government's claim that Moody was murdered after "substantial planning and premeditation" was paltry. There was no evidence that James Roane had ever expressed an intention to kill Moody prior to the murder. In fact, Denise Berkley testified for the government that

- 8 -

she heard that *Moody* instigated the confrontation, and that Moody had been purchasing drugs from Corey Johnson. Tr. 1700-02. In order to bolster its case on this essential aggravating factor, the government once again turned to Scott:

> Remind yourself of that credo following them down here from New York, from New Jersey, with the New York Boyz, where they clearly intended to take over blocks in New Jersey. They brought that mind set, that modus operandi, that way of operating, to Richmond. And indeed, they implemented it in the most violent fashion that they could. They laid waste the bodies that they promised they would lay waste in order to take over. Clear premeditation.

Tr. 3886-87.

Sterling Hardy also provided critical, inflammatory testimony against James Roane. He testified that James Roane shot Louis Johnson, Tr. 2171, because he "didn't like the guy." Tr. 2174. He also testified to the shooting of Martha McCoy and Torrick Brown, stating that when Anthony Mack said that Martha McCoy had not been killed, James Roane assured him that "'[t]he bitch is dead' because he knows he can shoot." Tr. 2184. Finally, Hardy testified to jailhouse conversations in which the killing of witnesses was allegedly discussed. Tr. 2191. These allegations regarding Martha McCoy and "the fact that from jail, while incarcerated, these defendants continued to try to have people killed" became a centerpiece of the government's argument for the death penalty. Tr. 3892.

Jerry Gaiters' testimony was similarly damning to James Roane. He testified that Mr. Roane supervised at least six underlings in the alleged CCE, Tr. 2324, and proof of such supervision was a necessary element of the CCE allegations. Gaiters also testified to Mr. Roane's involvement in the shooting of Louis Johnson, Tr. 2334, and helped tie Mr. Roane to the murder of Peyton Maurice Johnson. Tr. 2328. Finally,

Gaiters testified that Mr. Roane told him that Roane, Tipton and Johnson were "planning on taking over" the Newtowne area. Tr. 2330. As discussed above, this testimony was critical to the government's case in favor of the death penalty. Tr. 3886-87.

All of this testimony, upon which James Roane's death sentence rests, was bought and paid for by the prosecution.[5] Scott testified that in exchange for his testimony, the government "will speak up for me in behalf of somehow I'll get a deal." Tr. 897. Specifically, the government agreed to seek a downward departure for Scott, in exchange for his testimony. Tr. 898. Hardy and Gaiters also testified in exchange for the government's promise of a motion for downward departure. Tr. 2192, 2226-28, 3139-40. Hardy testified that he "anticipate[d]" a reduction in sentence in return for his testimony, Tr. 2228, and Gaiters acknowledged Mr. Vick's statement that, in exchange for his testimony, the government would advise the court sentencing him of his cooperation. Tr. 2192.

This kind of bartering for favorable testimony is illegal. Section 201(c)(2), by its terms, expressly forbids it. By its use of the unmodified term "[w]hoever," the statute's broad language clearly applies to the actions of prosecutors, and this Court is "bound to take Congress at its word." Oubre v. Entergy Operations, Inc., 118 S.Ct. 838, 841 (1998). As the Supreme Court stated in Brogan v. United States, 118 S.Ct. 805, 809-12 (1998):

> [I]t is not, and cannot be, our practice to restrict the
> unqualified language of a statute to the particular evil that
> Congress was trying to remedy – even assuming that it is
> possible to identify that evil from something other than the

---

[5] Section 201(c)(2) requires no showing of corrupt intent or intent to influence. United States v. Johnson, 621 F.2d 1073, 1076. Thus, the statute is violated even if the government acted in good faith, without intent to influence the witnesses' testimony.

> text of the statute itself. . . . Courts may not create their
> own limitations on legislation, no matter how alluring the
> policy arguments for doing so.

Section 201(c)(2) "could not be more clear." <u>Singleton</u>, Exh. B at 3. Moreover, the statute is to be broadly construed to further its purpose of deterring corruption. <u>United States v. Hernandez</u>, 731 F.2d 1147, 1149 (5th Cir. 1984); <u>United States v. Evans</u>, 572 F.2d 455, 480 (5th Cir. 1978).

Section 201(c)(2) operates "to prevent fraud upon the federal courts in the form of inherently unreliable testimony," <u>Singleton</u>, Exh. B at 3, and to do so, must govern the actions not only the actions of the defendant, but also those of the prosecution. The statute "indicates Congress's belief that justice is undermined by giving, offering, or promising anything of value for testimony. If justice is perverted when a criminal defendant seeks to buy testimony from a witness, it is no less perverted when the government does so." <u>Id.</u>

There can be no serious dispute that leniency is a "thing of value." Again, the statutory term "anything of value" is unmodified, and "must be broadly construed to carry out its congressional purpose." <u>See United States v. Williams</u>, 705 F.2d 603, 622-23 (2d Cir. 1983). Courts have consistently rejected arguments that the term "anything of value" is limited to tangible things of monetary value. <u>United States v. Marmolejo</u>, 89 F.3d 1185, 1191 (5th Cir. 1996); <u>Williams</u>, 705 F.2d at 622-23. In fact, "[i]t is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence." <u>United States v. Cervantes-Pacheco</u>, 826 F.2d 310, 315 (5th Cir. 1987); <u>see also United States v. Meinster</u>, 619 F.2d 1041, 1045 (4th Cir. 1980) ("[w]e think it obvious that promises of

immunity or leniency premised on cooperation in a particular case may provide a strong inducement to falsify in that case").

### B.    Mr. Roane's Trial Counsel Were Ineffective in Failing to Object

A claim of ineffective assistance of counsel requires that the defendant show first, that "counsel's representation fell below an objective standard of reasonableness," and second, that he was prejudiced by the deficient performance. Turner v. Williams, 35 F.3d 872, 894 (4th Cir. 1994) (quoting Strickland v. Washington, 466 U.S. 668, 687-88 (1984)). While the standard of effective representation is constant, the severity of the sentence faced by the defendant should be considered in determining whether counsel's performance meets this standard. Vela v. Estelle, 708 F.2d 954, 964 (5th Cir. 1983), cert. denied, 464 U.S. 1053 (1984).

Prejudice is shown where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Pruett v. Thompson, 771 F. Supp. 1428, 1445 (E.D. Va. 1991), cert. denied, 510 U.S. 984 (1993) (citation omitted); Turner, supra, 35 F.3d at 894. Where the defendant challenges a death sentence:

> [P]rejudice is established when "there is a reasonable probability that, absent [counsel's] errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."

Turner, supra, 35 F.3d at 894 (citation omitted). Finally, where, as is the case with respect to the Moody murder and Roane's death sentence, a verdict is "only weakly supported by the record," errors by counsel are more likely to have prejudiced the defendant. Strickland, 466 U.S. at 696; see also Blackburn v. Foltz, 828 F.2d 1177, 1186

- 12 -

(6th Cir. 1987) (fact that evidence was "not overwhelming" makes prejudice more likely).

James Roane's trial counsel fell below an objective standard of reasonableness in failing to object to the government's use of testimony procured in violation of 18 U.S.C. § 201(c)(2). As described above, it was apparent from the witnesses' testimony that the government had provided them "anything of value" in exchange for their testimony, in clear and obvious violation of the terms of § 201(c)(2).

This failing by trial counsel severely prejudiced Mr. Roane. Nearly every fact witness against him was compensated for his or her testimony in violation of § 201(c)(2). Moreover, as described above, testimony bought by the government was pivotal to his conviction. There can be no question that, had his trial counsel not failed to object, and had they excluded these tainted witnesses, the outcome of Mr. Roane's trial would have been vastly different.

Dated: March 15, 1999

Respectfully submitted,

JAMES H. ROANE, Jr.

By: _____
Scott L. Nelson
Paul F. Enzinna
Michael J. Barta (VSB # 30706)
MILLER, CASSIDY, LARROCA
   & LEWIN, L.L.P.
2555 M Street, N.W.
Washington, D.C. 20037
(202) 293-6400

Counsel for James H. Roane, Jr.

A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,

Plaintiff;

v.

CRIMINAL ACTION
9268CR04

VERNON LANCE THOMAS,

Defendant.

----------------------------------------

VOLUME II

April 28, 1993
Richmond, Virginia
9:30 a.m.

BEFORE:   HONORABLE JAMES R. SPENCER
United States District Judge

APPEARANCES:   HOWARD C. VICK, JR., ESQ.
WILLIAM H. PARCELL, III, Esq.
Office of the United States Attorney
Main Street Centre
Richmond, Virginia  23219
Counsel for Government;

REGINALD M. BARLEY, ESQ.
2025 East Main Street
Richmond, Virginia 23223;
CARY B. BOWEN, ESQ.
304 West Broad Street
Richmond, Virginia  23219
Counsel for Defendant.

JEFFREY B. KULL
OFFICIAL COURT REPORTER

P-R-O-C-E-E-D-I-N-G-S

A    It was mostly "O" and "V" and "J.R."

Q    Was Doug Talley a worker or partner?

A    He was mostly a worker.

Q    I direct your attention to January 13th, 1992. On that day, are you familiar with the fact that an individual by the name of Doug Moody was killed?

A    Yes, I was.

Q    And were you present in the house where Doug Moody was killed?

A    Yes.  I was present in the front of the house from the house in the back where he was.

Q    Could you tell the ladies and gentlemen of the jury what occurred?

A    It was me, "Mousey," and some other people, two other people was in the house.  And all of a sudden we heard glass break.  And a few minutes later, we heard a gunshot.  Me and "Mousey," we went outside, went around to the back and we seen Doug Moody standing on the porch and he was hollering and holding his hand up, stop "J.R.," don't do that no more, stab me know more.  And he just kept on stabbing him.

Q    "J.R." was stabbing Doug Moody?

A    Yes.

Q    How many different times would you say you saw

"J.R." stab Doug Moody?

A    At least 19, 20 times.

Q    And where were you in the house in relation to where you heard the glass break and heard a shot?

A    Where was I?

Q    Yes.

A    It was on the corner of Clay and -- I forgot the name of the street. But the house is white. It has got a red door in the front. It has got a fence around the sides.

Q    All right. And who lived -- were there two parts to this house?

A    Yes, there was.

Q    Who lived in the front part?

A    It was staining heir.

Q    Is he also known as Stanley Smithers?

A    Yes.

Q    Is that where you were when you heard the noise?

A    Yes, I was.

Q    Who lived in the back part of the house?

A    It was Curt and "Pepsi."

Q    Is that where Doug Moody was?

A    Yes.

Q    All right. After you saw James Roane stab Doug

Moody, what happened?

A    He came running over to where me, "Mousey," "Pepsi," Linwood, Curt, and Sandra was.

Q    Who is he?  Who came running over to you?

A    "J.R."

Q    What happened when he came running over?

A    He gave the knife to "Pepsi," and told "Pepsi," to get rid of it.

Q    What kind of knife was it?

A    It looked like a kitchen butcher knife.

Q    Where was Doug Moody at that point?

A    He was like trying to get off the porch.  He was stumbling and staggering off the porch and he was over by the fence between the fence and an alley.

Q    After "J.R." came and gave the knife to "Pepsi," and said get rid of it, what did you do?

A    Me and "Mousey" stayed and Linwood, "J.R.," Sandra, Curt, and "Pepsi," got in the car and left.

Q    Did you go to 1212 West Moore Street after witnessing that murder?

A    First we went to Hancock Street.  "Mousey's" brother 's house.  We told him what had happened. Then we went to Moore Street.

Q    Who was at Moore Street when you got there?

A    When we got there, it was "J.R." -- no, it was

"V," "E.B.," "O," and some other guys.

Q    Did "Whitey" go?

A    Yes.  "Whitey" was there.

Q    Did you hear "Whitey" talk about the killing of Doug Moody?

A    "Whitey" was  --  he was all excited, he was happy.  He said that him and Doug Moody had gotten to fighting, and you know, he said something about Doug Moody was trying to hurt him so he was trying to hurt him back.

Q    Who was he saying this to?

A    He was saying it to all of us.

Q    Was "V" one of the ones he was saying it to?

A    Yes.

Q    And did "V" say anything to "Whitey?"

A    He told him, the rest of them told him you need to  --

          MR. BARLEY:  I object.  I think he specifically asked first did "V" and he said did the others.  Could we get one answer at a time?

BY MR. VICK:

Q    What did "V" say for "Whitey?"

A    He told him he had to leave for awhile.

Q    Why did "V" think he had to leave?

          MR. BARLEY:  Objection.

THE COURT: Sustained.

BY MR. VICK:

Q    What exact exactly did "V" say?

A    He just told him he had to leave for awhile.  He had to stay in hiding.

Q    What were they talking about at the time "V" said you had to leave for awhile?

A    They was talking about Doug Moody, what happened with him and Doug Moody got to fighting, whatever.

Q    Do you know why Doug Moody was killed?

A    It had something to do with something about some drugs or some tapes.

Q    I direct your attention to the next day, January 14th, 1993 three 1992.  On that day, did you have occasion while on Norton Street to see "J.R." and "V?"

A    Yes.

Q    Did they have anything with them on that day?

A    Yes.  They had came in the house on Norton Street with guns.

Q    What kind of guns?

A    They was two handguns and two long guns, like Uzis.

Q    Did they ask you to do anything for them?

A    Yes.  After they got the guns out and they was

Q    Your hearing has been affected by your being shot, also?

A    Yes.  I'm completely deaf on the left ear.

Q    If you have problems hearing me, just ask me to speak up.  I'll yell it.

A    Okay.

Q    When did you meet "O" for the first time?

A    When did I meet him?

Q    When?  When was it?

A    When I met him?

Q    Right.

A    About three or four months before I was shot.

Q    Did you know an individual by the name of Curt Thorne?

A    Yes.

Q    Tell the ladies and gentlemen of the jury who Curt Thorne is?

A    Curt Thorne was my boyfriend.

Q    Do you know how Curt Thorne supported himself?

A    Yes.  Curt sold drugs for "Whitey" and "O."

Q    What kind of drugs did he sell for "Whitey" and "O?"

A    Crack, cook-'em-up.

Q    Did you help Curt in any way sell the drugs?

A    Yes.

Q    What did you do for him?

A    Well, people come to the door, and maybe sometimes I would pass the cocaine to them and get the money.

Q    Did "J.R." ever ask you if you wanted to sell drugs for him?

A    Yes.  I met "J.R." before I met the rest of the boys.  He asked me to sell drugs and I told him no.

Q    Why didn't you want to sell drugs for him?

A    Because I was a user.  I told him I would bring people to him but I wouldn't sell it.

Q    Do you know where "J.R." or "Whitey," "C.O.," and "V" got the drugs that they sold?

A    Yes.  They got their drugs from New York.

Q    Do you know who took them to New York to get their drugs?

A    Well, yes.  Linwood took them, and another guy took them.  I can't think of his name right offhand.

Q    What kind of car did he drive, do you remember?

A    A gray car.

          MR. VICK:  Could I see Government Exhibit 1?

          (Document proffered to witness.)

BY MR. VICK:

Q    I'm going to show you what's been marked

Government Exhibit Number 1. Is that the kind of car that the other fellow drove?

A     Yes. That's the car. Yes.

Q     Based upon -- how long were you involved with Curt in the selling of cocaine?

A     How long was I involved?

Q     You said you met "O," and when did you meet "J.R.?"

A     I met "J.R." on Hancock Street. I met "J.R." and "O" -- no, "J.R." came down selling drugs first by himself before "O" and them came down.

Q     When did you meet "Whitey?"

A     I met "Whitey" through Curt, because "Whitey" was bringing drugs to Curt and Curt was selling them for him.

Q     When was it that you met "Whitey." what time frame?

A     Like the month? About three or four months before --

Q     Before you got shot?

A     Yes, all of this was before I got shot.

Q     Would this have been November or December?

A     Most likely it was November.

Q     Of 1991?

A     Yes.

Q    When did you meet "V?"

A    I met "V" about a month or two after.  Like "V" came down from New York when they went up to get the drugs, and he came back.  Him and "E.B." came back down with them.

Q    From November when you met them, sometime in that time frame, to when you were shot on February 19th, 1992, were you involved through Curt with "O," "Whitey," "V," and "J.R." for that whole time?

A    Yes.

Q    Did you come to find out what their business relationship was, what the relationship was between "O" and "Whitey" and "J.R." and "V?"

A    Drugs.

Q    Did Curt --

A    Okay.  Curt, "Papoose," "Mousey," all of them, all of us were just  --  all of them were actually sellers.  They was like the head people.

Q    Who were the head people?

A    Who?

        MR. BARLEY:  He is cutting her off.

BY MR. VICK:

Q    Who were the head people?

A    "Whitey," "O,"  --  "Whitey," "O," "J.R.," "V." because "V," mostly, after he came down he mostly

controlled the drugs.

MR. BARLEY: I object unless she has seen it or has personal knowledge of it.

MR. VICK: She was just getting ready to tell us about that.

BY MR. VICK:

Q Continue.

A Thank you. Me and Curt went up to the house on Moore Street, and "V," he controlled the drugs because he had it bagged up and gave it out to the people to sell.

Q Did "Mousey" sell drugs for them?

A Yes, she did.

Q Did "Papoose?"

A Yes.

Q All right. Did you know Denise Berkley?

A Yes.

Q Did Denise work with them in some way?

A She used to clean the house for them.

Q Did she get drugs for that?

A Yes, she got drugs for it.

Q Now, do you know an individual by the name of Doug Talley? Excuse me, "Little Doug" Moody?

A Yes.

Q And what happened to "Little Doug" Moody?

A    He got killed.

Q    Who killed him?

A    "J.R." -- well, "J.R." and "Whitey." Can I tell the story?

Q    Tell the story.

A    Okay. We was at Curt's house and they excused me out of the house because they all was in the house. And "Little Doug," he came in the house with "J.R." I was standing on the corner with Sandra.

Q    Sandra who?

A    I don't know, Reavis? Something like that.

Q    "J.R.'s" girlfriend?

A    "J.R.'s" girlfriend. And I was standing object the corner with her. And about 15 minutes later, I heard a gunshot about three times. And Curt came out of the house and he went around the corner. All right, then "J.R.," he ran out of the house, ran up the street. And "Little Doug" jumped through the window and he was laying on the porch.

Q    When he was laying on the porch, what happened to him?

A    Okay. So Curt came back. Curt came back, I told Curt I was going in the house and clean up because I didn't have any reason to run. Then "J.R.," he came back around the corner and he told me

give him the knife. I was in there cleaning up the stuff they had mess the up. I had the knife, I took the stuff in the kitchen. He asked me for the knife and I gave him the knife.

Q    What knife?

A    It was a black knife, along knife with a black handle.

Q    Where had you gotten that knife?

A    I got it, Curt, they had gave, brought the knife and a couple times before and gave it to Curt. It had blood on it. And Curt got the blood off. I got the knife off the dresser.

Q    Who had given the knife to Curt before when it had blood on it?

A    "Whitey" and "O," all of them was together when they brought the knife to him.

Q    Did Curt keep that knife for them?

A    Yes, he did.

Q    Cleaned the blood off of it?

A    Yes, sir.

Q    When "J.R." asked you to bring him the knife, did you know what knife he was talking about?

A    It was on the dresser. Yes, I did.

Q    Did you go get it for him?

A    I was carrying the stuff in the kitchen. I just

gave him the knife as I was going into the kitchen.

Q   What did he do when he got that knife?

A   He took the knife -- well, I didn't see it because I didn't want to see it. I heard it. He was on the porch and he slapped "Little Doug" three or four times. I guess he chased him out of the yard, across the fence, and stabbed him with the knife.

Q   After "J.R." stabbed "Little Doug" with the knife, did he give that knife back to you?

A   He gave it to me and told me to throw it away. All I did was took and threw it across the fence. I didn't know what to do with it.

Q   Was the knife covered in blood?

A   Blood was on the knife.

Q   You just threw it away?

A   Yes.

Q   Where did you go after is that?

A   Norton Street to the house that "J.R." had up on Norton Street.

Q   Who lived at that house?

A   "J.R." was living there.

Q   With anyone else?

A   Well, "O," "Whitey," all them used to stay up there. If they weren't there they were on Moore Street.

Q     Where on Moore Street?

A     I think it was 1212 West Moore Street.

Q     Did "V" live in either one six those?

A     "V" was there with them.

Q     Norton Street and 1212 west newer?

A     Yes, back and forth.

Q     Do you know why "J.R." killed "Little Doug" Moody?

A     Yes.  Because he didn't want them to sell drugs on Harrison Street.

Q     Didn't want who?

A     Didn't want "Little Doug," Maurice.

Q     Peyton Maurice Johnson?

A     Yes.

Q     Were they drug salesmen?

A     Yes.  "Little Doug," he was helping Maurice sell drugs.

Q     Were they rifle drug salesmen to "O" and "Whitey" and "V" and "J.R.?"

A     Was they what?

Q     Were they rifles?  Were they selling drugs in the same area as "O," "Whitey," and "V" and "J.R.?"

A     Yes.

Q     Do you know what happened to Peyton Maurice Johnson?

B

 | Keyword | Case | Docket | Date: Filed / Added |  (101936 bytes)   RTF (106006 bytes)

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff-Appellee, <br><br> v. <br><br> SONYA EVETTE SINGLETON, <br><br> Defendant-Appellant. | No. 97-3178 |

F I L E D
United States Court of Appeals
Tenth Circuit

JUL 1 1998

PATRICK FISHER
Clerk

**APPEAL FROM THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

**(D.C. No. 96-10054-05-FGT)**

John V. Wachtel, Klenda, Mitchell, Austerman & Zuercher L.L.C., Wichita, Kansas, for Defendant-Appellant.

Michael G. Christensen, Assistant United States Attorney (Jackie N. Williams, United States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff-Appellee.

Before **SEYMOUR**, Chief Judge, **EBEL**, and **KELLY**, Circuit Judges.

**KELLY**, Circuit Judge.

Section 201(c)(2) of Title 18 of the United States Code prohibits giving, offering, or promising anything of value to a witness for or because of his testimony. Defendant-Appellant Sonya Singleton argues the government violated this statute by promising leniency to a witness in return for his testimony against her. Ms. Singleton was convicted of one count of conspiracy to distribute cocaine, <u>see</u> 21 U.S.C. §§ 841(a)(1), 846, and seven counts of money laundering, <u>see</u> 18 U.S.C. § 1956(a)(1)(B)(I). The district court sentenced her to forty-six months imprisonment on each count, to be served concurrently, and to be followed by three years of supervised release.

Ms. Singleton appeals her convictions, arguing the district court erred (1) in denying her motion to suppress testimony allegedly obtained in violation of 18 U.S.C. § 201(c)(2) and Kansas Rule of Professional Conduct 3.4(b), and (2) in denying her motion for judgment of acquittal on both the conspiracy and money laundering counts. Our jurisdiction arises under 28 U.S.C. § 1291. We reverse and remand for a new trial.

<u>Background</u>

In April 1992, a detective of the Wichita Police Department contacted local Western Union agents to determine if drug dealers were using Western Union services to transfer drug money. He found a large number of wire transfers over $1000 which bore similar identifiers, including similar names of recipients, and similar names, addresses and phone numbers of senders. The records led authorities to a group of people whom they believed were involved in a conspiracy to sell drugs. Further investigation indicated the drug business was begun by men who had moved from California to Wichita. They recruited local women to wire proceeds of drug sales back to California to pay for more cocaine; some of these women also received wire transfers on behalf of the conspiracy and transported cocaine from California to Wichita. Ms. Singleton was

identified as one who transferred and received money for the conspiracy. She was the common-law wife of Eric Johnson, who regularly bought, packaged, and sold drugs, and she was listed as either the sender or recipient on eight wire transfers suspected to have been sent on behalf of the conspiracy. Handwriting experts confirmed that her handwriting was present on paperwork accompanying the eight wire transfers.

Ms. Singleton and others were charged in a superseding indictment with multiple counts of money laundering and conspiracy to distribute cocaine. Before trial she moved to suppress the testimony of Napoleon Douglas, a coconspirator who had entered into a plea agreement with the government. The basis for her motion was that the government had impermissibly promised Mr. Douglas something of value--leniency--in return for his testimony, in violation of 18 U.S.C. § 201(c)(2) and Kansas Rule of Professional Conduct 3.4(b), which prohibits offering unlawful inducements to a witness. The district court denied the motion, ruling that § 201(c)(2) did not apply to the government.

At trial Mr. Douglas testified against Ms. Singleton. He stated that the government, through an assistant United States attorney, had promised to file a motion for a downward departure if he testified truthfully. See IV R. 204-06. His testimony of the government's promise in this regard is somewhat confused, however, and in Mr. Douglas's written plea agreement the government made no firm promise to file a motion for a downward adjustment. The agreement merely stated the government would file a motion under USSG § 5K1.1 or 18 U.S.C. § 3553(e) if, in its sole discretion, Mr. Douglas's cooperation amounted to substantial assistance. See I R. doc. 109, at 2. Both the testimony and plea agreement make clear Mr. Douglas understood that the actual grant of any downward adjustment was entirely within the purview of the sentencing court.

The plea agreement does, however, state three specific promises made by the government to Mr. Douglas in return for his explicit promise to testify. See id. at 1-3. First, the government promised not to prosecute Mr. Douglas for any other violations of the Drug Abuse Prevention and Control Act stemming from his activities currently under investigation, except perjury or related offenses. See id. at 1-2. Second, it promised "to advise the sentencing court, prior to sentencing, of the nature and extent of the cooperation provided" by Mr. Douglas. Id. at 2. Third, the government promised "to advise the Mississippi parole board of the nature and extent of the cooperation provided" by Mr. Douglas. Id. Mr. Douglas agreed, "in consideration of the items listed in paragraph 2 above . . . [to] testify[] truthfully in federal and/or state court . . . ." Id. at 2-3.

## Discussion

The issues before us are (1) whether the government's conduct was prohibited either by § 201(c)(2) or Kansas Rule of Professional Conduct 3.4(b); (2) if it was, whether Mr. Douglas's testimony should have been suppressed; and (3) whether the record contains sufficient evidence to remand for a new trial.

### I. Statutory Construction of 18 U.S.C. § 201(c)(2)

#### A. The Language and Plain Meaning

We review de novo the district court's interpretation of a federal statute. See Utah v. Babbitt, 53 F.3d 1145, 1148 (10th Cir. 1995). Our inquiry begins with the language of the statute, see Ardestani v. INS, 502 U.S. 129, 135 (1991), which "must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). "The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' when a contrary legislative intent is clearly expressed." Ardestani, 502 U.S. at 135-36 (citation omitted) (quoting Rubin v. United States, 449 U.S. 424, 430 (1981)). In the absence of that rare and exceptional circumstance, "we are bound to take Congress at its word." Oubre v. Entergy Operations, Inc., 118 S. Ct. 838, 841 (1998).

The Supreme Court has recently emphasized the primacy of statutory plain language. In Salinas v. United States, 118 S. Ct. 469, 473-74 (1997), the Court concluded that a bribe need not affect federal funds to violate the federal bribery statute, 18 U.S.C. § 666, because the "expansive, unqualified" plain language of the statute criminalized the acceptance of a bribe by a covered official in connection with "any" transaction involving $5,000 or more. Id. at 473. The statute made no mention of federal funds, and the court emphatically refused to rewrite Congress's enactment or judicially add elements to the crime. See id. at 473-75. Similarly, in Brogan v. United States, 118 S. Ct. 805, 809 (1998), the Court invalidated the longstanding "exculpatory no" doctrine under 18 U.S.C. § 1001 "[b]ecause the plain language of § 1001 admits of no exception" for the doctrine. Id. at 812. Section 1001, which imposes criminal liability for making a false statement to federal investigators, had long been interpreted by the courts of appeal to exclude liability for a suspect's mere denial of wrongdoing. The Court, however, rejected "the broad proposition that criminal statutes do not have to be read as broadly as they are written," and stated:

it is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was

trying to remedy--even assuming that it is possible to identify that evil from something other than the text of the statute itself. . . . Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so.

Id. at 809-12. Most recently, the Court in Oubre found that where a general waiver of all causes of action against an employer by an employee did not conform to specific enumerated requirements for waivers under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626, the waiver did not release the employee's ADEA claims. See Oubre, 118 S. Ct. at 842. The Court wrote, "Courts cannot with ease presume ratification of that which Congress forbids." Id. at 841.

Section 201(c)(2) could not be more clear. It says:

Whoever . . . directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court . . . authorized by the laws of the United States to hear evidence or take testimony . . . shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2). We note at the outset that § 201 is to be broadly construed to further its legislative purpose of deterring corruption. See United States v. Hernandez, 731 F.2d 1147, 1149 (5th Cir. 1984); United States v. Evans, 572 F.2d 455, 480 (5th Cir.), cert. denied, 439 U.S. 870 (1978).

The class of persons who can violate the statute is not limited. "Whoever" completes the following elements commits a crime. 18 U.S.C. § 201(c)(2). First, the statute requires a gift, offer, or promise, either direct or indirect, to a person. See id. Second, the gift, offer, or promise must be "of value." Id. Third, the gift, offer, or promise must be made "for" or "because of" the person's sworn testimony at a trial or other proceeding before an authorized court. Id. The state of mind required to violate the statute is knowledge that the thing of value is given for or because of testimony. See United States v. Campbell, 684 F.2d 141, 150 (D.C. Cir. 1982) (construing parallel subsection); United States v. Brewster, 506 F.2d 62, 82 (D.C. Cir. 1974) (quoting United States v. Brewster, 408 U.S. 501, 527 (1972)) (same).

The first issue facing us is whether the assistant United States attorney, acting on behalf of the government, is within the statutory class "whoever." The Supreme Court has recognized a limited canon of construction which provides that statutes do not apply to the government or affect governmental rights unless the text expressly includes the government. See Nardone v. United States, 302 U.S. 379, 383 (1937); United States v. Herron, 87 U.S. (20 Wall.) 251, 255 (1873). The canon applies only to two classes of cases, however. See Nardone, 302 U.S. at 383. The first class in which the government is presumptively excluded from general statutory language involves statutes which would deprive the sovereign of "a recognized or established prerogative title or interest." Id. A classic example is the exemption of the sovereign from statutes of limitation. The second class is comprised of those statutes which would create an absurdity if applied to the government, as, for example, a speed limit applied to a policeman pursuing a suspect. See id. at 384.

Even if § 201(c)(2) could be said to deprive the sovereign of an established prerogative, two further exceptions remove § 201(c)(2) from this class of statutes. First, the presumption that the sovereign is excluded unless named does not apply "where the operation of the law is upon the agents or servants of the government rather than on the sovereign itself." Id. at 383. See United States v. Arizona, 295 U.S. 174, 184 (1935); Dollar Sav. Bank v. United States, 86 U.S. (19 Wall.) 227, 239 (1873); see also City of Buffalo v. Hanna Furnace Corp., 305 N.Y. 369, 376 (1953). In the case before us, § 201(c)(2) does not restrict any interest of the sovereign itself; it operates only upon an agent of the sovereign, limiting the way in which that agent carries out the government's interests. "There is no presumption that regulatory and disciplinary measures do not extend to such officers. Taken at face value the language indicates the purpose of Congress to govern conduct of its own officers and employees as well as that of others." Arizona, 295 U.S. at 184 (holding that the Secretary of the Interior was clearly subject to a law prohibiting "any person" from constructing a dam on navigable waterways without the consent of Congress).

The second exception provides that the government is subject to a statute, even if it infringes upon a recognized government prerogative, if the statute's purpose is to prevent fraud, injury, or wrong. Nardone, 302 U.S. at 384; Herron, 87 U.S. (20 Wall.) at 255-56. Nardone itself relied upon this principle to hold that federal agents were covered by the statutory term "anyone" in the 1934 federal wiretap statute. See Nardone, 302 U.S. at 382-84. The anti-gratuity provision of § 201(c)(2) indicates Congress's belief that justice is undermined by giving, offering, or promising anything of value for testimony. If justice is perverted when a criminal defendant seeks to buy testimony from a witness, it is no less perverted when the government does so. Because § 201(c)(2) addresses what Congress perceived to be a wrong, and operates to prevent fraud upon the federal courts in the form of inherently unreliable testimony, the proscription of § 201(c)(2) must apply to the government. See id. at 384. Further, the interests of the United States as sovereign militate in favor of applying § 201(c)(2) against federal prosecutors. The sovereign's interests are in the enforcement of its laws and the just administration of its

judicial system; applying § 201(c)(2) to all parties in that judicial system advances both interests.

Having escaped the first class of cases in which the canon applies, we determine whether our case falls within the second: cases in which "public officers are impliedly excluded from language embracing all persons" because such a reading would "work obvious absurdity." Id. A brief overview of legal principles and the common law will confirm the rationality of the statute's result and indicate the scope of the tradition behind its application to the government. See Kuzma v. IRS, 821 F.2d 930, 932 (2d Cir. 1987) ("[E]stablished principles of statutory construction compel us to seek a rational and sensible construction of the language in question . . . .").

One of the very oldest principles of our legal heritage is that the king is subject to the law. See Romans 13. King John was taught this principle at Runnymede in A.D. 1215, when his barons forced him to submit to Magna Carta, the great charter that imposed limits on the exercise of sovereign power. See William Sharp McKechnie, Magna Carta, 36-42 (1914). One of the first modern expositions of this hallowed principle is found in Lex, Rex,[(1)] whose title indicated the fundamental shift in our legal heritage toward the primacy of the law and the subordinate position of the king. Justice Brandeis expounded as follows on the principle:

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means--to declare that the Government may commit crimes in order to secure the conviction of a private criminal--would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

Olmstead v. United States, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting). This venerable principle will not give way to the expediency of the government's present practices without legislative authorization. See Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 354 (1982).

The policy expressed in § 201(c)(2) has long been enforced at common law. See Hamilton v. General Motors Corp., 490 F.2d 223, 227-28 (7th Cir. 1973).[(2)] The public policy against payments to fact witnesses is expressed in the majority of states in both the law of contracts and in ethical rules, which we address below. The policy is weighty enough that contracts to pay fact witnesses are void as violative of public policy. See 6A Arthur Linton Corbin, Corbin on Contracts § 1430 (1962); Restatement of Contracts § 552(1) (1932); Restatement (Second) of Contracts, § 73 cmt. b (1981); 7 Richard A. Lord, Williston on Contracts § 15:6 (4th ed. 1997). Such contracts also fail for lack of consideration. See, e.g., Williston, supra, at § 15:6. Every citizen has the legal duty to testify to facts within his knowledge, and any witness may be compelled to do so by subpoena and civil contempt proceedings. We note that agreements for testimony are not always used in federal prosecutions. In United States v. Bambulas, 471 F.2d 501, 505 (7th Cir. 1972), the court held:

From the testimony at trial and the sentences imposed on Bambulas and Russell, there is no indication that immunity or a promise of leniency had been offered by federal authorities to Russell. In addition, Fortner testified that federal agents had emphatically stated to him that there would be "no deals" as reward for his testimony.

Id. See also United States v. Meinster, 619 F.2d 1041, 1045 (4th Cir. 1980). The judicial process is tainted and justice cheapened when factual testimony is purchased, whether with leniency or money. Because prosecutors bear a weighty responsibility to do justice and observe the law in the course of a prosecution, it is particularly appropriate to apply the strictures of § 201(c)(2) to their activities.

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer.

Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 803 (1987) (quoting Berger v. United States, 295 U.S. 78, 88 (1935), overruled on other grounds by Stirone v. United States, 361 U.S. 212 (1960)). We conclude the statute's application to government officials, far from being absurd, is at the center of our legal tradition.

Because of our duty to harmonize apparently conflicting statutes whenever possible, see Chemical Weapons Working Group, Inc. v. Department of the Army, 111 F.3d 1485, 1490 (10th Cir. 1997), we consider whether applying § 201(c)(2) to federal prosecutors works an absurdity in view of the federal immunity statute, 18 U.S.C. §§ 6001-6005. Although it could be argued

that §§ 6001-6005 authorize federal prosecutors to give immunity for testimony while § 201(c)(2) criminalizes offering anything of value for testimony, we believe the statutes operate in sufficiently separate spheres to avoid both conflict and absurdity. The immunity statute allows removal of a witness's Fifth Amendment privilege so that a silent witness may be forced to speak. Under §§ 6001-6005 the government does not give immunity directly for the witness's testimony; the government may move the court to grant immunity, which in turn removes the witness's testimonial privilege so the ordinary compulsion may be brought to bear to require the witness to testify. Both statutes can operate fully and independently; together they manifest a Congressional intent to allow testimony obtained by the court's grant of immunity, but to criminalize the gift, offer, or promise of any other thing of value for or because of testimony. It is not necessary to our decision to further explore the interplay between §§ 6001-6005 and § 201(c)(2), and we leave for other courts the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination . . . ." United States v. Fausto, 484 U.S. 439, 453 (1988).

We note that if the assistant United States attorney were not covered by the statutory term "whoever," then the statute would not prohibit her even from bribing a witness with money in exchange for favorable testimony, which the government concedes the statute prohibits. See Aplees. Brief at 8; see also United States v. Gorman, 807 F.2d 1299, 1304-06 (6th Cir. 1986) (affirming conviction of assistant United States attorney for taking illegal gratuity under parallel subsection), cert. denied, 484 U.S. 815 (1987). We conclude § 201(c)(2) applies to federal prosecutors who make promises for or because of testimony on behalf of the government.

The assistant United States attorney made at least three promises to Napoleon Douglas. Because it is not clear that the government promised to move for a downward adjustment in return for his testimony, we rely for our analysis only on the three promises specifically made in the plea agreement: (1) the promise not to prosecute Mr. Douglas for certain offenses, (2) the promise to inform Mississippi authorities of his cooperation, and (3) the promise to inform the district court of his cooperation. These promises were made "for" his testimony: Mr. Douglas promised to testify "in consideration of" the three promises. See I R. doc 109, at 2-3 (Plea Agreement). The statute's "for or because of" language does not require a quid pro quo relation between the testimony and the promises, but merely requires that the promises be motivated by the testimony, even though the testimony might have been given without the promises. See United States v. Johnson, 621 F.2d 1073, 1076 (10th Cir. 1980) (construing parallel subsection); Evans, 572 F.2d at 479-82; United States v. Alessio, 528 F.2d 1079, 1082 (9th Cir.) (same), cert. denied, 426 U.S. 948 (1976); Brewster, 506 F.2d at 71-72 (same). Here, however, the record indicates the testimony and the promises mutually induced one another, a relation stronger than the "for or because of" required by § 201(c)(2). See United States v. Sun-Diamond Growers, 138 F.3d 961, 966 (D.C. Cir. 1998) (construing parallel language in § 201(c)(1)(A)).

It remains only to determine whether the promises fall within the scope of the statutory term "anything of value." Because the term is not specifically defined in the statute, we assume the ordinary meaning of the words expresses the legislative purpose, and we interpret them according to their everyday meaning. See Russello v. United States, 464 U.S. 16, 21 (1983); United States v. Pommerening, 500 F.2d 92, 97 (10th Cir.), cert. denied, 419 U.S. 1088 (1974). "Value" embodies notions of worth, utility, and importance generally. Congress could have, but did not limit or modify the word in any way. Accordingly, courts have recognized that "anything of value" under § 201 must be broadly construed to carry out its congressional purpose. See, e.g., United States v. Williams, 705 F.2d 603, 622-23 (2d Cir.) (noting that the phrase "has consistently been given a broad meaning"), cert. denied, 464 U.S. 1007 (1983). Our sister circuits have interpreted the phrase synonymously with "thing of value," and have noted that the pervasive use of the term in criminal statutes of both the states and the federal government has made it a term of art, covering intangible as well as tangible things. See United States v. Nilsen, 967 F.2d 539, 542-43 (11th Cir. 1992) (construing 18 U.S.C. § 876), cert. denied, 507 U.S. 1034 (1993); United States v. Schwartz, 785 F.2d 673, 679-81 (9th Cir.) (construing 18 U.S.C. § 1954), cert. denied, 479 U.S. 890 (1986); United States v. Girard, 601 F.2d 69, 71 (2d Cir.) (construing 18 U.S.C. § 641), cert. denied, 444 U.S. 871 (1979).

The government argues that cases involving § 201(c) have all involved monetary payments. However, courts have uniformly rejected arguments that "anything of value" should be restricted to things of monetary, commercial, objective, actual, or tangible value. See Schwartz, 785 F.2d at 679-81; United States v. Marmolejo, 89 F.3d 1185, 1191 (5th Cir. 1996) (construing 18 U.S.C. § 666), aff'd sub nom. Salinas v. United States, 118 S. Ct. 469 (1997), and cert. denied, 118 S. Ct. 599 (1997); Nilsen, 967 F.2d at 542-43 ("This broad interpretation is based upon a recognition that monetary worth is not the sole measure of value."); Williams, 705 F.2d at 622-23 (holding "anything of value" under § 201 is not limited to what objectively has actual value); Girard, 601 F.2d at 71.

Value has been accorded a broader, more common interpretation. See Schwartz, 785 F.2d at 679. We agree with those circuits which have held that the test of value is whether the recipient subjectively attaches value to the thing received. See United States v. Picquet, 963 F.2d 54, 55 (5th Cir.) (construing 18 U.S.C. § 1029), cert. denied, 506 U.S. 902 (1992);

Gorman, 807 F.2d at 1304-05; Schwartz, 785 F.2d at 680; Williams, 705 F.2d at 623 (holding that proper construction of § 201 focuses on whether recipient subjectively attached value to the thing received). But cf. United States v. Sheker, 618 F.2d 607, 609 (9th Cir. 1980) (declining to adopt the view, under 18 U.S.C. § 912, that anything of value includes anything that has subjective value to the defendant, and instead requiring that the value be recognized or appreciated by others).

Courts construing the phrase have held a variety of intangibles to be things of value, including information regarding the whereabouts of a witness, information contained in DEA reports, assistance in arranging a merger, a witness's testimony, conjugal visits, amusement, the promise to reinstate an employee, and the promise not to run in a primary election. See Sheker, 618 F.2d at 609; Girard, 601 F.2d at 70-71; Schwartz, 785 F.2d at 679; United States v. Zouras, 497 F.2d 1115, 1121 (7th Cir. 1974) (construing 18 U.S.C. § 876); Marmolejo, 89 F.3d at 1191; Giomi v. Chase, 132 P.2d 715, 716-17 (N.M. 1942) (construing "thing of value" in state gambling statute); People ex rel. Dickinson v. Van De Carr, 84 N.Y.S. 461, 463-64 (N.Y. App. Div. 1963) (construing "thing of value" in state bribery statute); People v. Hochberg, 404 N.Y.S.2d 161, 167 (N.Y. App. Div. 1978) (same).

Although this precedent alone would require a conclusion that the promises made to Mr. Douglas are of value, four further considerations confirm the matter. First, much of the precedent cited construes the phrase "thing of value"; and the use in § 201 of "anything of value" indicates an even broader scope of coverage.

Second, much of the precedent construes statutory language in which the term appears at the end of a series of enumerated specifics, such as "any fee, kickback, commission, gift, loan, money, or thing of value." Schwartz, 785 F.2d at 679 (construing 18 U.S.C. § 1954, and noting that legislative history indicated the enumeration was one of illustration, not limitation); see Marmolejo, 89 F.3d at 1191 (construing "anything of value of $5,000 or more"); Nilsen, 967 F.2d at 542 (construing "any money or other thing of value"); Picquet, 963 F.3d at 55; Girard, 601 F.2d at 70-71. That these courts have broadly construed the phrase to include intangibles in spite of the interpretive canon ejusdem generis indicates the strength of the term's plain meaning. In contrast to these cases and statutes, "anything of value" in § 201(c)(2) stands alone, unlimited by any enumeration.

Third, the purpose of the statute confirms Congress's broad language. One obvious purpose of the blanket prohibition in § 201 is to keep testimony free of all influence so that its truthfulness is protected. See United States v. Biaggi, 853 F.2d 89, 101 (2d Cir. 1988), cert. denied, 489 U.S. 1052 (1989); Evans, 572 F.2d at 480. The promise of intangible benefits imports as great a threat to a witness's truthfulness as a cash payment. See United States v. Cervantes-Pacheco, 826 F.2d 310, 315 (5th Cir. 1987) ("It is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence . . . ."), cert. denied, 484 U.S. 1026 (1988); Schwartz, 785 F.2d at 680 ("A violation of trust which is influenced by the offer of an intangible service is no less damaging . . . than if the influence was in the form of a cash kickback."); United States v. Meinster, 619 F.2d 1041, 1045 (4th Cir. 1980) ("We think it obvious that promises of immunity or leniency premised on cooperation in a particular case may provide a strong inducement to falsify in that case."); see also United States v. Kimble, 719 F.2d 1253, 1255-57 (5th Cir. 1983) (stating witness "admitted lying in over thirty different statements motivated by his sense of self-preservation" under plea arrangement requiring his testimony in return for lenient sentence), cert. denied, 464 U.S. 1073 (1984).

Fourth, § 201(c)(1) opens by providing "otherwise than as provided by law for the proper discharge of official duty." In contrast, § 201(c)(2) includes no such exemption for official acts authorized by law. Because Congress specifically exempted public duties from one subsection but did not exempt them from the subsection at issue in this case, we should interpret the plain language of the statute to cover promises of leniency by prosecutors.

We find no basis in law, policy, or common sense to judicially limit "anything of value" to things reducible to monetary or tangible value. Justice Holmes's words are appropriate: "[T]here is no canon against using common sense in construing laws as saying what they obviously mean." Roschen v. Ward, 279 U.S. 337, 339 (1929).

In this light we apply the statutory phrase "anything of value" to the promises made to Mr. Douglas. The obvious purpose of the government's promised actions was to reduce his jail time, and it is difficult to imagine anything more valuable than personal physical freedom. See Cervantes-Pacheco, 826 F.2d at 315. Although the information promised by the government would certainly not guarantee Mr. Douglas's release, it was an invaluable step toward that end. The Ninth Circuit, in holding that information can be a thing of value, indicated by example the broad rationale of its holding: "For instance, state secrets might trade hands without cash consideration. Information obtained for political advantage might have value apart from its worth in dollars." Schwartz, 785 F.2d at 679 (quoting Sheker, 618 F.2d at 609); see also United States v. Fowler, 932 F.2d 306, 309-10 (4th Cir. 1991) (joining Second and Sixth Circuits in holding information can be a thing of value under 18 U.S.C. § 641). But see United States v. Tobias, 836 F.2d 449, 451 (9th Cir.), cert. denied, 485 U.S. 991 (1988). The information and intervention promised by the government for Mr. Douglas's legal advantage was of great value. See, e.g.,

Sheker, 618 F.2d at 609. In the case of the promise not to prosecute, the value was even greater: besides guaranteed physical freedom he was guaranteed freedom from the burden of defending himself and from the stigma of prosecution and conviction as well.

Our basis for determining these promises were of value is that the record indicates Mr. Douglas subjectively valued them. They were all he bargained for in return for his testimony and guilty plea. See Nilsen, 967 F.2d at 543 ("[T]he conduct and expectations of a defendant can establish whether an intangible objective is a 'thing of value.'"). In addition, he testified that he wanted the government's assistance to help "everything work out for [him]." IV R. 206. In these circumstances the promises made to him fall well within the statutory term "anything of value." Having fulfilled every statutory element, we conclude the government's conduct was covered by the plain language and meaning of § 201(c)(2).

## B. The Structure of § 201

Our construction of the particular statutory language at issue is fortified by the language and structure of the statute as a whole. See K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988); Russello, 464 U.S. at 22-26. Section 201 addresses corruption of public officials and witnesses, and its provisions have been divided generally into bribery prohibitions and gratuity prohibitions. See, e.g., Johnson, 621 F.2d at 1076 (quoting United States v. Strand, 574 F.2d 993, 995 (9th Cir. 1978)). The bribery prohibitions, collected under § 201(b), are distinguished by their statutory requirements of corruptness on the part of the giver and intent to influence the receiver's action. The gratuity prohibitions collected under § 201(c), on the other hand, contain no requirements of corruption and intent to influence the receiver, and Congress attached concomitantly lesser penalties to their violation. See United States v. Irwin, 354 F.2d 192, 197 (2d Cir. 1965) (construing current statutory language under prior subsection),[3] cert. denied, 383 U.S. 967 (1966). The gratuity prohibitions have been held to be lesser included offenses of the bribery provisions. See, e.g., Brewster, 506 F.2d at 67-76.

The statute at issue in this case, § 201(c)(2), is a gratuity prohibition, and like every other gratuity provision in § 201(c)(2), it contains no requirements of corruptness or intent to influence. See Johnson, 621 F.2d at 1076; Brewster, 506 F.2d at 71-72; Irwin, 354 F.2d at 197; Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n, 865 F. Supp. 1516, 1523 (S.D. Fla. 1994), aff'd in part, rev'd in part, and remanded, 117 F.3d 1428 (11th Cir. 1997).

In contrast, a separate bribery provision under § 201(b), dealing with bribery of witnesses, does require heightened intent. Section 201(b)(3) provides that whoever "corruptly gives, offers, or promises anything of value to any person . . . with intent to influence the testimony under oath or affirmation of such . . . person as a witness" shall be fined or imprisoned. Congress thus deliberately included the corruptness and intent-to-influence elements in § 201(b)(3) and excluded them from § 201(c)(2). "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Brown v. Gardner, 513 U.S. 115, 120 (1994) (quoting Russello, 464 U.S. at 23). Moreover, the predecessor statute to § 201(c)(2) did require an agreement that the testimony would be influenced by the thing of value. See 18 U.S.C. § 209 (1952). Congress deliberately deleted that language, and it is not our place to reinsert it.

Section 201(d) further illumines the plain meaning of § 201(c)(2). This subsection provides:

Paragraphs (3) and (4) of subsection (b) and paragraphs (2) and (3) of subsection (c) shall not be construed to prohibit the payment or receipt of witness fees provided by law, or the payment, by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying.

18 U.S.C. § 201(d). The existence of § 201(d) as a specific exception to § 201(c)(2) indicates that § 201(c)(2) would otherwise prohibit travel and other witness fees, which are given to witnesses because of their testimony.

We find no clearly expressed legislative intention contradicting the statute's language. The legislative history confirms Congress's purpose that giving or receiving anything of value by "witnesses 'for' or 'because of' . . . testimony . . . should also be prohibited." H.R. Rep. No. 87-748, at 16 (1961). The committee report also indicates Congress's policy: "The conduct which is forbidden has the appearance of evil and the capacity of serving as a cover for evil." Id. at 19. The purpose and policy of the statute confirm its plain language and structure. We conclude § 201(c)(2) prohibited the government's promises to Mr. Douglas of leniency and intervention on his behalf in return for his testimony. See Dixson v. United States, 465 U.S. 482, 496 (1984) ("Congress' longstanding commitment to a broadly drafted federal bribery statute, its expressed desire to continue that tradition with the 1962 revisions, its affirmative adoption of the language at issue in this case, and the House Report[] . . . combine to persuade us that Congress never intended § 201(a)[] . . . to be given the cramped reading proposed

by petitioners."). The Supreme Court's more recent words are instructive as well: "No rule of construction . . . requires that a penal statute be strained and distorted in order to exclude conduct clearly intended to be within its scope. . . ." See Salinas v. United States, 118 S. Ct. 469, 475 (1997) (citing United States v. Raynor, 302 U.S. 540, 552 (1938)).[4]

## II. The Law Enforcement Justification

The government asserts, without argument or authority, that agreements for testimony between the government and a witness are not contemplated by this statute. Its position is that its agreement in return for testimony was justified and legitimate, and that Congress could not have intended § 201(c)(2) to hamper the punishment of crime by bringing within its sweep this government practice. Even assuming such a practice, our answer is that the matter was one of policy for Congress to decide. See Nardone, 302 U.S. at 383. In Nardone the Court rejected an argument that the government should be exempt from the federal wiretap statute, suggesting, "Congress may have thought it less important that some offenders should go unwhipped of justice than that officers should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty." Id. We likewise discern what § 201(c)(2) contemplates from its language, and its language makes no exception for the government's conduct. Although the government's apparent practice of giving inducements for testimony, as opposed to other forms of cooperation, and the judiciary's seeming approval of such practice give us pause, they do not alter the words of a clear statute. See Brogan v. United States, 118 S. Ct. 805, 811 (1998). "The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations." Hampton v. United States, 425 U.S. 484, 490 (1976) (quoting United States v. Russell, 411 U.S. 423, 435 (1973).

To answer the government's vague argument that some overriding policy should prevent application of this statute to the government's conduct, we will raise sua sponte the justification of law enforcement authority. "Criminal prohibitions do not generally apply to reasonable enforcement actions by officers of the law." Brogan, 118 S. Ct. at 811. If the justification applies, conduct which violates the terms of a criminal statute is nevertheless not forbidden. The justification can be generally described as follows: a peace officer, prison guard, or private citizen authorized to act as a peace officer may, to the extent necessary to make an arrest, prevent an escape, or prevent the commission of a crime, violate a criminal statute if the conduct which constitutes the violation is reasonable in relation to the gravity of the evil threatened and the importance of the interest to be furthered. See Paul H. Robinson, Criminal Law Defenses § 142(a) (1984). The government's conduct does not fall within this justification for at least two reasons: it was not undertaken by a peace officer or one acting in that capacity, and it was not required by an exigent need to make an arrest or prevent an escape or other crime.

The Supreme Court's more general statement of the rule that "[c]riminal prohibitions do not generally apply to reasonable enforcement actions by officers of the law," embraces field enforcement activity. Brogan, 118 S. Ct. at 811. The Court has held, for example, that the government's limited undercover participation in an unlawful drug operation is "a recognized and permissible means of investigation." United States v. Russell, 411 U.S. 423, 432 (1973); see Lewis v. United States, 385 U.S. 206, 208-09 (1966). Brogan itself states that 18 U.S.C. § 1001 "does not make it a crime for an undercover narcotics agent to make a false statement to a drug peddler." Brogan, 118 S. Ct. at 811 (internal quotes and alterations omitted); see United States v. Monaco, 700 F.2d 577, 580-81 (10th Cir. 1983) ("To obtain evidence of certain crimes undercover agents frequently must participate in illegal activities."); United States v. Szycher, 585 F.2d 443, 449 (10th Cir. 1978) ("Government officers can, of course, employ appropriate artifice and deception to ferret out illegal activities."); cf. United States v. Duggan, 743 F.2d 59, 83-84 (2d Cir. 1984) (holding defense of public authority requires government agent to have actual authority to authorize statutory violation); United States v. Anderson, 872 F.2d 1508, 1516 (11th Cir.) (holding because CIA agents have no authority to violate federal statutes, defense fails), cert. denied, 493 U.S. 1004 (1989); Fed. R. Crim. P. 12.3 (regulating presentation of law enforcement defense).

The conduct of police, investigators, and law enforcement agents is regularly evaluated against the standard of what is legitimate and reasonably necessary to enforce the law. See, e.g., United States v. Mosley, 965 F.2d 906, 908-15 (10th Cir. 1992); United States v. Warren, 747 F.2d 1339, 1341-44 & nn.4-10 (10th Cir. 1984) (collecting cases); Monaco, 700 F.2d at 580-81; United States v. Biswell, 700 F.2d 1310, 1314 (10th Cir. 1983); Szycher, 585 F.2d at 449; see also United States v. Asencio, 873 F.2d 639, 640-41 (2d Cir. 1989). But we have found no case in which prosecutors, in their role as lawyers representing the government after the initiation of criminal proceedings, have been granted a justification to violate generally applicable laws. See United States v. Ryans, 903 F.2d 731, 739-40 (10th Cir.) (holding that disciplinary rule applies to prosecutors upon commencement of criminal proceedings), cert. denied, 498 U.S. 855 (1990).

The law enforcement justification exists to allow field officers a practically necessary means to detect and prevent crime, and to apprehend suspects. It is justified by the difficulties inherent in detecting certain types of crime. See Russell, 411 U.S. at 432 (narcotics); United States v. Kelly, 707 F.2d 1460, 1468 (D.C. Cir.) (public corruption), cert. denied, 464 U.S. 908

(1983); Monaco, 700 F.2d at 580-81 (prostitution). The government's violation of § 201(c)(2), however, is entirely unrelated to detecting crime. Once the exigencies of field enforcement are satisfied, we can find no policy by which prosecutors may be excused from statutes regulating testimony presented to the federal courts. Although there are difficulties inherent in proving certain types of crimes, violating § 201(c)(2) is not necessary to overcome those difficulties: compulsory process is lawful and available, and avoids the taint on truthfulness which attends unlawful witness gratuities. The law enforcement justification has never altered the playing field on which crimes are proved in court. We decline to expand the meaning of "enforcement action" beyond its historical scope of detection, apprehension, and prevention of crime.

Because the government's statutory violation occurred not in a field investigation but in the context of testimony which was to be presented to the court, we further hold its action was not "reasonable." Brogan, 118 S. Ct. at 811. The chasm between the government's present conduct and reasonable law enforcement actions can be illustrated by analogy to the FBI's Abscam operation, under which operatives and undercover agents offered bribes to public officials and arrested those who accepted the bribes. See Kelly, 707 F.2d at 1461-63. Although Abscam created controversy and dissent in the courts, it was held a legitimate means of detecting public corruption. See, e.g., id. at 1469-71. The government's present inducement for testimony goes much further. Reasonable law enforcement actions stop with detecting crime and observing enough to prove it. The government's statutory violation unreasonably exceeds this purpose, and is the more egregious because the intended product of the violation is testimony presented in court. We conclude the government's violation of § 201(c)(2) was neither "reasonable" nor an "enforcement action." Brogan, 118 S. Ct. at 811. Consequently it falls outside the scope of legitimate investigatory practices and is not justified by law enforcement authority.

Cases involving the application of ethical rules to federal prosecutors fortify our conclusion. The Department of Justice attempted, first through a policy statement known as the Thornburgh Memorandum, then through a federal regulation, 28 C.F.R. pt. 77 (1997), to exempt its litigators from state ethical rules prohibiting ex parte communication with represented parties. The federal courts have unanimously rejected the notion that federal prosecutors are exempt from these ethical rules. (5) See, e.g., United States ex rel. O'Keefe v. McDonnell Douglas Corp., 132 F.3d 1252, 1257 (8th Cir. 1998); United States v. Lopez, 4 F.3d 1455, 1458-63 (9th Cir. 1993). In doing so, courts have rejected arguments that the rule "was not intended to apply to prosecutors pursuing investigations," or that their contact "was authorized by law." Lopez, 4 F.3d at 1458; see also Matter of Doe, 801 F. Supp. 478, 484-87 (D.N.M. 1992). If federal prosecutors are bound by an ethical rule governing ex parte contact in the course of a prosecution, we think it even more clear that they are bound by a federal statute regulating the evidence presented in federal court. The Supreme Court has reiterated, in another context, the prevailing rule that "a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers." Butz v. Economou, 438 U.S. 478, 489 (1978).

### III. Section 201(c)(2) in Relation to Other Statutes

The government argues that several provisions of law authorized it to make its agreement with Mr. Douglas. The government apparently refers to an unwritten agreement with Mr. Douglas to make a sentence reduction recommendation. See Aplees. Brief at 7, 9. Although any such agreement is not before us because it is not clear from the record that it was made, we will construe the government's argument as one that it had statutory authorization for the three written promises it did make to Mr. Douglas for his testimony.

The federal criminal sentencing statute, 18 U.S.C. § 3553(e), provides, "Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." In addition, 28 U.S.C. § 994(n) instructs the United States Sentencing Commission to ensure that guidelines reflect "the general appropriateness of imposing a lower sentence than would otherwise be imposed, including a sentence that is lower than that established by statute as a minimum sentence, to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." Accordingly, USSG § 5K1.1 provides that the government may move for a downward departure from the guidelines if it determines the defendant has "provided substantial assistance in the investigation or prosecution of another person who has committed an offense . . . ." USSG § 5K1.1. "The appropriate reduction shall be determined by the court for reasons stated that may include . . . the truthfulness, completeness, and reliability of any information or testimony provided by the defendant." Id. at § 5K1.1(a)(2). The government also cites Fed. R. Crim. P. 35(b), which says, "The court, on motion of the Government made within one year after the imposition of the sentence, may reduce a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense . . . ."

Each of these provisions of law authorizes only that substantial assistance can be rewarded after it is rendered; none authorizes the government to make a deal for testimony before it is given, as the government did with Mr. Douglas.

Consequently the statutes cannot justify the government's promises in this case.

However § 201(c)(2) prohibits even the rewarding of testimony after it is given: it prohibits anything of value to be given, offered or promised "because of" testimony "given." 18 U.S.C. § 201(c)(2). The sentencing provisions may thus appear to conflict by authorizing something of value (a motion for and grant of sentence reduction) to be given "because of" testimony rendered. We believe the statutes can be read together in this way: in light of § 201(c)(2), "substantial assistance" does not include testimony. Congress enacted the sentencing provisions against the backdrop of its general prohibition against giving anything of value for or because of testimony. See generally 2B Norman J. Singer, Sutherland Statutory Construction § 53.01 (5th ed. 1992). Against this background, § 994 authorizes the Sentencing Commission to reward all forms of substantial assistance other than testimony.

Our reading of the statutes will not impair the substantial assistance provisions, because a defendant can substantially assist an investigation or prosecution in myriad ways other than by testifying. Nor will our holding drastically alter the government's present practices. The government may still make deals with accomplices for their assistance other than testimony, and it may still put accomplices on the stand; it simply may not attach any promise, offer, or gift to their testimony. Because the operation of the sentencing statutes is not positively repugnant to § 201(c)(2), we must give effect to both. See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992). The question whether USSG § 5K1.1(a)(2) exceeds statutory authority or conflicts with § 201(c)(2) by making testimony, as opposed to other forms of cooperation, a basis for a finding of substantial assistance is not directly before us, and we do not decide it.

The government's reliance on the substantial assistance sentencing statutes is, in essence, an argument that they impliedly amend or repeal the plain prohibition of § 201(c)(2). Courts generally and quite consistently disfavor implied repeals and amendments. See, e.g., United States v. Estate of Romani, 118 S. Ct. 1478, 1486 (1998) (declining to consider implied amendment or repeal, and instead harmonizing statutes); 1A Norman J. Singer, Sutherland Statutory Construction § 22.13 (5th ed. 1992) ("Amendments by implication, like repeals by implication, are not favored and will not be upheld in doubtful cases . . . ."); id. at § 23.09 ("Courts are reluctant to find repeal by implication even when the later statute is not entirely harmonious with the earlier one. If two statutes conflict somewhat, the court must, if possible, read them so as to give effect to both . . . ."). Courts will generally not find an implied repeal or amendment unless either the text or legislative history indicates Congress's intent to obviate the legal power of the earlier statute. See id. at § 23.10. We find no glimmer of such an indication in the sentencing statutes or their legislative history.

## IV. Precedent

Although neither party cited any case in which a criminal defendant argued the government violated §201(c)(2) by offering leniency or other inducements to a witness, we have been able to find three such reported cases. We find each unpersuasive.

In United States v. Isaacs, 347 F. Supp. 763 (N.D. Ill. 1972), one of the defendants in a prosecution for conspiracy, bribery, and other offenses argued that the government violated § 201(h), the identical predecessor of § 201(c)(2), by exercising influence on state officials to procure something of value for a witness. The United States Attorney, in cooperation with the Department of Justice, allegedly went to California and met with state officials to persuade them to grant the witness a license to become a director of the Hollywood Park Turf Club without a public hearing and in spite of the witness's implication in the bribery. See id. at 767. It was necessary to avoid a public hearing on the license so the witness would not be subject to cross-examination on her involvement in the bribery. See id.

The defendant, relying only on newspaper reports, argued the government had violated § 201(h) by giving something of value to a witness for her testimony, and requested an evidentiary hearing to develop facts on the matter. In making its ruling, the court mischaracterized § 201(h), stating the defendant's argument was based on an inference that the award of the license to the witness was "a bribe intended to influence her testimony . . . ." Id. at 767. The statute is abundantly clear that it proscribes gratuities regardless of intent to influence testimony. The court then denied the defendant's motion on two grounds. First, it held the conjectural allegations based on newspaper reports were insufficient to warrant an evidentiary hearing. See id. Second, it held that Giglio v. United States, 405 U.S. 150 (1972) indicated that suppression was not an appropriate remedy when the government promises leniency to a witness in return for her testimony. See Isaacs, 347 F. Supp. at 767.

Giglio held the government must disclose a promise of leniency made to a key witness in return for his testimony. See Giglio, 405 U.S. at 153-54. Section 201(h) was not implicated in Giglio; the defendant there argued only that the promise was material exculpatory evidence going to the credibility and reliability of the key witness, and that he was entitled to a new trial to present the evidence to the jury. The Supreme Court agreed, holding that due process was violated when the jury was erroneously told no promises of leniency were made to the witness, because evidence of the promise was "relevant to his credibility and the jury was entitled to know of it." Id. at 155. The Isaacs court took this statement to preclude application of

§ 201(h).

We believe Giglio's holding--that Brady v. Maryland, 373 U.S. 83 (1963) applies to impeachment evidence--is not dispositive of the statutory question before us, a question not presented to the Court in Giglio. It is quite clear that due process as interpreted in Brady and Giglio, as well as federal legislation, see Jencks Act, 18 U.S.C. § 3500, require a large class of materials to be turned over to the defense in a criminal case. Evidence of the government's valuable promises to a witness falls within this class. But this does not prohibit Congress from also criminalizing certain conduct within the class. For example, the government in a criminal case must disclose known perjury to the defense. See United States v. Agurs, 427 U.S. 97, 103-04 (1976). Yet the occurrence of perjury remains a crime. See 18 U.S.C. §§ 1621, 1623. Likewise the criminality of offering anything of value for testimony is not inconsistent with Giglio's rule that the offer be disclosed. An unambiguous statute is before us, and within constitutional boundaries we have no authority to refuse to apply it. Consequently we must reject Isaac's inference from Giglio that § 201(c)(2) does not apply in this situation.

Section 201(h) was also raised by the defendant in United States v. Barrett, 505 F.2d 1091, 1100-02 (7th Cir. 1974), cert. denied, 421 U.S. 964 (1975), in which the government entered into a plea agreement similar to its agreement with Mr. Douglas. In Barrett, the primary witness against the defendant pled guilty and agreed to testify in return for the government's recommendation of an extraordinarily lenient sentence, transactional immunity, and civil tax immunity. The witness's testimony was that he paid large bribes to various public officials; in return for this testimony, he was exempted from paying tax and penalties on the money constituting the bribes. The defendant moved to suppress on the ground that this arrangement violated § 201(h). The district court denied the motion but allowed the government's bargain to be used to impeach the witness's credibility. See id.

The Seventh Circuit approved this disposition and in a footnote repeated Isaacs's inference from Giglio. See id. n.9. It went on to state that the premise of the defendant's § 201(h) argument was that the government had no authority to grant civil tax immunity in return for testimony. The defendant conceded the government did not violate § 201(h) by granting criminal immunity, because the United States Code authorizes the government to grant such immunity. See 18 U.S.C. § 6002. Following this reasoning, the court found a provision of the tax code authorizing the government to settle any tax case, 26 U.S.C. § 7122, and held that because Congress authorized the government to settle tax liability, it could settle tax liability in return for testimony. See Barrett, 505 F.2d at 1101-02.

We believe this conclusion is incorrect because both the court and the parties reasoned from a faulty premise. Section 201(h) did not prohibit the government from giving unauthorized things of value for testimony; it proscribed giving anything of value for testimony. To read the section as prohibiting only the giving of unauthorized things (besides ignoring its plain language) is to read it right out of the code. It is a truism that the government may not do unauthorized things. And it is § 201(h) that makes gifts, offers, and promises unauthorized in certain circumstances. If the section is to have any meaning it must be read to prohibit giving otherwise authorized things "for" or "because of" testimony. Otherwise, under Barrett's reasoning, the government's authorization to expend money means the government may pay money to a witness for his testimony. We will not eviscerate the statute in this way. Section 201(c)(2) discriminates not on the basis of what things of value are authorized, but on whether the thing of value is given "for" or "because of" testimony.

Finally, the Sixth Circuit addressed an argument like Ms. Singleton's in United States v. Blanton, 700 F.2d 298, 310-11 (6th Cir.), reheard in part, 719 F.2d 815 (6th Cir. 1983),[6] cert. denied, 465 U.S. 1099 (1984), in which the former governor of Tennessee, Leonard Blanton, was convicted on various charges of corruption. The primary witness against him received a liquor license through a corrupt arrangement with Mr. Blanton. In return for the witness's truthful testimony, the United States persuaded Tennessee's Alcoholic Beverage Commission not to revoke his liquor license. The witness wanted the government's persuasion because fraud in procuring a liquor license was ground for its revocation. See id.

Mr. Blanton argued the witness's testimony should have been suppressed because the government procured it in return for something of value, in violation of § 201(h). The court rejected his argument, holding the "purported 'thing of value'--a liquor license--was not offered by the government." Id. at 311. It supported this by stating that the government used only persuasion and exercised no coercive power. Further, it held the government did not "give" a thing of value because it merely preserved the status quo: the witness kept the license he previously had. See id.

Neither ground of the holding persuades us. It seems apparent to us that the issue was whether the government's persuasion, which was offered and given, was a thing of value. The court's focus on the liquor license and on the state's control of it obscures this point: the government's intangible persuasion might have been enormously valuable to the witness, since he sought it and it was effective in the goal of retaining his license. We are likewise unpersuaded that preservation of the status quo cannot constitute a thing of value. The persuasion of the United States was brought to bear in return for testimony at a

time when the witness's status quo (which happened to be ill-gotten gain) was about to change drastically for the worse. We find no principled basis in Blanton on which to hold the government's conduct in our case was not covered by the unambiguous prohibition of § 201(c)(2). "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992).

We further disagree with the Eleventh Circuit to the extent it has held that § 201(c)(2) is violated only when the resultant testimony is false. See Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n, 117 F.3d 1328, 1335 n.2 (11th Cir. 1997); United States v. Moody, 977 F.2d 1420, 1424-25 (11th Cir. 1992), cert. denied, 507 U.S. 944 (1993). It seems the court in Golden Door took out of context Moody's statement that § 201(c)(2) "obviously proscribes a bribe for false testimony; persons of ordinary intelligence would come to no other conclusion." Moody, 977 F.2d at 1425. Moody upheld § 201(c)(2) against overbreadth and vagueness challenges by a defendant who had paid a witness to fabricate a story in court. The court held that as applied to these facts the statute was not vague or overbroad: no one of ordinary intelligence could contest that the statute clearly prohibited this conduct. See id. at 1424. Moody nowhere intimated the statute applied only to false testimony. In the context of the as-applied challenge, the court had no occasion to determine what other conduct the statute proscribed, and the defendant did not demonstrate any real or substantial unconstitutional applications. See Moody, 977 F.2d at 1424-25.

Moreover, requiring false testimony under § 201(c)(2) would interpose elements not required even by the bribery provisions, which do not require the bribe recipient's action to be influenced in fact. See United States v. Hernandez, 731 F.2d 1147, 1149 (5th Cir. 1984); Johnson, 621 F.2d at 1076. "We ought not to open the door to an evasion of the statute by this device." Oubre v. Entergy Operations, Inc., 118 S. Ct. 838, 842 (1998). It is anomalous to require under a gratuity provision both that testimony actually be given, and that it be false, when the bribery provisions require neither. See Hernandez, 731 F.2d at 1149 ("The crime [of bribery] is consummated whether or not the offer is accepted by the offeree.").

We conclude that under § 201(c)(2) the promise need not be intended to affect, and need not actually affect, the testimony in any way. Promising something of value to secure truthful testimony is as much prohibited as buying perjured testimony. See Shuttlesworth v. Housing Opportunities Made Equal, 873 F. Supp. 1069, 1078 (S.D. Ohio 1994). In a similar gratuity provision prohibiting gifts, promises, or offers to a public official for or because of an official act, Irwin held, "It is not necessary for the Government to show that the gift caused or prompted or in any way affected the happening of the official act or had anything to do with its nature or extent or the manner or means by which it was performed." Irwin, 354 F.2d at 197. We believe there is no principled basis on which to judicially add elements to the statute when Congress has chosen not to include them. "[W]here the words of a law, treaty, or contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded. This is a maxim of law, and a dictate of common sense . . . ." Green v. Biddle, 21 U.S. (8 Wheat.) 1, 89-90 (1823).

### V. Kansas Professional Rule 3.4(b)

Ms. Singleton argues the government violated Kansas Professional Rule 3.4(b) in presenting the testimony of Mr. Douglas. The rule, adopted by the Supreme Court of Kansas, provides, "A lawyer shall not . . . offer an inducement to a witness that is prohibited by law." Kansas Rule of Professional Conduct 3.4(b) (1997). Commentary to the Model Rules, as adopted by the Supreme Court of Kansas, states, "The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying . . . ." Kansas Rule of Professional Conduct 3.4(b) cmt. (1997). We have already established, in agreement with our sister circuits, that intangible value can be equivalent to financial value, and that the promise of leniency is an equal or greater incentive to lie than is cash. Moreover, because we have held that the government's promises ran afoul of 18 U.S.C. § 201(c)(2), and were thus prohibited by law, we must conclude the government violated Rule 3.4(b).

### VI. Remedy

In the circumstances before us, the appropriate remedy for the testimony obtained in violation of § 201(c)(2) is suppression of its use in Ms. Singleton's trial.(7) "[T]he principal reason behind the adoption of the exclusionary rule was the Government's 'failure to observe its own laws.'" United States v. Russell, 411 U.S. 423, 430 (1973) (quoting Mapp v. Ohio, 367 U.S. 643, 659 (1961)). The exclusionary rule has been applied to constitutional, statutory, and procedural rule violations to deter unlawful conduct. See United States v. Blue, 384 U.S. 251, 255 (1966). The Supreme Court itself has applied the rule to various statutory violations, see Sabbath v. United States, 391 U.S. 585, 586, 588-90 (1968); Miller v. United States, 357 U.S. 301, 313-14 (1958); Nardone v. United States, 308 U.S. 338, 339-41 (1939); Nardone v. United States, 302 U.S. 379, 380-84 (1937), and has held open this application while denying use of the rule for certain regulatory violations, see United States v. Caceres, 440 U.S. 741, 754-55 & n.21 (1979). Likewise the courts of appeals have held suppression

appropriate where federal statutes have been violated. See, e.g., United States v. Marts, 986 F.2d 1216, 1218-19 (8th Cir. 1993); United States v. Rivieccio, 919 F.2d 812, 816 (2d Cir. 1990), cert. denied, 501 U.S. 1230 (1991); United States v. Chemaly, 741 F.2d 1346, 1353-54 & n.2 (11th Cir. 1984), reh'g en banc vacated and panel opinion reinstated, 764 F.2d 747 (11th Cir. 1985) (en banc); United States v. Soto-Soto, 598 F.2d 545, 550 (9th Cir. 1979); United States v. Genser, 582 F.2d 292, 307-09 (3d Cir. 1978). Although its application to statutory violations is not automatic, see Weiss v. Commissioner, 919 F.2d 115, 116 (9th Cir. 1990), we believe the policies of the rule require its use in this context.

Suppression is a judicially fashioned rule whose primary purpose is to deter official misconduct. See United States v. Peltier, 422 U.S. 531, 542 (1975); United States v. Calandra, 414 U.S. 338, 347-48 (1974). We must balance the good of preventing future unlawful conduct with the evil of disallowing relevant evidence of guilt in an individual case. See United States v. Duchi, 944 F.2d 391, 396 (8th Cir. 1991).

We believe exclusion will effectively deter the unlawful conduct before us. Agreements to seek leniency or refrain from filing charges in return for testimony are entered into with the intention of presenting to a court the testimony so acquired. Excluding that tainted testimony removes the sole purpose of the unlawful conduct and leaves no incentive to violate § 201(c)(2). Cf. id. Courts declining to apply the exclusionary rule for violation of statutes have done so on the ground that it is "inappropriate until such time as 'widespread and repeated violations'" of the statute exist, United States v. Roberts, 779 F.2d 565, 568 (9th Cir.) (quoting United States v. Wolffs, 594 F.2d 77, 85 (5th Cir. 1979)), cert. denied, 479 U.S. 839 (1986), and they have specifically held the remedy available for that situation, see United States v. Griley, 814 F.2d 967, 976 (4th Cir. 1987). This approach is appropriate because deterrence is a preventive function which cannot be served unless there is a significant likelihood of future violations to be deterred. See Calandra, 414 U.S. at 347-48. We have exactly that situation. "No practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence." Cervantes-Pacheco, 826 F.2d at 315. This ingrained practice of buying testimony indicates that suppression is necessary to compel respect for the statutory protections Congress has placed around testimony in federal courts. Exclusion is also necessary to remove the incentive to disregard the statute. See Calandra, 414 U.S. at 347 (quoting Elkins v. United States, 364 U.S. 206, 217 (1960)). The benefits of deterrence outweigh the evil of excluding relevant evidence, and the balance falls heavily in favor of suppression.

A secondary policy protected by the exclusionary rule is "the imperative of judicial integrity." Elkins, 364 U.S. at 222. Courts will not be made party to lawlessness by permitting unhindered use of the fruits of illegality. See Terry v. Ohio, 392 U.S. 1, 12-13 (1968); Mapp, 367 U.S. at 660. Although this basis for the exclusionary rule exerts limited force, see Stone v. Powell, 428 U.S. 465, 485 (1976); see also John Kaplan, The Limits of the Exclusionary Rule, 26 Stan. L. Rev. 1027, 1036 & n.53 (1974); Henry P. Monaghan, The Supreme Court 1974 Term--Foreword: Constitutional Common Law, 89 Harv. L. Rev. 1, 5-6 & n.33 (1975), we find it relevant because of the substance of the policy codified in § 201(c)(2).

The Second Circuit has written, regarding parallel provisions in § 201 prohibiting bribes and gratuities in the context of public officials,

[T]here is no reason to infer that the policy and purpose behind the 'corrupt intent to influence' offenses [are] substantially different from [those] underlying the 'for or because of' offenses. . . . '[E]ven if corruption is not intended by either the donor or the donee, there is still a tendency in such a situation to provide conscious or unconscious preferential treatment of the donor by the donee . . . .'"

Biaggi, 853 F.2d at 101 (second and third alterations in original) (quoting United States v. Biaggi, 674 F. Supp. 86, 89 (E.D.N.Y. 1987) (quoting United States v. Evans, 572 F.2d 455, 480 (5th Cir.), cert. denied, 439 U.S. 870 (1978))). We find this comparison of policy applicable between the witness bribery and gratuity prohibitions. Congress evidenced an intent in § 201(c)(2) to remove the temptation inherent in a witness's accepting value from a party for his testimony. See Evans, 572 F.2d at 480. That temptation, even if unconscious, is to color or falsify one's testimony in favor of the donor. The law already imposes on every witness the solemn and fundamental duty to testify truthfully, and accepting unlawful gratuities or inducements from a party compromises that solemn duty. When testimony tainted in this way is presented to the courts of the United States, judicial integrity is directly impugned in a way it is not by tangible evidence whose reliability is unaffected by an underlying illegality. And when the statutory policy of Congress is to protect courts and parties from that taint, suppression is particularly appropriate because it effectuates that purpose.

For this reason we are unpersuaded by cases holding suppression inappropriate for statutory violations on the ground that where Congress has established other penalties the courts should not create a judicial remedy. See, e.g., United States v. Benevento, 836 F.2d 60, 69-70 (2d Cir. 1987), cert. denied, 486 U.S. 1043 (1988); United States v. Michaelian, 803 F.2d 1042, 1049-50 (9th Cir. 1986); United States v. Kington, 801 F.2d 733, 737-38 (5th Cir. 1986), cert. denied, 481 U.S. 1014

(1987); see also United States v. Thompson, 936 F.2d 1249, 1251-52 (11th Cir. 1991), cert. denied, 502 U.S. 1075 (1992). Unlike all of these cases, the violation of § 201(c)(2) at issue in our case directly tainted the reliability of the evidence. To permit this unlawfully obtained evidence "to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law." United States v. Mitchell, 322 U.S. 65, 67 (1944) (quoting McNabb v. United States, 318 U.S. 332, 345 (1943)).

We emphasize that the rule we apply today rests in no way on the Constitution; it is a creature solely of statute. The constitutional boundaries of testimony like that presented in this case have been amply delineated in Hoffa v. United States, 385 U.S. 293, 297-99, 310-12 (1966), Brady, 373 U.S. at 86-91, Giglio, 405 U.S. at 155-56, Cervantes-Pacheco, 826 F.2d at 312-16, and the lines of cases they represent. Our holding today is unrelated to them.

VII. Sufficiency of the Evidence

Having concluded Ms. Singleton's motion to suppress should have been granted, we address her claim that the district court erred in denying her motion for judgment of acquittal as to both her conspiracy and money laundering convictions. We hold at the outset that the failure to suppress Mr. Douglas's testimony was not harmless error as to either the conspiracy or the money laundering convictions. The government relied on Mr. Douglas as its principal witness, and, considering the entire record, we are entirely unable to say that the admission of his testimony did not influence the verdict. See Kotteakos v. United States, 328 U.S. 750, 764-65 (1946).

The remaining question is whether the record contains sufficient other evidence upon which a jury could find guilt beyond a reasonable doubt. If the evidence, excluding the testimony of Mr. Douglas, is legally insufficient to support her convictions, a new trial is prohibited by double jeopardy principles. See United States v. McAleer, 1998 WL 101804, at *4 (10th Cir. 1998) (citing Burks v. United States, 437 U.S. 1, 18 (1978)). If, however, the record contains sufficient evidence to support a conviction without Mr. Douglas's testimony, then justice requires a new trial. See United States v. Tateo, 377 U.S. 463, 465 (1964).

We review de novo the denial of a motion for judgment of acquittal. See United States v. Lampley, 127 F.3d 1231, 1242 (10th Cir. 1997), cert. denied, 118 S. Ct. 1098 (1998). Our standard is whether the evidence is sufficient to sustain a conviction. See Fed. R. Crim. P. 29(a). Excluding the testimony of Mr. Douglas and viewing the remaining evidence and all reasonable inferences from it in the light most favorable to the government, we conclude that a rational jury could have found Ms. Singleton guilty beyond a reasonable doubt of both the conspiracy and money laundering charges. See United States v. Leos-Quijada, 107 F.3d 786, 794 (10th Cir. 1997); see also United States v. Coleman, 7 F.3d 1500, 1502-03 (10th Cir. 1993); United States v. Ruiz-Castro, 92 F.3d 1519, 1531 (10th Cir. 1996).

REVERSED and REMANDED for a new trial.

---

<strong>FOOTNOTES</strong><br>Click footnote number to return to corresponding location in the text.

1. Samuel Rutherford, Lex, Rex, or The Law and the Prince (1644) (Sprinkle Publications 1982).

2. From the general rule against payments to fact witnesses, Hamilton excepts reimbursements for travel, subsistence, and the reasonable value of time lost in attendance. Hamilton, 490 F.2d at 227. These exceptions track 18 U.S.C. § 201(j), currently renumbered as § 201(d), which provide the corollary statutory exceptions from § 201(c)(2) for such reimbursements.

3. Section 201, with its present statutory language, was enacted in 1962. In 1986 Congress renumbered § 201 into its present form. See Criminal Law & Procedure Technical Amendments Act of 1986, Pub. L. 99-646, § 46(h), 100 Stat. 3592, 3603 (1986). The pre-1986 statute, which Irwin interpreted, contained the same distinctions between bribery and gratuity provisions. Section 201(c)(2), which was designated § 201(h) before 1986, has not been altered since its enactment in 1962.

4. The argument that § 201(c)(2) applies to government inducements for testimony appears first to have been made (excepting several older cases which we address later) in an article by a former government prosecutor. See J. Richard Johnston, Paying the Witness: Why Is It OK for the Prosecution, but Not the Defense?, 12 WTR Crim. Just. 21 (1997).

5. A subcommittee of Congress also expressed its disapproval of the Department of Justice's position:

We disagree with the Attorney General's attempts to exempt departmental attorneys from compliance with ethical

requirements adopted by the State bars to which they belong and in the rules of the Federal courts before which they appear. While recognizing that it is ultimately the courts who finally decide disputes over such authority, we nevertheless urge reconsideration and withdrawal of the Attorney General's June 8, 1989 memorandum, "Communication with Persons Represented by Counsel."

H.R. Rep. No. 101-986, at 32 (1990).

6.Although the mandate of the panel opinion was vacated when the Sixth Circuit reheard the case en banc, the rehearing was limited to issues unrelated to § 201(h). The en banc opinion specifically adopted the panel's dispositions and reasoning on all other issues, including the § 201(h) matter. See Blanton, 719 F.2d at 817, 833.

7. The suppression remedy we apply rests wholly on the government's statutory violation, not on the prosecutor's violation of Kansas Professional Rule 3.4(b).

---

 | Keyword | Case | Docket | Date: Filed / Added | WP (101936 bytes)  RTF (106006 bytes)

---

*Comments to: WebMaster, ca10@law.wuacc.edu.*
*Updated: July 2, 1998.*
*HTML markup Copyright © 1998, Washburn University School of Law.*
*URL: http://lawlib.wuacc.edu/ca10/cases/1998/07/97-3178.htm.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 1999, I caused the foregoing

MOTION OF JAMES H. ROANE, JR. TO AMEND HIS MOTION TO VACATE, SET ASIDE

OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255; AMENDED MOTION OF

JAMES H. ROANE, JR. TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT

TO 28 U.S.C. § 2255; and proposed ORDER to be served by first-class mail, postage prepaid,

upon:

Robert J. Erickson
United States Department of Justice
10th & Constitution Ave., N.W.
Washington, DC 20530

Paul F. Enzinna

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



FILED
OCT - 1 1999
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Criminal No. 92CR68 |
| JAMES H. ROANE, Jr. | ) Civil No. 97CV895 |
| Defendant. | ) |

## SECOND AMENDED MOTION OF JAMES H. ROANE, Jr.
## TO VACATE, SET ASIDE OR CORRECT
## SENTENCE PURSUANT TO 28 U.S.C. § 2255

James H. Roane, Jr., a prisoner in the custody of the United States, under

sentence of death, now being held at the United States Penitentiary, Terre Haute, Indiana,

hereby amends his previous Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28

U.S.C. § 2255, and the memorandum in support thereof. Mr. Roane incorporates in this

motion and memorandum (1) the entirety of his initial motion and memorandum in support;

(2) the entirety of his first amended motion and memorandum in support; (3) to the extent

applicable, each of the grounds for relief stated by his codefendants, Richard Tipton and

Corey Johnson, in their petitions and amended petitions; and (4) the following grounds for

relief:

## I.     THE TRIAL COURT FAILED PROPERLY TO INSTRUCT THE
## JURY ON THE ESSENTIAL ELEMENTS OF THE CCE STATUTE

In *Richardson v. United States*, 119 S. Ct. 1707 (1999), the United States

Supreme Court held that in order to convict under the federal Continuing Criminal Enterprise

("CCE") statute, 21 U.S.C. § 848, it is insufficient for the jury to agree merely that the defendant committed a "continuing series of violations [of the federal drug laws]." Rather, the *Richardson* Court held, the jury must be unanimous with regard to which specific violations make up the "continuing series of violations." 119 S. Ct. at 1713. The *Richardson* Court noted that this ruling would "make a difference where . . . the government introduces evidence that the defendant has committed more underlying crimes than legally necessary to make up a 'series.'" *Id.* at 1709-10. The *Richardson* Court specifically reserved the question whether a failure to require unanimity may be "harmless." *Id.* at 1721.

At trial in this case, this Court instructed the jury that it could find "the defendants" to have committed a "continuing series of violations" on the basis of numerous specific acts, including five in which James Roane was alleged to have participated: Counts 1 (conspiracy), 5 (murder of Douglas Moody), 8 (murder of Peyton Johnson), 11 (murder of Louis Johnson) and 32 (drug possession).[1] Tr. 3210-11. The Court failed to instruct the jury – as required by *Richardson* – that it could not find that James Roane had participated in a CCE unless it agreed *unanimously* on the specific underlying violations committed by Mr. Roane giving rise to the CCE. The decision in *Richardson* makes clear that this was error.

Mr. Roane raised this issue on direct appeal, prior to the decision in *Richardson*. The Fourth Circuit, reviewing the claim for plain error, questioned whether there was error at all, but held that even if it was error to fail to instruct the jury on the need for unanimity, Mr. Roane was not prejudiced by that failure because the jury unanimously convicted him of at least three

---

[1] By failing to treat the defendants separately, and by advising the jury that it must find that the "continuing series of violations" was undertaken "by the defendants," the instructions in this case were particularly likely to confuse the jury, and permit a conviction absent the necessary finding that *each* defendant personally committed a "continuing series of violations."

underlying offenses.[2] 90 F.3d at 885. *Richardson* makes clear that the failure to instruct was error. Moreover, it was "structural" error, and therefore subject to automatic reversal, without any inquiry into prejudice.

"Although most constitutional errors have been held amenable to harmless error analysis, some will always invalidate the conviction." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). Errors that "necessarily render a trial fundamentally unfair," and which "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair,'" require reversal in all cases, independent of any showing of actual prejudice. *Neder v. United* States, 119 S. Ct. 1827, 1833 (1999) (*quoting Rose v. Clark*, 478 U.S. 570, 577-78 (1986)).

The error at issue here – the Court's failure to instruct the jury that to convict James Roane of involvement in a CCE, it was required to agree unanimously on which specific "violations" committed by him made up the "continuing series of violations" required by the CCE statute – was not in the class of "trial errors which occur 'during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented.'" *Sullivan, supra*, 508 U.S. at 281. Rather, it belongs to the class of "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.*

A criminal defendant is, of course, entitled to have a jury consider the evidence, and decide whether the defendant's acts constitute a crime. But errors occurring in the course of

---

[2] Even though this issue was decided on direct appeal, Mr. Roane may raise it again on collateral review by virtue of the intervening change in law represented by *Richardson. Davis v. United States*, 417 U.S. 333, 342 (1974).

trial, such as the improper admission of particular evidence, may be assessed under the harmless error standard because an appellate court reviewing the case "simply reviews the remainder of the evidence against the defendant to determine whether the admission of the [improper evidence] was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).

In addition, however, a criminal defendant is entitled to acquittal unless the jury determines guilt *unanimously*. By contrast to situations in which an appellate court may determine for itself whether, in light of properly admitted evidence, the improper admission of particular evidence was harmless beyond a reasonable doubt, a jury that does not act unanimously "produces 'consequences that are necessarily unquantifiable and indeterminate,'" and therefore not amenable to harmless error analysis. *Neder, supra*, 119 S. Ct. at 1834 (*quoting Sullivan, supra*, 508 U.S. at 282). For example, a general verdict of guilty rendered by a jury that had been instructed that a simple majority was sufficient for conviction could not be upheld under harmless error analysis, no matter how strong the evidence against the defendant. This is so because the question facing the appellate court is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered . . . was surely unattributable to the error." *Sullivan, supra*, 508 U.S. at 279.

The right to a unanimous verdict is so critical that it is one of the few rights that may not be waived, in any circumstances. *United States v. Ullah*, 976 F.2d 509, 513 (9th Cir. 1992); *United States v. Gipson*, 553 F.2d 453, 456 n.4 (5th Cir. 1977). As then-Judge Kennedy stated, the requirement of a unanimous verdict underlies the very framework of our criminal system:

> The dynamics of the jury process are such that often only one or two members express doubt as to view held by a majority at the outset of deliberations. A rule which insists on unanimity furthers the deliberative process by requiring the minority view to be examined and, if possible, accepted or rejected by the entire jury. The requirement of jury unanimity thus has a precise effect on the fact-finding process, one which gives particular significance and conclusiveness to the jury's verdict. Both the defendant and society can place special confidence in a unanimous verdict . . . .

*United States v. Lopez*, 581 F.2d 1338, 1341 (9th Cir. 1978). In our system, it is insufficient for conviction that a jury merely agree that the defendant is an evildoer. *See, e.g., Lanzetta v. New Jersey*, 306 U.S. 451 (1939). Since the criminal law punishes acts, rather than persons, the jury must first agree, unanimously, on "just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged." *United States v. Gipson*, 553 F.2d 453, 457-58 (5th Cir. 1977).

In affirming the convictions on direct appeal, the Fourth Circuit wrote that Mr. Roane was not prejudiced by any error in the trial court's failure to give a unanimity instruction because the fact that he was convicted of more than three underlying offenses demonstrates that the jury agreed unanimously on at least three such violations. 90 F.3d at 885. However, three violations alone are not sufficient to make up a "continuing series of violations;" rather, to show a "continuing series," the government must prove that the violations are *related. United States v. Hall*, 93 F.3d 126, 129 (4th Cir. 1996). Since the "continuing series" is an element of the offense, the jury necessarily must agree unanimously that at least three violations are "related." Even if, as the Fourth Circuit held, the jury's findings indicate that it unanimously found that Mr. Roane committed the Count 1 conspiracy, the Count 32 possession charge, and three CCE murders, there is no indication in the jury's findings that the jury unanimously agreed that at least three of those violations were *related* and, if so, which ones.

In the circumstances of this case, it is not possible for a reviewing court to "simply review[] the remainder of the evidence" and determine whether the trial court's error was harmless. It is simply not possible to determine whether, as required, the jurors unanimously agreed that Mr. Roane committed at least three, specific, related "violations." The consequences of the error are "'necessarily unquantifiable and indeterminate,'" and therefore not amenable to harmless error analysis. *Neder, supra,* 119 S. Ct. at 1834 (*quoting Sullivan, supra,* 508 U.S. at 282).

## CONCLUSION

By failing to instruct the jury that, to convict, it was required to agree unanimously on which three or more specific "violations" committed by James Roane constituted the "continuing series of violations" required for conviction under the CCE statute, and that those specific violations were related, the trial court deprived Mr. Roane of his right to trial by jury under the Sixth Amendment. His conviction should be set aside and the requested relief granted.

Respectfully submitted,

JAMES H. ROANE, Jr.

By: _____

Scott L. Nelson
Paul F. Enzinna
Michael J. Barta (VSB # 30706)
MILLER, CASSIDY, LARROCA
   & LEWIN, L.L.P.
2555 M Street, N.W.
Washington, D.C. 20037
(202) 293-6400

Dated: September 30, 1999      Counsel for James H. Roane, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of September, 1999, I caused the foregoing SECOND AMENDED MOTION OF JAMES H. ROANE, Jr. TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 to be served by first-class mail, postage prepaid, upon:

Robert J. Erickson
United States Department of Justice
10th & Constitution Ave., N.W.
Washington, DC 20530

Wingate Grant
Assistant United States Attorney
600 E. Main St.
Suite 1800
Richmond, VA 23219

Donald R. Lee, Jr.
1015 E. Main St.
4th Floor
Richmond, VA 23219

Barbara L. Hartung
1001 E. Main St.
Suite 504
Richmond, VA 23219

Paul F. Enzinna

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

F I L E
JUN 2 5 2001
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal No. 92CR68 |
| v. | ) | |
| | ) | Civil No. 97CV895 |
| JAMES H. ROANE, Jr. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MOTION OF JAMES H. ROANE, Jr. TO AMEND HIS MOTION TO VACATE,
SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

James H. Roane, Jr., a prisoner in the custody of the United States, under sentence of death, now being held at the United States Penitentiary, Terre Haute, Indiana, respectfully requests that he be permitted to amend his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255, to include as an additional ground for relief the denial of his rights under the Grand Jury Clause of the Fifth Amendment. The grounds for this motion are as follows:

1.    In Counts 5, 8 and 11 of the indictment, Mr. Roane was charged with killing three individuals "while engaged in and working in furtherance of a Continuing Criminal Enterprise," in violation of 21 U.S.C. § 848(e). That statute provides that any person committing such a murder may be punished by a term of imprisonment (between 20 years and life) or the death penalty, but before the death penalty may be imposed, the statute requires that the jury find the existence of certain aggravating factors enumerated in 21 U.S.C. § 848(n). 21 U.S.C. §§ 848(g), (k). Absent such a finding, the statute requires that "a sentence, other than death" be imposed. Id. Neither the original indictment nor either of the superseding indictments in this case made any reference whatsoever to the aggravating factors required to be proved before the death

DC01:296866.1

penalty may be imposed under 21 U.S.C. § 848. However, following the indictment, the prosecution filed a notice of its intention to seek the death penalty against Mr. Roane for Counts 5, 8 and 11, specifying the aggravating factors on which the government would rely in seeking the death penalty. After deliberating for four days following the penalty phase of the trial, the jury imposed the death penalty against Mr. Roane on Count 5, for the murder of Douglas Moody.

2. In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court's recently held that "facts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] by definition 'elements' of a separate legal offense," which must be charged by the grand jury and found by the petit jury beyond a reasonable doubt. <u>Id</u>. at 483 n.10. In Counts 5, 8 and 11, Mr. Roane was charged by the grand jury with simple murder, but convicted by the petit jury of capital murder, on the strength of aggravating factors not charged by the grand jury, but merely alleged by the prosecution. Because the aggravating factors on which his convictions depend are essential elements of the crimes for which Mr. Roane was convicted on Count 5, 8 and 11, and because those essential elements were not charged by the grand jury, Mr. Roane 's convictions on these counts violate the Fifth Amendment. <u>Id</u>.

3. The decision in <u>Apprendi</u> announced a "watershed change in constitutional law." <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 524 (O'Connor, J., dissenting); <u>see</u> <u>also</u> J. K. Robinson, *Preface to the Thirtieth Annual Review Of Criminal Procedure*, 89 Geo. L. J. 1045, 1046 (<u>Apprendi</u> "may have altered the pre-existing practices governing the charging, prosecution, and sentencing of criminal defendants in the United States"); A. Ellis, P. Goldberger, J. Feldman, Jr., K. Landau, *Apprehending And Appreciating Apprendi*, <u>Criminal Justice</u> (Winter 2001) (<u>Apprendi</u> "is arguably one of the most important and far-reaching criminal cases decided by the [Supreme] Court in years"). Prior to <u>Apprendi</u>, no court had intimated that the Grand Jury

Clause requires that the aggravating factors required for a capital murder conviction must be charged in the indictment; in fact, the courts that had considered the question had held that aggravating factors need not be charged in the indictment. <u>See United States v. Peters</u>, 778 F. Supp. 431, 445-46 (N.D. Ill. 1991); <u>Dufour v. Florida</u>, 495 So. 2d 154, 163 (Fla. 1986); <u>Illinois v. Davis</u>, 447 N.E.2d 353, 366-67 (Ill. 1983); <u>Talamantez v. Superior Ct. of San Diego County</u>, 122 Cal. App. 3d 629, 634-35 (Cal. Ct. App. 1981); <u>North Carolina v. Dixon</u>, 361 S.E.2d 562, 564 (N.C. 1987). Thus, the Supreme Court's decision in <u>Apprendi</u> brought about a fundamental shift in the legal landscape, making Mr. Roane's claim available for the first time.

4. The Supreme Court decided <u>Apprendi</u> on June 26, 2000, less than one year ago. <u>See</u> 28 U.S.C. § 2255 (motion under §2255 must be made within one year on which right is initially recognized by Supreme Court). Mr. Roane has pursued this claim with all reasonable dispatch, and the government will not be prejudiced by the proposed amendment.

For the reasons stated, Mr. Roane respectfully requests that the Court accept the attached Third Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.

Dated: June 25, 2001

Respectfully submitted,

JAMES H. ROANE, Jr.

By: Paul F. Enzinna
Michael J. Barta (VSB # 30706)
Gregory J. Golden (VSB # 40139)
BAKER BOTTS, L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 639-7700

Dated: June 25, 2001

<u>Counsel for James H. Roane, Jr.</u>

# CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of June, 2001, I caused the foregoing

(1)  Motion of James H. Roane, Jr. to Amend his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255;

(2)  Third Amended Motion of James H. Roane, Jr. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255; and

(3)  Memorandum in Support of the Third Amended Motion of James H. Roane, Jr. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.

to be served by first-class mail, postage prepaid, upon:

Robert J. Erickson
United States Department of Justice
10th & Constitution Ave., N.W.
Washington, DC  20530

Wingate Grant
Assistant United States Attorney
600 E. Main St.
Suite 1800
Richmond, VA 23219

Frederick R. Gerson
7102 Three Chopt Road
Richmond, Virginia 23226

Barbara L. Hartung
1001 E. Main St.
Suite 504
Richmond, VA 23219

Paul F. Enzinna

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal No. 92CR68 |
| v. | ) | |
| | ) | Civil No. 97CV895 |
| JAMES H. ROANE, Jr. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## THIRD AMENDED MOTION OF JAMES H. ROANE, Jr.
## TO VACATE, SET ASIDE OR CORRECT
## <u>SENTENCE PURSUANT TO 28 U.S.C. § 2255</u>

James H. Roane, Jr., a prisoner in the custody of the United States, under sentence of

death, now being held at the United States Penitentiary, Terre Haute, Indiana, hereby amends his

previous Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (June 1,

1998), his Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255

(March 15, 1999), and his Second Amended Motion to Vacate, Set Aside or Correct Sentence

Pursuant to 28 U.S.C. § 2255 (Oct. 1, 1999), to add the following Ground for Relief, under

paragraph 12:



> **<u>Ground Eight</u>:**[1] Denial of Fifth Amendment right to indictment by grand
> jury.
>
> In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the United States Supreme
> Court held that "facts that expose a defendant to a punishment greater than
> that otherwise legally prescribed [are] by definition 'elements' of a
> separate legal offense," and must be charged in the indictment. <u>Id</u>. at 483.
> Mr. Roane was charged, convicted and sentenced to death for murder in
> furtherance of a continuing criminal enterprise, 21 U.S.C. § 848(e).

---

[1] Mr. Roane's initial Motion raised seven grounds for relief. His Amended Motion
provided additional support for those grounds.

RECEIVED JUN 2 5 2001 CLERK, U.S. DISTRICT COURT RICHMOND, VA

DC01:295836.1

However, the indictment failed to charge necessary elements of *capital* murder under the statute; *i.e.*, the aggravating factors which, under 21 U.S.C. § 848(n), must be charged and proved in order to render a violation of § 848(e) subject to the death penalty. Mr. Roane's convictions for capital murder, and his death sentence, are therefore invalid.

The grounds for this claim are fully set forth in the accompanying Memorandum in

Support.

Dated: June 25, 2001

Respectfully submitted,

JAMES H. ROANE, Jr.

By:

Paul F. Enzinna

Michael J. Barta (VSB # 30706)
Gregory J. Golden (VSB # 40139)
BAKER BOTTS, L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 639-7700

<u>Counsel for James H. Roane, Jr.</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

JAMES H. ROANE, Jr.

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Criminal No. 92CR68

Civil No. 97CV895

## MEMORANDUM IN SUPPORT OF THE
## THIRD AMENDED MOTION OF JAMES H. ROANE, Jr.
## TO VACATE, SET ASIDE OR CORRECT
## SENTENCE PURSUANT TO 28 U.S.C. § 2255

James H. Roane, Jr., a prisoner in the custody of the United States under sentence of death, now being held at the United States Penitentiary, Terre Haute, Indiana, hereby amends his previous Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255, and the memoranda in support thereof, to add as a ground for relief the violation of his rights under the Fifth Amendment's Grand Jury Clause. In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court's recently held that "facts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] by definition 'elements' of a separate legal offense," which must be charged by the grand jury and found by the petit jury beyond a reasonable doubt. Id. at 483 n.10. In Counts 5, 8 and 11, Mr. Roane was charged by the grand jury with simple murder, but convicted by the petit jury of capital murder, on the strength of aggravating factors not charged by the grand jury, but merely alleged by the prosecution. Because the aggravating factors on which his convictions depend are essential elements of the crimes for which Mr.

DC01:296863.1


RECEIVED
JUN 25 2001
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

Roane was convicted on Count 5, 8 and 11, and because those essential elements were not charged by the grand jury, Mr. Roane 's convictions on these counts violate the Fifth Amendment. Id. Mr. Roane incorporates in this motion and memorandum (1) the entirety of his initial motion and memorandum in support; (2) the entirety of his First and Second Amended Motions and Memoranda in Support; and, (3) to the extent applicable, each of the grounds for relief stated by his codefendants, Richard Tipton and Corey Johnson, in their petitions and amended petitions.

## INTRODUCTION

James Roane was charged with, and convicted of, three murders in furtherance of a continuing criminal enterprise, in violation of 21 U.S.C. § 848(e). The United States sought the death penalty for each, but the jury imposed the death penalty for only one such violation, the murder of Douglas Moody, charged in Count 5.

### 1.    The Statutory Scheme

Section 848 of the Anti-Drug Abuse Act of 1988 penalizes, *inter alia*, murders committed while engaged in or working in furtherance of a continuing criminal enterprise. Section 848(e) provides that any person committing such a murder may be punished by a term of imprisonment (between 20 years and life) or the death penalty. However, before the death penalty may be imposed, the statute requires that a hearing be held, in which the jury is required to consider, and make special findings regarding, the existence or absence of certain aggravating factors enumerated in 21 U.S.C. § 848(n). 21 U.S.C. §§ 848(g), (k) (1996). The statute provides that the death penalty may be imposed only if, in addition to finding that the elements of the murder offense described in § 848(e) have been proved, the jury finds the existence of (a) one of the aggravating factors enumerated in 21 U.S.C. § 848(n)(1); and (b) at least one of the

aggravating factors enumerated in 21 U.S.C. §§ 848(n)(2) – (12). 21 U.S.C. § 848(k). Absent such findings, the statute requires that "a sentence, other than death" be imposed. Id.

If the jury finds (at least) two statutory aggravating factors, it must then consider any statutory and nonstatutory mitigating factors submitted by the defendant, 21 U.S.C. § 848(m), and then weigh any such mitigating factors found to be applicable against the statutory aggravating factors, and any nonstatutory aggravating factors the government has proven. The jury may "recommend" a death sentence if, and only if, it concludes that the aggravating factors sufficiently outweigh any mitigating factors. 21 U.S.C. § 848(k).

## 2.    The Charges in This Case

Mr. Roane was initially indicted on April 24, 1992, with superseding indictments filed on May 18, 1992, and July 20, 1992. Count 5 alleged that, "while engaged in and working in furtherance of a Continuing Criminal Enterprise," Mr. Roane "knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured and caused the intentional killing of Douglas Moody," in violation of 21 U.S.C. § 848(e). Counts 8 and 11 used the same language to charge Mr. Roane with the murders of Peyton Maurice Johnson and Louis Johnson, in violation of 21 U.S.C. § 848(e). Neither the original indictment nor either of the superseding indictments made any reference whatsoever to the aggravating factors required to be proved before the death penalty may be imposed under 21 U.S.C. § 848.

On May 1, 1992, the prosecution filed a notice of its intention to seek the death penalty against Mr. Roane for counts 5, 8 and 11. The notice stated that the prosecution would rely on all four mental states listed in Section 848(n)(1) as aggravating factors. With regard to the statute's requirement that at least one additional aggravating factor listed in 21 U.S.C. § 848(n)(2) – (12) be proved before the death penalty may be imposed, the government's notice

stated that it intended to prove that in the commission of these offenses, Mr. Roane knowingly created a great risk of death to one or more individuals other than the victim of the offense, 21 U.S.C. § 848(n)(5), and that he committed the offense after substantial planning and premeditation, 21 U.S.C. § 848(n)(8). The notice also stated that the prosecution would attempt to prove several nonstatutory aggravating factors.[1]

After deliberating for four days following the penalty phase of the trial, the jury concluded that the prosecution had established all four (n)(1) aggravating factors (that Mr. Roane intended to kill Douglas Moody, intentionally inflicted serious bodily injury upon him, intentionally engaged in conduct intending that he be killed, and intentionally engaged in conduct which he knew created a grave risk of death) and one (n)(8) aggravating factor (that Mr. Roane killed Moody after substantial planning and premeditation). The jury also found that the prosecution had established three nonstatutory aggravating factors. The Court accepted the jury's "recommendation" that Mr. Roane be sentenced to death for the murder of Douglas Moody, but not for the murders of Peyton Maurice Johnson and Louis Johnson.

## ARGUMENT

"Much turns on the determination that a fact is an element of an offense rather than a sentencing consideration, given that *elements must be charged in the indictment*, submitted to a jury, and proven by the Government beyond a reasonable doubt." Jones v. United States, 526 U.S. 227, 232 (1999) (emphasis added); see also United States v. Davis, 184 F.3d 366, 368 (4th Cir. 1999). Because the indictment in this case failed to charge essential elements of the capital

---

[1] These included allegations that Mr. Roane committed multiple murders; that he had a substantial criminal history; that he recruited a minor to participate in the murders; that he seriously wounded an individual in the course of committing his offenses; and that he was a member of a conspiracy which had as one of its goals murders other than for those for which he was charged.

crimes with which Mr. Roane was charged, of which he was convicted, and for which he received the death penalty, his convictions for those crimes, and his death sentence, are invalid.

## I.

### THE AGGRAVATING FACTORS ARE ELEMENTS OF THE CRIMES CHARGED IN COUNTS 5, 8 AND 11, AND THE INDICTMENT'S FAILURE TO CHARGE THEM INVALIDATES MR. ROANE'S CONVICTIONS

From our nation's beginning, the Grand Jury has played a critical role in our criminal justice system, as "a shield, standing between the accuser and the accused, protecting the individual citizen against oppressive and unfounded government prosecution." United States v. Hogan, 712 F.2d 757, 759 (2d Cir. 1983). As the first Justice Harlan wrote,

> "[i]n the secrecy of the investigations by grand juries, the weak and helpless – proscribed, perhaps, because of their race, or pursued by an unreasoning public clamor – have found, and will continue to find, security against official oppression, the cruelty of mobs, the machinations of falsehood, and the malevolence of private persons who would use the machinery of the law to bring ruin upon their personal enemies."

Hurtado v. California, 110 U.S. 516, 554-55 (1884) (Harlan, J., dissenting). That the Grand Jury's role as a "shield" is particularly important in capital cases – which not only expose defendants to the ultimate penalty, but also arouse tremendous "public clamor" – is evident from the words of the Grand Jury Clause of the Fifth Amendment itself, which provides, in part, that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."

> "The grand jury, like the petit jury, 'acts as a vital check against the wrongful exercise of power by the State and its prosecutors.' It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, *including the important decision to charge a capital crime.*"

Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (citation omitted) (emphasis added). See also Smith v. United States, 360 U.S. 1, 10 (1959) (capital defendant may not waive indictment).

James Roane was, in fact, indicted by a grand jury. However, he was not indicted by the grand jury for a *capital* crime. Crimes are creatures of statute, and a defendant may be found guilty of a particular crime only upon a finding that he or she has met each of the essential elements described in the statute. E.g., Sullivan v. Louisiana, 508 U.S. 275, 277-78 (1993). In order for the grand jury to fulfill its role as a "shield," an indictment must do more than merely identify the crime with which the defendant is charged. Instead, it must evidence the grand jury's conclusion that the defendant has committed each of the elements that must be proved before the defendant may suffer the punishment prescribed for that crime. Jones, 526 U.S. at 232-234. The indictment in this case fails because it is absolutely silent with regard to critical elements of the offenses for which Mr. Roane was convicted under Counts 5, 8 and 11; *i.e.* the aggravating factors that 21 U.S.C. § 848 requires to be proved to convert simple murder into the capital offense for which Mr. Roane was convicted in these counts.[2]

The Supreme Court's capital punishment jurisprudence since Furman and Gregg has drawn a clear distinction between simple murder and capital murder. Conviction for murder may not, in itself, subject a defendant to the death penalty, absent proof of additional facts that narrow the class of murderers eligible for the death penalty. E.g., Spaziano v. Florida, 468 U.S. 447, 460 (1984) (capital punishment system must "rationally distinguish between those [murderers] for whom death is an appropriate sanction and those for whom it is not"). Aggravating factors

---

[2] Although Mr. Roane was charged with three counts of capital murder, the death penalty was imposed only on one, the murder of Douglas Moody charged in Count 5. However, even though Counts 8 and 11 did not result in a capital sentence, they were improperly charged as capital crimes. See Smith v. United States, 360 U.S. 1, 8 (1959) ("when the offense as charged is

"narrow the class of persons eligible for the death penalty and . . . justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." <u>Zant v. Stephens</u>, 462 U.S. 862, 877 (1983).

The indictment in this case charges Mr. Roane with murder, but standing alone, it is insufficient to charge him with *capital* murder. It charges merely that "while engaged in and working in furtherance of a Continuing Criminal Enterprise," Mr. Roane "knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured and caused the intentional killing of" three individuals, in violation of 21 U.S.C. § 848(e). Without more, proof of this charge would subject Mr. Roane only to a term of imprisonment between 20 years and life. 21 U.S.C. § 848(e). Contrary to the explicit command of the Fifth Amendment, Mr. Roane was "held to answer for a capital . . . crime" not upon any action by the grand jury, but upon the *prosecution's* determination that, in its view, rather than the grand jury's Mr. Roane had met the elements of a *capital* murder under § 848 – *i.e.*, that he not only committed a murder punishable under § 848(e), but that he did so in such a way as to satisfy the aggravating factors required under the statute to transform a murder into a *capital* murder. In sum, the grand jury's role as a "shield" between the government and the accused in a capital case was utterly usurped in this case, in clear violation of the Fifth Amendment's explicit command.

In <u>Jones v. United States</u>, 526 U.S. 227 (1999), the Supreme Court recently considered the question of what "elements" of a criminal statute must be specified in the indictment. The defendant in that case was convicted of a carjacking under 18 U.S.C. § 2119, which provided that:

---

sufficiently broad to justify a capital verdict, the trial must proceed on that basis, even though the evidence later establishes that such a verdict cannot be sustained").

> Whoever, [possessing a firearm] . . . takes a motor vehicle . . . from the person or the presence of another by force and violence or by intimidation, or attempts to do so, shall –
>
> (1)  be fined under this title or imprisoned not more than 15 years, or both,
>
> (2)  if serious bodily injury . . . results, be fined under this title or imprisoned not more than 25 years, or both, and
>
> (3)  if death results, be fined under this title or imprisoned for any number of years up to life, or both . . . .

The indictment made no reference to "serious bodily injury," but after Jones was convicted, the government sought a sentence of 25 years, based on injuries suffered by the victim. The defendant argued that "serious bodily injury" was an element of the crime for which the government sought the extended sentence, and therefore was required to be specified in the indictment and proved to the jury. The District Court, however, concluded that "serious bodily injury" was not an element of the crime but a "sentencing factor," which need neither be charged nor proved to the jury.

The Supreme Court, however, disagreed. The Court noted that the carjacking statute:

> [A]t first glance has a look to it suggesting that the numbered subsections are only sentencing provisions. It begins with a principal paragraph listing a series of obvious elements (possession of a firearm, taking a motor vehicle, connection with interstate commerce, and so on). That paragraph comes close to standing on its own, followed by sentencing provisions, the first of which, subsection (1), certainly adds no further element.

Id. at 232-233. However, the Court continued, this "superficial impression" could not withstand examination of subsections (2) and (3). Those subsections:

> [N]ot only provide for steeply higher penalties, but condition them on further facts (injury, death) that seem quite as important as the elements in the principal paragraph (e.g., force and violence, intimidation). It is at best questionable whether the specification of facts sufficient to increase a penalty range by two-thirds, let

alone from 15 years to life, was meant to carry none of the process safeguards that elements of an offense bring with them for a defendant's benefit.

Id. at 233. In order to avoid "serious constitutional questions" that would otherwise be raised, the Court concluded that despite its structure – which suggested that "serious bodily injury" might be a "sentencing factor" not required to be charged in the indictment or proved beyond a reasonable doubt to the jury – § 2119 should be read as establishing "three separate offenses by the specification of distinct elements, each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict." Id. at 252. Since the element of "serious bodily injury" had not been charged in the indictment or proved to the jury beyond a reasonable doubt, the Court reversed Jones' conviction under the statute.

The statute at issue here, 21 U.S.C. § 848, is precisely analogous to 18 U.S.C. § 2119. Section 848(e) lists "a series of obvious elements" (engagement in or work in furtherance of a CCE, intentional killing), and the subsections following it, § 848(g) – (n) appear to be "sentencing provisions." However, just as with 18 U.S.C. § 2119, those other sections condition "steeply higher penalties" on proof of facts without which a capital sentence may not be imposed. James Roane, for example, could not have received the death penalty for the murder of Douglas Moody unless and until the jury concluded that he had committed that murder after "substantial planning and premeditation." 21 U.S.C. § 848(n)(8). "It is at best questionable" whether the specification of facts necessary not merely to increase the sentence, but to impose a wholly different, and vastly more serious, category of punishment[3] "was meant to carry none of

---

[3] E.g., Woodson v. North Carolina, 428 U.S. 280, 305 (1976) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.")

the process safeguards that elements of an offense bring with them for a defendant's benefit." Jones, 526 U.S. at 233. Just as the Court found that 18 U.S.C. § 2119 creates three separate carjacking offenses, with different penalties and different elements that must be proved, 21 U.S.C. § 848 establishes two separate murder offenses – capital and non-capital – and requires, for conviction of capital murder, that elements in addition to those required for conviction of non-capital murder (*i.e.*, the aggravating factors) be charged in the indictment and found by the jury beyond a reasonable doubt.

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Court extended the reasoning of Jones, holding that what had been prescribed in Jones by virtue of statutory construction was, in fact, constitutionally-mandated. In Apprendi, the defendant fired a weapon into the home of an African-American family, allegedly because of the family's race. The defendant was charged in an indictment with unlawful possession of weapons, but his sentence was enhanced under New Jersey's "hate crime" statute, which provided for enhanced penalties where an offense was motivated by racial animus. The indictment did not charge that the shooting was racially motivated, and the finding on which the defendant's sentence was enhanced was made by the judge rather than the jury, by a preponderance of the evidence rather than beyond a reasonable doubt. The Court reversed, because:

> New Jersey threatened Apprendi with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race. As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect Apprendi from unwarranted pains should apply equally to the two acts that New Jersey has singled out for punishment.

Id. at 476.

Again, James Roane's case is indistinguishable. The federal criminal code threatened him with a sentence of up to life imprisonment if he intentionally killed while engaging in or working in furtherance of a CCE. The statute threatened him with a far more serious punishment if he did so *and, in addition, committed acts constituting the aggravating factors required by §* *848(n)*. Under Apprendi, the procedural safeguards designed to protect him, including the Fifth Amendment's requirement that the indictment charge every element of the crime, apply equally to the two different sets of actions that § 848 punishes. As the Apprendi Court put it:

> [F]acts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] by definition "elements" of a separate legal offense.

Id. at 483. Proof of every single allegation contained in the indictment would not, without more, subject James Roane to a capital sentence. Under the statute, he could only be exposed to a greater punishment upon proof of additional facts – here, that he killed Douglas Moody after "substantial planning and premeditation" – which were not alleged in the indictment. See 21 U.S.C. § 848(n)(8). Under Apprendi, those additional facts are, "by definition 'elements' of a separate legal offense," which was not charged by indictment. Apprendi, 530 U.S. at 483.

## II.

### THE RELIEF MR. ROANE SEEKS IS NOT BARRED BY *TEAGUE v. LANE*

In Teague v. Lane, 489 U.S. 288, 310 (1989), the Supreme Court announced that, subject to two exceptions, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." The Teague Court held that a court reviewing a claim under 28 U.S.C. § 2255 must make a three-step "threshold" inquiry. *First*, it must determine the date on which the petitioner's conviction became final. *Second*, because "[n]ew rules of constitutional criminal procedure 'are generally not applied retroactively

on collateral review,'" <u>United States v. Sanders</u>, 247 F.3d 146 (4th Cir. 2001), the court must determine whether the petitioner seeks to take advantage of a "new rule;" *i.e.*, one announced after his conviction became final. *Third*, if the petitioner does seek to take advantage of a "new rule," the court must determine whether that "new rule" falls within one of the two exceptions announced in <u>Teague</u> to the bar against retroactive application of "new rules." Although the Supreme Court's decision in <u>Apprendi</u> was announced after Mr. Roane's convictions became final, <u>Teague</u> does not bar relief in this case. *First*, as applied to this case, <u>Apprendi</u> holds that the federal capital murder statute does not reach the conduct with which Mr. Roane was charged by the grand jury in Counts 5, 8 and 11, rendering <u>Teague</u> inapplicable to this case. <u>See Bousley v. United States</u>, 523 U.S. 614 (1998). *Second*, even if <u>Teague</u> were applicable, the rule announced in <u>Apprendi</u> is subject to <u>Teague</u>'s exception for "watershed rul[es] of criminal procedure," and must be applied retroactively.

## A.     *Teague* **Is Inapplicable**

In <u>Bousley v. United States</u>, 523 U.S. 614 (1998), the Supreme Court held that <u>Teague</u> "is inapplicable to the situation in which this Court decides the meaning of a criminal statute enacted by Congress." In <u>Bousley</u>, the defendant pled guilty to charges of "using" a firearm "during and in relation to a drug trafficking crime," in violation of 18 U.S.C. 924(c). After his conviction became final, the Court determined in <u>Bailey v. United States</u>, 516 U.S. 137, 144 (1995), that conviction under the "use" prong of 924(c) requires proof of the defendant's "active employment of the firearm." Since he had not "actively employed" a firearm, the defendant in <u>Bousley</u> claimed on collateral review that his plea was not knowing and intelligent, because "neither he, nor his counsel, nor the [trial] court had correctly understood the essential elements of the crime with which he was charged." <u>Bousley</u>, 523 U.S. at 618.

The <u>Bousley</u> Court held that <u>Teague</u> did not bar collateral relief, even though <u>Bailey</u> was decided after Bousley's conviction became final. The <u>Bousley</u> Court held that "[t]here is surely nothing new about" the constitutional claim made by Bousley; *i.e.*, that a plea must be knowing and intelligent," and that "because <u>Teague</u> by its terms applies only to procedural rules, we think it is inapplicable to the situation in which this Court decides the meaning of a criminal statute enacted by Congress." 523 U.S. at 620. These principles render <u>Teague</u> inapplicable in this case.

*First*, "[t]here is surely nothing new about" Mr. Roane's constitutional claim, which is that the Fifth Amendment demands a grand jury make the determination whether to charge a capital crime. Indeed, this command is stated explicitly in the Fifth Amendment itself, and has been the clear law of this land for centuries.

*Second*, as applied in this case, the Supreme Court's decision in <u>Apprendi</u> constitutes one in which that Court "decide[d] the meaning of a criminal statute enacted by Congress." As described above, 21 U.S.C. § 848 establishes two separate murder offenses, one capital and one non-capital. At the time of Mr. Roane's indictment, trial and conviction, neither he, his counsel nor this Court had the benefit of the decision in <u>Apprendi</u>, which makes clear that the aggravating factors in 21 U.S.C. § 848(n) are essential elements of the capital offense described in 848, and that, unless it charges the required aggravating factors, a grand jury that charges a murder in violation of § 848 necessarily charges *simple*, rather than *capital*, murder. As applied in this case, <u>Apprendi</u> does not change the law, but instead makes clear that the crime charged against Mr. Roane in Counts 5, 8 and 11 is a *non-capital* crime, and that the prosecution's enhancement of those charges, by the addition of aggravating factors without benefit of grand

jury review, is invalid. Thus, <u>Teague</u> is inapplicable here. <u>See</u> <u>Bousley</u>, 523 U.S. at 623 (Stevens, J., concurring in part and dissenting in part).

**B.      Even if *Teague* Applies, The Rule at Issue Must be Applied Retroactively**

Both <u>Apprendi</u> and <u>Jones</u> were decided after Mr. Roane's convictions became final, and the Fourth Circuit has held that <u>Apprendi</u> announced a "new rule" under <u>Teague</u>. <u>United States v. Sanders</u>, 247 F.3d 139, (4th Cir. 2001). For the reasons stated above, however, <u>Teague</u> is inapplicable here. But even if <u>Teague</u> were found to apply in this case, the rule at issue here is subject to <u>Teague</u>'s exception for "watershed rul[es] of criminal procedure," and therefore is applicable retroactively.

"[A] new rule should be applied retroactively if it requires the observance of those procedures that . . . are implicit in the concept of ordered liberty." <u>Teague</u>, 489 U.S. at 311 (citation and internal quotation marks omitted). Such a rule is applied retroactively if, "without it, 'the likelihood of an accurate conviction is seriously diminished,'" and if it "alter[s] our understanding of the *bedrock procedural elements* essential to the fairness of the proceeding." <u>Sanders</u>, 247 F.3d at 148 (*quoting* Teague, 489 U.S. at 313; <u>Sawyer v. Smith</u>, 497 U.S. 227, 242 (1990) (emphasis in original). The rule at issue here is such a rule.

In <u>Adams v. Aiken</u>, 965 F.2d 1306 (4th Cir. 1992) ["<u>Adams I</u>"] the Fourth Circuit considered the question of retroactive application of a "new rule" under <u>Teague</u>. Adams was convicted of capital murder and, in <u>Adams I</u>, the Fourth Circuit held that, tested by <u>Cage v. Louisiana</u>, 498 U.S. 39 (1990), the trial court's instructions "diluted the reasonable doubt standard and allowed the jury to find Adams guilty by a measure of proof that failed to meet the requirements of the Due Process Clause." 965 F.2d at 1311. However, the <u>Adams I</u> court also held that the rule announced in <u>Cage</u> was a "new rule" under <u>Teague</u>, which did not fit within an

exception to the rule in <u>Teague</u>, and could not be applied retroactively on collateral review. <u>Id</u>. at 1311-12.

However, in <u>Adams v. Evatt</u>, 511 U.S. 1001 (1994), the Supreme Court vacated the judgment in <u>Adams I</u>, remanding the case for further consideration in light of its intervening decision in <u>Sullivan v. Louisiana</u>, 508 U.S. 275 (1993). On remand, the Fourth Circuit reversed course, holding that although it was a "new rule" under <u>Teague</u>, the rule announced in <u>Cage</u> "requires the observance of those procedures that are implicit in the concept of ordered liberty," and therefore must be applied retroactively. <u>Adams v. Aiken</u>, 41 F.3d 175, 178 (4th Cir. 1994) ("<u>Adams II</u>").

In <u>Sullivan</u>, the Supreme Court had concluded that a trial court's giving of a reasonable doubt instruction deficient under <u>Cage</u> can never be "harmless error." The <u>Sullivan</u> Court held that under <u>Chapman v. California</u>, 386 U.S. 18 (1967), the proper role of an appellate court conducting harmless error analysis is to determine "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." 508 U.S. at 279 (emphasis in original). And since, when the reasonable doubt instruction is deficient, the trial fails to produce a valid guilty verdict:

> the entire premise of *Chapman* review is simply absent. There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no *object*, so to speak, upon which harmless-error scrutiny can operate.

<u>Id</u>. at 280. The <u>Sullivan</u> Court concluded by noting that the right to trial by jury reflects "a profound judgment about the way in which law should be enforced and justice administered,"

and that "[t]he deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate," can never be harmless error. Id. at 281-82.

In Adams II, the Fourth Circuit noted that, under Teague, a "new rule" must be applied retroactively where it "not only improve[s] accuracy, but also alter[s] our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." 41 F.3d at 178 (*quoting* Sawyer v. Smith, 497 U.S. at 242) (emphasis in original). The Adams II court held that in light of Sullivan, the "new rule" announced in Cage is such a rule. The Adams II court noted that the Sullivan Court had held that "a misdescription of the burden of proof . . . vitiates *all* the jury's findings," and that the Supreme Court had also held that a criminal trial infected by a structural error like that at issue in Cage, Sullivan and Adams II, "cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." Adams II, 41 F.3d at 178 (*quoting* Sullivan, 508 U.S. at 281, and Arizona v. Fulminante, 499 U.S. 279, 310 (1991)) (emphasis in original). The Adams II court concluded that a Cage error "prevents a jury verdict of guilty from coming into existence . . . [and] is a breach of the right to a trial by jury, resulting in a lack of accuracy and the denial of a bedrock procedural element essential to fairness." Id. at 178-79. Under Teague, the Adams II court held, such a rule must be applied retroactively on collateral review.

The rule at issue here – *i.e.*, that the essential elements of a capital crime must be charged by the grand jury – is just such a rule. In Vasquez v. Hillery, 474 U.S. 254 (1986), the Supreme Court held, just as it held in Sullivan with regard to a Cage error, that certain improprieties in the grand jury process constitute structural error which may never be harmless. In the same term that it decided Vasquez, the Supreme Court also decided, in United States v. Mechanik, 475 U.S. 66 (1986), that violation of a grand jury rule meant to protect against the danger that a defendant

will be required to defend against a charge for which there is no probable cause may be harmless error, and that such a defendant's conviction purges any taint because a conviction beyond a reasonable doubt necessarily establishes probable cause. However, in <u>Vasquez</u>, the Court rejected the same argument made in the context of different grand jury improprieties.

In <u>Vasquez</u>, a habeas petitioner proved that the grand jury which indicted him had been selected through a process that impermissibly discriminated against African-Americans. The Court rejected the notion that his conviction after a fair trial purged the taint and rendered the error harmless, because:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; *and perhaps most significant of all, a capital offense or a noncapital offense* – all on the basis of the same facts. . . . Thus, even if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, *the nature or very existence of the proceedings to come.*

474 U.S. at 263 (emphasis added). The <u>Vasquez</u> Court held that "[w]hen constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm." <u>Id</u>. at 263. Noting that "we simply cannot know that the need to indict would have been assessed in the same way by a grand jury properly constituted," the <u>Vasquez</u> Court held that "discrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review." <u>Id</u>. at 263-64.

The constitutional error in this case – *i.e.*, the prosecution's usurpation of the grand jury's constitutionally-mandated prerogative to charge, or decline to charge, a capital crime – is of a

piece with that in <u>Vasquez</u>, in that "we simply cannot know" whether, had the grand jury been afforded its constitutionally-mandated prerogative of determining whether to charge a capital crime, it would have entered such a charge. <u>Id</u>. at 263. And just as a <u>Cage</u> error "prevents a jury verdict of guilty from coming into existence . . . [causing] a breach of the right to a trial by jury, resulting in a lack of accuracy and the denial of a bedrock procedural element essential to fairness," <u>Adams II</u>, 41 F.3d at 178-79, the prosecution's usurpation of the grand jury's function prevents a valid capital indictment from coming into existence, breaching the defendants' rights under the Grand Jury Clause and "resulting in a lack of accuracy and the denial of a bedrock procedural element essential to fairness." <u>Id</u>. Under <u>Teague</u>, the "new rule" at issue here must be applied retroactively.

The Fourth Circuit's decision in <u>United States v. Sanders</u>, 247 F.3d 139 (4th Cir. 2001), is not to the contrary. There, the court held that <u>Apprendi v. New Jersey</u> announced a "new rule" which may *not* be applied retroactively under <u>Teague</u>. In <u>Sanders</u>, the defendant pleaded guilty to conspiring to distribute cocaine base in violation of 21 U.S.C. §§ 841 and 846. He was sentenced on the basis of the court's determination of the type and quantity of drugs involved. Following the Supreme Court's decision in <u>Jones</u> and <u>Apprendi</u>, the defendant argued that the type and quantity of drugs were elements of the offense rather than sentencing factors, and that his sentencing deprived him of his right to a finding of guilt by a jury, beyond a reasonable doubt. The <u>Sanders</u> court held that the portion of the <u>Apprendi</u> rule on which Sanders relied – a rule which "shifts the fact-finding duties from an impartial judge to a jury," <u>Sanders</u>, 247 F.3d at 148 – is not a "watershed" rule subject to an exception to <u>Teague</u>'s rule against retroactive application of "new rules." This conclusion was premised on the fact that the Supreme Court has held that a trial court's failure to submit an element of the crime to the jury for decision does not

so infect the accuracy and fairness of the proceedings as to amount to "structural error," but may be harmless error. Id. at 148-149 (*citing* Neder v. United States, 527 U.S. 1, 15 (1999)). However, Apprendi and Jones govern not only the role of the *petit* jury, but also the role of the grand jury, and the grand jury violation at issue here – *i.e.*, Mr. Roane's trial on a capital charge not imposed by the grand jury – may *not* be subject to harmless error, but, rather, so infects the proceedings as to constitute structural error. Vasquez, 474 U.S. 260-264.

Of course, as the Fourth Circuit has written, for a rule to qualify under Teague's second exception, it "must be such that, without it, the likelihood of an accurate conviction is seriously diminished," Sanders, 247 F.3d at 48 (*quoting* Teague, 489 U.S. at 313), and the constitutional violation at issue here does not implicate the accuracy of the petit jury's conclusion that Mr. Roane did, in fact, kill Douglas Moody. But see § III(B), *infra*. However, the constitutional violation at issue here gravely diminishes the accuracy of his conviction for *capital* murder because Mr. Roane was never properly charged with that crime. Just as a Cage error results in a lack of accuracy by preventing a valid guilty verdict from coming into existence, the constitutional violation at issue here resulted in a patently inaccurate conviction because Mr. Roane was convicted of a crime with which he was never charged by the grand jury. Even it Teague were held to apply to this case, retroactive relief is appropriate under its exception for "watershed" rules.

## III.

## THIS CLAIM IS NOT BARRED BY PROCEDURAL DEFAULT

Even though it was not raised at trial, this claim is not barred by procedural default. *First*, cause existed for failure to raise the claim at trial, and Mr. Roane has been prejudiced by the fact that it was not raised. See Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977). *Second*, Mr.

Roane is actually innocent of the charges in Count 5, for which he received the death penalty. See Murray v. Carrier, 477 U.S. 478, 488 (1986).

**A.    Mr. Roane Meets the "Cause and Prejudice" Standard**

**1.    The Legal Basis for This Claim Was "Not Reasonably Available" At Trial**

A petitioner on collateral review establishes "cause" for the failure to raise a claim at trial where "the factual or legal basis for [the] claim was not reasonably available to counsel" at the time of trial. Murray v. Carrier, 477 U.S. 478, 488 (1986). Where a claim is "truly novel," it is "not reasonably available," and cause exists for the failure to raise it at trial. Reed v. Ross, 468 U.S. 1, 15 (1984). The claim at issue here is such a claim.

In Reed, the defendant was convicted of first-degree murder under a state statute that assigned him the burden of proving lack of malice. Six years later, however, the Supreme Court held that requiring a murder defendant to prove lack of malice violates the due process clause. Mullaney v. Wilbur, 421 U.S. 684 (1975). Two years after Mullaney was decided, the Supreme Court held that it should be applied retroactively. Hankerson v. North Carolina, 432 U.S. 233 (1977). On collateral review in Reed, the District Court held that federal habeas relief was barred because the defendant had failed to raise the claim at trial. The Fourth Circuit, however, reversed, holding that the Mullaney issue was so novel at the time of trial that the defendant's attorney could not reasonably be expected to have raised it.

The Supreme Court affirmed. It recognized, as had the Fourth Circuit, that prior to Mullaney, there existed "hint[s] here and there" of the basis for such a claim, 468 U.S. at 13, but held that:

> It is in the nature of our legal system that legal concepts, including constitutional concepts, develop slowly, finding acceptance in some courts while meeting rejection in others. Despite the fact that a constitutional concept may ultimately enjoy general acceptance,

as the <u>Mullaney</u> issue currently does, when the concept is in the embryonic stage, it will, by hypothesis, be rejected by most courts. Consequently, a rule requiring a defendant to raise a truly novel issue is not likely to serve any functional purpose.

<u>Id</u>. at 15. The <u>Reed</u> Court held that requiring trial counsel to raise such a claim would not promote either fairness or efficiency at trial, <u>id</u>., and affirmed Judge Haynsworth's conclusion that requiring trial counsel to raise such claims "might actually disrupt" trials by forcing defense counsel to raise "and all remotely plausible claims that could, some day, gain recognition." <u>Id</u>. at 16 (quoting <u>Ross v. Reed</u>, 704 F.2d 705, 708 (1983)). Therefore, the <u>Reed</u> Court held, "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim" at trial. <u>Id</u>.

When Mr. Roane was indicted in 1992, the courts that had considered the issue had uniformly rejected the notion that aggravating factors must be charged in the indictment. <u>See</u> <u>United States v. Peters</u>, 778 F. Supp. 431, 445-46 (N.D. Ill. 1991); <u>Dufour v. Florida</u>, 495 So. 2d 154, 163 (Fla. 1986); <u>Illinois v. Davis</u>, 447 N.E.2d 353, 366-67 (Ill. 1983); <u>Talamantez v. Superior Ct. of San Diego County</u>, 122 Cal. App. 3d 629, 634-35 (Cal. Ct. App. 1981); <u>North Carolina v. Dixon</u>, 361 S.E.2d 562, 564 (N.C. 1987). Thus, prior to <u>Apprendi</u>, there was a "near-unanimous body" of opinion rejecting this claim. <u>Dalton v. United States</u>, 862 F.2d at 1307 (8th Cir. 1988) (citations omitted).[4] Federal courts have consistently held that the kind of "clear

---

[4] In <u>United States v. Sanders</u>, 247 F.3d 139, 144-45 (4th Cir. 2001), the Fourth Circuit held that no "cause" existed to excuse a § 2255 petitioner's failure to raise at trial his claim that the jury, rather than the court, must determine drug quantity. Although the claim was based on <u>Apprendi</u>, which was decided after the petitioner's conviction became final, the <u>Sanders</u> court held that other defendants had raised the same claim prior to <u>Apprendi</u>. <u>Id</u>. at 145. By contrast, the claim raised here by Mr. Roane does not appear to have been raised previously. Moreover, the fact that other <u>Apprendi</u>-like claims were raised prior to the <u>Apprendi</u> decision is insufficient a basis for procedural default in this case. <u>See Ross v. Reed</u>, 704 F.2d 705, 708 (4th Cir. 1983) ("It is rare that a major decision, breaking with precedent, is not foreshadowed by straws in the wind. A hint here and there voiced in other contexts is not the explication of a broad principle

DC01:296863.1                               - 21 -

break" with a "near-unanimous body of lower court authority" wrought by <u>Jones</u> and <u>Apprendi</u> provides cause to excuse a procedural default. <u>Id</u>.

For example, in <u>Hargrave v. Dugger</u>, 832 F.2d 1528 (11th Cir. 1987), the Eleventh Circuit decided a case in which the defendant had been sentenced to death pursuant to jury instructions which prevented the jury from considering non-statutory mitigating circumstances. Two years later, the Supreme Court held in <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978), that a capital jury may not be precluded from considering any such mitigating factor. Because the law prevailing at the time of the petitioner's trial "could be construed to be directly contrary to" <u>Lockett</u>, the Eleventh Circuit held in <u>Hargrave</u> that the petitioner "lacked the tools to construct [his] constitutional claim" at trial, and, therefore, that he had established cause for his procedural default. 832 F.2d at 1533 (quoting <u>Engle v. Isaac</u>, 456 U.S. 107, 133 (1982)) (alterations in original).

Similarly, in <u>Dalton</u>, the defendant had been convicted of mail and wire fraud on an "intangible rights" theory, prior to the Supreme Court's decision in <u>McNally v. United States</u>, 483 U.S. 350 (1987). In <u>Dalton</u>, the Eighth Circuit pointed out that at the time of the petitioner's conviction, "every federal court of appeals to consider the issue . . . approved the "intangible rights" theory of mail-fraud prosecutions," and that <u>McNally</u> "represented precisely the kind of 'clear break with the past, . . . overturn[ing] a longstanding and widespread practice . . . which a near-unanimous body of lower court authority has expressly approved' which will excuse a prior failure to raise a claim." <u>Id.</u> at 1310 (quoting <u>Reed</u>, 468 U.S. at 17) (alterations in original); <u>see also</u> <u>Rattigan v. United States</u>, 151 F.3d 551 (6th Cir. 1998) (holding that, even though the

---

offering a reasonable basis for a challenge to frequently approved jury instructions which had been used in North Carolina, and other states, for over a century."), *aff'd*, 468 U.S. 1 (1984).

defendant had defaulted his challenge to a jury instruction by not raising it at trial, cause existed because intervening Supreme Court case changed prevailing law).

The holdings in <u>Apprendi</u> and <u>Jones</u> evidence just such a "clear break" with precedent. The issue in this case—that the aggravating factors were not charged in the indictment—is raised only by the confluence of the <u>Apprendi</u> and <u>Jones</u> holdings; it was not possible to raise this constitutional claim before both of those cases were decided, over seven years after Mr. Roane was convicted. There was a "longstanding and widespread practice" – approved by the courts -- of the government failing to charge aggravating factors in indictments and then securing capital sentences at trial. The <u>Apprendi</u> and <u>Jones</u> cases, however, put an end to that practice.

There was simply no reason for Mr. Roane's trial counsel to have objected to the lack of aggravating factors in the indictment because state and federal courts had never constitutionally required their inclusion. In fact, a "near-unanimous body of lower court authority" had specifically held that aggravating factors need not be charged in the indictment. <u>Dalton</u>, 862 F.2d at 1310. Thus, raising that issue at trial would not serve any "functional purpose" or increase the "efficiency" of the criminal justice system under the reasoning of <u>Reed</u>. To expect defense counsel to anticipate the holding of not one, but two, Supreme Court cases which would be handed down seven years after conviction and which would negate near-unanimous existing precedents is to expect the impossible. At the time of indictment and trial, this claim was not reasonably available to counsel and thus Mr. Roane has adequately demonstrated cause for his default.

**2.**     <u>**Mr. Roane Was Prejudiced By The Failure To Raise This Claim At Trial**</u>

There can be little doubt that the constitutional violation at issue here, "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abramson</u>, 507

exchange for her testimony, she would not be prosecuted for her own drug activities, but also that the government had paid her and relocated her. Tr. 1757. Ms. Berkeley also admitted to being high on crack cocaine at the time Mr. Moody was killed. Tr. 1773. She testified that Mr. Roane stabbed Mr. Moody, but conceded that Mr. Roane was not present when she returned to the Newtowne Gang's headquarters later that evening and found Richard Tipton talking excitedly about the incident, and others told Mr. Tipton he had to get away. Tr. 1710, 1735.

Priscilla "Pepsi" Greene also testified that Mr. Roane killed Mr. Moody.[5] Ms. Greene, who was shot in the head after the Moody murder and before trial, admitted that she didn't remember the shooting, but claimed she recovered her memory before she made her arrangement with the government. Tr. 2565. Officer Fleming admitted that Greene had very little memory when he first interviewed her, but claimed that it improved. Tr. 2584.

In contrast to these witnesses, Gina Taylor, who did not use drugs, and who did not make any deal with the government, gave the police a description of the killer that plainly did not match Mr. Roane, but which did match another suspect. Tr. 2727-2729. The government, however, never showed Ms. Taylor a photograph of Roane and asked if Mr. Roane was Mr. Moody's killer. Tr. 2932.

Thus, the evidence on which Mr. Roane's conviction for the murder of Mr. Moody rests is extraordinarily weak. But since trial, new evidence has emerged that further indicates that Mr. Roane in fact did not kill Mr. Moody. First and foremost, undersigned counsel has located an eyewitness to Mr. Moody's murder, who has stated in a sworn declaration that Mr. Roane was not involved in the killing. See Exhibit A hereto. In addition, Mr. Roane's trial counsel has

---

[5] Ms. Greene's testimony that Mr. Moody was killed "because 'O' and 'Whitey' and them didn't want Maurice and 'Little Doug' to work in that area," Tr. 2553, was the

stated under oath that he failed to obtain easily obtainable records, or to present the testimony of a witness, who could have placed Roane at a Richmond hotel at the time of Moody's killing. <u>See</u> Exhibit H to Memorandum in Support of Motion of James H. Roane, Jr. To Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (June 15, 1998). Undersigned counsel has located both this witness and these records. Particularly in light of the paucity of evidence offered by the government to prove that Mr. Roane killed Mr. Moody, it is "more likely than not that no reasonable juror would have convicted" Mr. Roane of this crime had it had the benefit of this newly-discovered evidence.

In <u>Schlup</u>, the defendant was convicted of murdering a fellow prisoner. In his habeas petition, Schlup introduced new evidence, in the form of affidavits from other prisoners that averred that Schlup was not present at the time of the murder. <u>Schlup</u>, 513 U.S. at 857-58. Considering the new evidence, the Supreme Court stated that "it surely cannot be said that a juror. . . would vote to convict." <u>Id</u>. at 331. <u>See also</u> <u>Terry v. Cross</u>, 112 F. Supp. 2d 543, 554-55 (E.D. Va. 2000) (procedural default excused where defendant raised question of actual innocence of statutory rape based on victim's age); <u>Carriger v. Stewart</u>, 132 F.3d 463 (9th Cir. 1997) (excusing procedural default because defendant presented new evidence of actual innocence consisting of another person's confession to the crime and evidence that the other person had bragged to others about committing the crime); <u>Paradis v. Arave</u>, 130 F.3d 385 (9th Cir. 1997) (finding actual innocence to excuse procedural default based on new forensic evidence).

Mr. Roane presents new evidence in this petition, raising a significant question of whether he is actually innocent of murder. This evidence, which was not presented at trial,

_only_ evidence at trial that this murder was "in furtherance" of the CCE, and therefore

establishes an alibi for Mr. Roane, placing him far from the scene of the crime, and provides the testimony of an eyewitness – not subject to the same credibility doubts as the government's witnesses – who swears that Mr. Roane did not commit the crime. If this evidence had been submitted to the jury at Mr. Roane's trial, "it is more likely than not that no reasonable juror would have convicted him in the light of" them. Schlup, 513 U.S. at 327. Thus, Mr. Roane has established actual innocence, and his claim must be heard despite any procedural default.

## CONCLUSION

James Roane faces the death penalty for a capital crime which was never charged by the grand jury, in patent violation of the Fifth Amendment. The grounds for this constitutional claim have only recently become available to Mr. Roane, but retroactive application is plainly called for here, particularly in light of the fact that Mr. Roane did not, in fact, commit the murder for which he is to forfeit his life. Mr. Roane respectfully requests that the Court vacate, set aside or correct his convictions on Counts 5, 8 and 11, as well as his death sentence on Count 5.

Respectfully submitted,

JAMES H. ROANE, Jr.

By:          

Paul F. Enzinna
Michael J. Barta (VSB # 30706)
Gregory J. Golden (VSB # 40139)
BAKER BOTTS, L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 639-7700

Dated: June 25, 2001          <u>Counsel for James H. Roane, Jr.</u>

---

subject to 21 U.S.C. § 848.

A

-----------------------------------------x

UNITED STATES

        Plaintiff,

   v.

JAMES H. ROANE, Jr.

        Defendant.

-----------------------------------------x

CR No. 92-68-03

## DECLARATION OF DEMETRIUS ROWE

I, Demetrius Rowe, hereby declare as follows:

1.    I am a resident of Richmond, Virginia, currently residing at 3414 East Clay Street. I am thirty years old.

2.    I witnessed the killing of Douglas Moody on January 13, 1992, outside a house owned by Albert Walters, at the corner of Clay and Harrison Streets, in Richmond. I witnessed the killing from a porch across the street.

3.    At the time of the killing, I had been on the porch for several hours. Earlier, I had seen "Whitey" and "O" enter an apartment at the back of Mr. Walters' house. A couple of hours later, I saw Doug Moody enter the same apartment. A few minutes later, I heard noises of a fight from the apartment, and saw Doug Moody come out of the apartment. Moody was bloody, and staggering. He was followed closely by

"Whitey" and "O". Moody was trying to get away from "Whitey" and "O". Moody went into the yard, and then the alley, where "Whitey" and "O" attacked him. A woman came out of the house next door and tried to help Moody.

4. I did not see James Roane, Sandra Reavis, "Pepsi" Greene or Denise Berkeley at the scene of Douglas Moody's murder.

5. I was never interviewed by the police regarding Moody's murder. Prior to 1998, I was never approached or interviewed by any attorney or investigator for James Roane.

6. The above statements, which I swear are true and correct, are made without any coercion or promise.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_Demetrius Rowe_
Demetrius Rowe

Dated:

Sworn to before me this
15th day of _March_ , 1999
_Sharel P. Burton_
Notary Public

My commission expires: _September 30, 2001_

-2-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

MAY - 1 2003

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA     )
    )
v.     )     CASE NO. 3:92CR68
    )
JAMES ROANE. a/k/a "J.R."     )

## FINAL ORDER

In accordance with the accompanying Findings of Fact and Conclusions of Law it is ordered that:

1. Claim VIII is dismissed;

2. Roane is granted relief on that portion of Claim IV.B.2 discussed in the accompanying Findings of Fact and Conclusions of Law;

3. Roane's convictions and sentences on Counts Five, Six, and Seven are vacated;

4. If no appeal is taken from this Order, within sixty days from the date of entry hereof, the United States must inform the Court whether it requests that Roane be resentenced or whether it intends to retry Roane on the vacated Counts.

The Clerk is directed to send a copy of this Final Order and the Findings of Fact and Conclusions of Law to counsel of record and counsel for the United States.

It is so ORDERED.

_/s/ James R. Spencer_
United States District Judge

Richmond, Virginia
Date: 5-1-03

899

UNITED STATES OF AMERICA )
                                          )

v.                                 )         CASE NO. 3:92CR68

                                          )

JAMES ROANE. a/k/a "J.R." )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Procedural History

Richard Tipton, Cory Johnson, and James Roane were indicted on a series of federal crimes, including multiple capital murders, growing out of their concerted drug-trafficking activities, principally in Richmond, Virginia. Count Five charged that on or about January 13, 1992, Richard Tipton and James Roane while engaged in and working in furtherance of a Continuing Criminal Enterprise caused the intentional killing of Douglas Moody in violation of 21 U.S.C. § 848(e)(1)(a). Count Six charged Tipton and Roane with a violation of 18 U.S.C. § 924(c) in conjunction with the murder of Douglas Moody. Count Seven charged Tipton and Roane with violating 18 U.S.C § 1959 by murdering Douglas Moody. The jury convicted Roane on Counts Five, Six, and Seven, but acquitted Tipton on those same counts. Following a penalty hearing, the jury recommended that Roane be sentenced to death on Court Five, for the murder of Douglas Moody. This Court sentenced Roane to death in accordance with the jury's recommendation.

After filing an unsuccessful appeal, Roane filed a motion for relief pursuant to 28 U.S.C. § 2255 with this Court. The United States moved for summary judgment. Upon review of the record and the parties' submissions, the Court concluded that Roane was entitled to an

1

evidentiary hearing on his claim that he was denied effective assistance of counsel in conjunction with the charges related to the murder of Douglas Moody (Claim IV.B.2) and his claim that he is actually innocent of the charges related to the murder of Moody (Claim VIII). The Court conducted an evidentiary hearing on those claims on June 21, 2002.

**B.      Roane's Claims**

In Claim IV.B.2, Roane asserts that he was denied effective assistance of counsel by counsel's failure to locate a favorable eyewitness to the murder and adduce available testimonial and documentary evidence to support an alibi defense. In Claim VIII, Roane contends that he is actually innocent of the murder of the Douglas Moody. Roane bases this claim of actual innocence on his alibi evidence that counsel failed to introduce and on the testimony of the purported eyewitness who swears that Roane did not murder Moody.[1]

**C.      Findings Of Fact**

1.      In early 1992, Ronita Hollman and Doug Moody were selling drugs in the Newtowne area of Richmond, Virginia, for Peyton Maurice Johnson. Tr. at 1992-93; 2553. Richard Tipton, Cory Johnson, and James Roane decided to take over the drug trade in Newtowne. Tr. at 1156-58, 2330.

2.      As part of this plan, Roane and Tipton approached Hollman to lure her away from her association with Peyton Johnson and to sell drugs for them. Tr. at 1962-63. Tipton told Hollman about his plans for the Newtowne area and informed her that they were willing to kill people to accomplish those plans. Tr. at 1963.

3.      On or about January 6, 1992, Cory Johnson and Roane left two handguns with their underling, Robert Papoose Davis. Tr. at 1894. On January 11 or January 12, 1992, Roane retrieved one of the guns from Davis. Tr. at 1895.

4.      Douglas Moody was murdered around 12:00 a.m. on January 13, 1992. See Gov't Trial Exhibit 119.

---

[1] Tr. refers to the trial transcript. Hr. Tr. refers to the evidentiary hearing transcript. Hr. Ex. refers to exhibits introduced at the evidentiary hearing.

5. On January 14, 1992, Roane and Cory Johnson retrieved a bag of weapons they had left at the residence of Robert Davis earlier that day. Roane and Cory Johnson then went looking for Peyton Maurice Johnson. Roane located Peyton Maurice Johnson in a tavern.

6. Roane left the tavern and reported what he had seen to Cory Johnson. Within minutes, Cory Johnson entered the tavern and fatally shot Peyton Maurice Johnson with an automatic weapon.

7. In January of 1992, Louis Johnson was acting as bodyguard for a rival drug dealer in the Newtowne area. While acting in this capacity, Louis Johnson threatened Cory Johnson. On January 29, 1992, Roane got out of his car and shot Louis Johnson. Immediately thereafter, Cory Johnson and Lance Thomas exited Roane's car and continued to shoot Louis Johnson until he was dead.

8. The murders of Douglas Moody, Peyton Maurice Johnson, and Louis Johnson were part of the general plan of Roane, Tipton, and Johnson to take over the drug trade in the Newtowne area.

9. At trial, Denise Berkley testified that, shortly before Douglas Moody was murdered, she was smoking crack at a building on the corner of Clay and Harrison Streets. Tr. at 1694. Berkley heard a shot followed by the breaking of a window from the back of the building. Tr. at 1695-96.

10. Berkley further testified that she went outside and saw Roane stab Doug Moody "18 or 19 times" while Moody pleaded for Roane to stop. Tr. at 1697-98. The knife looked like a butcher's knife. Tr. at 1697. Roane then approached Pepsi Greene, gave her the knife and told her to get rid of it. Tr. at 1699.

11. Finally, Berkley testified that Sandra Reavis was present when Moody was killed. Tr. at 1698-99. Berkley testified that she saw Reavis, Roane, Curt Thorne, Linwood Chiles, and Pepsi Greene leave the scene of the murder in Chiles' station wagon. Tr. at 1699.

12. When the police arrived at the scene of the murder, they found a broken window and a bullet hole in the back of the building where Berkley first heard the sounds of a struggle. Tr. at 1824; Gov't Exs. 9-2 through 9-4, 119.

13. The autopsy of Moody's body reflected that he had been shot twice and stabbed 18 times. The stab wounds were inflicted by a single edged blade. Tr. at 2070-74.

14. At trial, Priscilla "Pepsi" Greene testified that she was on the corner of Clay and Harrison Street when she heard two or three shots. Tr. at 2549. Greene then saw Roane and Tipton exit the house from where the shots were fired. Tr. at 2549. After five or ten

3

minutes, Greene, accompanied by Roane, went to Curt Thorne's house, where Roane directed Pepsi to get him the big knife he stored there. Tr. at 2550-51, 2572-3. Later that night, Roane returned the knife, now covered with blood, to Greene and told her to dispose of it. Tr. at 2551-52. Greene threw the knife over a fence. Tr. at 2551.

15. Greene's physical description of the knife was largely consistent with Berkley's testimony and the medical evidence. Tr. at 2583, Gov't Ex. 146.

16. Greene testified that following the murder, Linwood Chiles drove her, Curt Thorne, Roane, and Reavis to Norton Street. Tr. at 2552, 2576. Thereafter, Greene and Thorne stayed on Norton Street, and Roane, Reavis, and Chiles left that location. Tr. at 2576.

17. Robert Davis lived close to the scene of the Moody murder. Tr. at 1893, 2560. Davis testified that, immediately following the Moody murder, he saw Tipton and Roane by the steps near his house and heard them conversing as follows, "Yeah, I got him, I got him . . . we can't stay out here, man. This is hot anyway." Tr. at 1896.

18. The testimony of Berkley, Davis, and Greene was credible and was corroborated by the physical evidence of murder including the autopsy and the crime scene video. See Gov't Ex. 119. Greene's testimony was and remains particularly compelling.

19. Roane was represented at trial by David Baugh and Arnold Henderson.

20. At trial, Baugh called Gina Taylor, a neighbor who had attempted to aid the wounded Moody.[2] Taylor testified that she had seen an individual jabbing the prostrate Moody. Tr. 2902. Taylor testified that the assailant was only about five feet six inches tall and was definitely not Roane. Tr. 2905-6. However, the exculpatory value of Taylor's testimony was undermined by Taylor's acknowledgment that she could not identify the assailant's gender or see the assailant's face. Tr. 2905-6. Additionally, Taylor's credibility was diminished by her evasive manner on cross-examination and her admission she had "kind of" dated Tipton. Tr. at 2906.

Baugh followed up Taylor's testimony by presenting evidence that two hours before the murder, a person named Keith had come to Moody's mother's house looking for him, and that a week prior, Keith's friends, armed with machine guns, had kicked in the door of Moody's mother's residence while attempting to find Moody. Tr. at 2930-31. Detective Dalton conceded that foregoing information initially had led the police to suspect Keith Barley, a small featured black juvenile male, as Moody's murderer. Tr. at 2928.

---

[2] The knife that appears in the crime scene video, Gov't Ex. 119, is not the murder weapon. Taylor brought this knife out of her home to cut Moody's clothes off so that she could administer first aid. Tr. at 1827-28; 2903-4.

21. Prior to trial, Roane told Baugh that he did not participate in the murder of Douglas Moody. Hr. Tr. at 66.

22. Baugh was convinced that Roane did not participate in the Moody murder. Hr. Tr. at 66, 88.

23. Roane told Baugh that on the night of January 12, 1992, he was in a hotel room at the Howard Johnson (hereinafter "the hotel") with codefendant, Sandra Reavis. Hr. Tr. at 66-68, 70-71.

24. The Howard Johnson was located a couple of miles from where Douglas Moody was murdered. The hotel is now a Holiday Inn. Hr. Tr. at 7-8.

25. Roane told Baugh that he and Sandra Reavis were driven to the Howard Johnson hotel by Linwood Chiles. Tr. at 51, 67.

26. Roane told Baugh that Carmella Cooley accompanied them to the hotel. Hr. Tr. at 51, 67.

27. Roane told Baugh that Linwood Chiles registered and paid for the hotel room in cash. Hr. Tr. at 67.

28. In an effort to confirm Roane's alibi, Baugh spoke with Carmella Cooley and attempted to obtain records of Roane's visit to the hotel. Tr. 66-68.

29. Carmella Cooley indicated to Baugh that she had once accompanied Roane and Reavis to the Howard Johnson. Hr. Tr. at 68, 72. However, Cooley could not verify Roane's story that he went to the hotel on January 12, 1992. Hr. Tr. at 68. Baugh concluded that Cooley's ignorance of the date and her apparent hostility made her a bad defense witness. Hr. Tr. at 68.

30. Baugh contacted the Howard Johnson's and asked if the hotel had a record of Linwood Chiles renting a room on January 12, 1992. Hr. Tr. at 66, 71. When Baugh received a negative response from the hotel management, he went to the hotel and attempted to find such a record himself. Hr. Tr. at 66-67.

31. Baugh limited his search to looking for a record of a room rental under the name of Linwood Chiles for the night of January 12, 1992. Hr. Tr. 70-71. Baugh was unsuccessful in finding any such record. Hr. Tr. at 70. Neither Baugh nor the record before the Court suggest that constraints of time or resources played a part in his decision to terminate his search for records corroborative of Roane's alibi.

32. Alfred Brown is an investigator employed by Roane in conjunction with his 28 U.S.C. § 2255 motion. In May of 1998, Brown obtained permission from the hotel management to

review the occupancy records for January of 1992. Brown was pointed to several boxes that contained the relevant records. Hr. Tr. at 5. Within three hours, Brown found two registration cards that had been signed by Linwood Chiles. Hr. Tr. at 11; Pet. Hr. Ex. 3. The first card indicates that "Chiles, Linwood" had checked into a room for the night of January 2, 1992 and checked out on January 3, 1992. Pet. Hr. Ex. 3. The second card indicates that "Chiles, Larry" had checked into a room on January 12, 1992, and checked out on January 13, 1992. Pet. Hr. Ex. 3. Brown also obtained a receipt from the hotel indicating that a "Chiles, Larry" had checked in January 12, 1992, checked out January 13, 1992, and had paid cash for his room. Pet. Hr. Ex. 3. Linwood Chiles' address appears on the face of the receipt and the registration records. Hr. Tr. at 49.

33. In 1992 or 1993, Baugh could have located the same documents discovered by Brown, if he had subpoenaed the records or if he had spent three hours looking through the hotel records.

34. Roane was amenable to testifying in his own defense. Hr. Tr. at 72-73. Baugh advised Roane not to testify unless Baugh could discover some objective confirmation of his alibi for the Moody murder. Hr. Tr. 59; 72-73.

35. If Baugh had discovered the hotel records discussed above, he would have advised Roane to testify. Hr. Tr. at 85-86; 91. Roane would have testified consistent with his testimony at the evidentiary hearing.

36. At the evidentiary hearing, Roane testified that: on the night of January 12, 2002, he, Linwood Chiles, Sandra Reavis, and Carmella Cooley drove to the Howard Johnson in Chiles' station wagon , Hr. Tr. at 45-50; Chiles registered for the room and paid cash, Hr. Tr. at 48; shortly after paying for the room, Chiles and Cooley left, Hr. Tr. 50; Roane and Reavis remained in the room all night and left the next morning, Hr. Tr. at 50

37. Roane further stated that he "didn't have a weapon at all" in the day or two preceding the murder of Douglas Moody. Hr. Tr. at 37. Roane denied that Davis ever kept a gun for him. Hr. Tr. at 58.

38. Based on Roane's demeanor and the details of his account, the Court finds that Roane's testimony that he was at a hotel at the time of the Moody murder, although not compelling, was tenable.

39. At the evidentiary hearing, Sandra Reavis testified that: on the night of January 12, 1992, she, James Roane, Linwood Chiles, and Carmella Cooley drove to the Howard Johnson in Chiles' station wagon, Hr. Tr. at 14-16; she, Roane and Chiles remained in the car while Cooley registered for a room, Hr. Tr. at 16; thereafter Chiles and Cooley left, Hr. Tr. 16-17. Reavis further testified that Roane stayed in the hotel room with her until they left the hotel at around 10:00 a.m. the next morning, January 13, 1992, Hr. Tr. at 17. Reavis'

testimony was flat and unpersuasive.

40. Reavis could not recall when she first told anybody that she was at a hotel with Roane on the night Doug Moody was killed. Hr. Tr. at 24.

41. The Government introduced a letter that Roane had written to Reavis while he was incarcerated awaiting trial. In that letter, Roane indicated that Reavis had requested him to lie and exonerate her by "tak[ing] [the] conspiracy case for [her]". Gov't Hr. Ex. 1 at 2.

42. Prior to the conclusion of her direct appeal, Reavis would not have been willing to waive her Fifth Amendment right to remain silent and provide Roane with an alibi for the Moody murder.

43. At the evidentiary hearing, Demetrius Lavone Rowe testified that at about 8:30 p.m., on January 12, 1992, she had seen Sandra Reavis in the Newtowne area. Hr. Tr. at 97. Rowe testified that Reavis told her she was going to eat with James Roane and then the two of them were going to a hotel. Hr. Tr. at 97. Rowe testified that shortly thereafter she saw Reavis and Roane leave the area. Hr. Tr. at 97. Rowe testified that Reavis and Roane left the area, not in Chiles' station wagon, but in cab. Hr. Tr. 105-107. Rowe did not see Roane again that night. Hr. Tr. at 99-102.

44. Rowe further testified that she had witnessed the murder of Douglas Moody. Hr. Tr. at 92. Rowe testified that she was on a porch drinking when she heard the sounds of fighting from a nearby house. Hr. Tr. at 94-95. Rowe testified that she then witnessed Doug Moody, Pepsi Greene, Curt Thorne, Richard Tipton, Cory Johnson, and a man she did not recognize spill out of the house across the street. Hr. Tr. at 95-99. Rowe testified that as they came out of the house, Johnson was struggling with Moody. Hr. Tr. 95-99. Rowe testified that Johnson continued to attack Moody after Moody had fallen to the ground. Hr. Tr. at 100. Rowe testified that although she did not recognize the unidentified male, she was sure it was not James Roane. Hr. Tr. at 95.

45. Prior to trial, Rowe did not tell the police or anyone associated with Roane's trial defense what she had witnessed. Roane Third Amend. Memo. Ex. A, Clerk Record #849.

46. Roane failed to present any evidence to suggest that a reasonable investigation by trial counsel would have led to the discovery of Rowe as a witness to the murder of Douglas Moody.

47. Rowe's testimony, to the extent it exculpated James Roane for the murder of Doug Moody, was not credible and would carry no weight with a jury. This conclusion is based on Rowe's demeanor, the fact that Rowe's current version of events conflicts with the earlier versions provided to § 2255 counsel and to the Court, wherein she swore that

7

Pepsi Greene was not at the scene of the murder of Douglas Moody. Roane Third Amend. Memo. Ex. A, Clerk Record #849; Roane Reply Memo. Ex. B.

**D.   Conclusions of Law**

1.   Ineffective Assistance of Counsel

a.        In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court held that to demonstrate the ineffective assistance of counsel, a defendant first must show that counsel's representation was deficient and, then, must establish that the deficient performance prejudiced the defense. Id. at 687. To satisfy the deficient performance facet of Strickland, the defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. The prejudice facet of the Strickland test requires the defendant to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

b.        Roane contends counsel was deficient for not calling Rowe as witness and for failing to present an alibi defense. Roane has failed to demonstrate that counsel was deficient for failing to discover Rowe was a witness or that he was prejudiced by the failure to present her testimony. See Findings of Fact 43-47. However, Roane has provided substantial proof for his charge that counsels' investigation of, and subsequent failure to present, an alibi were unreasonable. The Supreme Court has provided the following pertinent guidance for such a claim:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91. The Court further emphasized what investigation decisions are reasonable depends on the information known to counsel and "critically" on the information supplied to counsel by the defendant. Id. Counsel obviously had a duty to investigate Roane's alibi and counsel did take steps to confirm that alibi. The critical question here is whether counsel's investigation of the hotel records was reasonable in light of the information known to counsel. See id. For the reasons set forth below, the Court concludes that it was not.

Prior to trial, counsel had substantial information that indicated Roane's claim

that he was at a hotel at the time of the Moody murder was credible. First, counsel had the testimony of an apparently disinterested eyewitness, Gina Taylor, who insisted that Roane did not commit the murder. Second, counsel had the detailed account of the alibi from his client. Roane's candor with counsel regarding his other criminal acts assured counsel that the alibi was true. Third, counsel's initial investigation, corroborated the details of the account provided by Roane. Although Carmella Cooley could not provide a specific date, she confirmed to counsel that she had accompanied Roane and Reavis to a hotel. With all this information in hand, counsel had every reason to believe the hotel records would provide objective evidence to corroborate Roane's story. Under such circumstances, counsel was obliged to thoroughly review the hotel's records to determine whether they could yield support for an alibi defense. See Brown v. Sternes, 304 F.3d 677, 694-96 (7th Cir. 2002)(concluding based on facts known to counsel, counsel was required to conduct an "in depth" investigation of mental health defense).

The record indicates that counsel did not follow through and seek the records with the vigor demanded by the situation. See id.; Hoots v. Allsbrook, 785 F.2d 1214, 1219-20 (4th Cir. 1986)(assuming counsel was deficient when he decided not to carry his investigation of possible eyewitnesses past review of police reports where client pressing an alibi defense); Cf. United States v. Russell, 221 F.3d 615, 621 (4th Cir. 2000) (concluding counsel was deficient for relying on the government's representation of defendant's criminal record where his client has informed him that such record was not accurate). The Court does not doubt counsel's testimony that he called the hotel a couple of times and on one occasion he went to the hotel to find the records. However, counsel did not volunteer any details regarding his search and the quantum of evidence presented at the evidentiary hearing indicates the search was very limited in scope and duration. Counsel was looking only for a hotel registration record in the name of Linwood Chiles for January 12, 1992. Hr. Tr. at 70-71. When his search did not readily yield such a record, counsel simply terminated his investigation, discarded the alibi defense and concentrated on the misidentification defense.

Under the circumstances facing trial counsel, reasonably competent counsel would have filed a subpoena demanding all records held by the hotel pertaining to a Mr. Chiles for January of 1992 or spent a few hours going through all the records at the hotel to assure himself that no records corroborative of his client's alibi existed. See Nealy v. Cabana, 764 F.2d 1173, 1178-1180 (5th Cir. 1985)(criticizing counsel for not utilizing a subpoena to confirm his client's alibi). Counsel failed to take such actions and that failure was constitutionally deficient. Hooper v. Garraghty, 845 F.2d 471, 474-75 (4th Cir. 1988)(concluding counsel was deficient when he discarded insanity defense after limited exploration of that defense); Proffit v. Waldron, 831 F.2d 1245, 1248-49 (5th Cir. 1987)(concluding counsel was deficient where counsel made some exploration of a defense but failed to take an obvious and readily available investigatory step which would have made the defense viable); Sullivan v. Fairman, 819 F.2d 1382, 1391-92 (7th Cir. 1987)(concluding perfunctory attempts to contact witnesses were not reasonable). The Court finds that counsel's failure to obtain corroborative records of Roane's alibi and the subsequent failure to present an alibi defense at trial is attributable to the unreasonably

limited amount of time and resources counsel devoted to looking for corroborative hotel records. See Brown v. Sternes, 304 F.3d 677, 694-96 (7th Cir. 2002)(concluding counsel was deficient for prematurely abandoning mental health defense); Jennings v. Woodford, 290 F.3d 1006, 1015 (9th Cir. 2002)(counsel was ineffective when he ruled out mental health defense in favor of alibi defense after only preliminary investigation into mental health defense).

c.        "[A]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome [of the trial]." Id. at 694. In the present case, Roane has met that burden.

Had counsel conducted an adequate investigation, he would have found the records which offered some objective support for Roane's assertion that he was at a hotel when Douglas Moody was murdered. Findings of Fact 32-33. Armed with these records, Roane would have testified that he was at a hotel at the time of the murder of Douglas Moody. Findings of Fact 34-35. The alibi would have been somewhat corroborated by the introduction of the hotel records that indirectly supported that testimony. Of course, the impact of this evidence must be evaluated in light of the strength of the government's case at trial. Strickland, 466 U.S. at 697.[3] As recited above, see Findings of Fact 1-18, although the evidence of Roane's guilt was strong, it was neither undisputed nor overwhelming and hinged primarily on the testimony of Pepsi Greene and Denise Berkley. But for counsel's deficiency, Roane would have presented an alibi defense consisting of Roane's testimony and marginally corroborative hotel records. See Findings of Fact 32, 34-38, 42. Although thin, the foregoing alibi evidence would have bolstered Roane's plausible misidentification defense and is of sufficient credence to create a reasonable probability that Roane would have been acquitted of the charges related to the murder of Douglas Moody. See Griffin v. Warden, 970 F.2d 1355, 1358-60 (4th Cir. 1992) (emphasizing the strength of an alibi to challenge an eyewitness

---

[3] In evaluating the potential prejudice of omitted evidence, the Court must also consider any negative aspects that would accompany its introduction. Whitley v. Bair, 802 F.2d 1487, 1494-97 (4th Cir. 1986). Taking the stand was an occasion fraught with peril for Roane. To maintain any semblance of credibility before a jury, if questioned, Roane would have to acknowledge among other things his participation in the plans to take over the drug trade in the Newtowne area and in the murders of Peyton Maurice Johnson and Louis Johnson. However, the Government forsook the opportunity to bolster its theory that Moody's murder was the first in a series of murders related to the plans to take over the drug trade in the Newtowne area. At the evidentiary hearing, the Government did not require Roane to provide details regarding his participation in the plans to take over the drug trade in the Newtowne area and the murders of Peyton and Louis Johnson.

identification); <u>Nichols v. Butler</u>, 953 F.2d 1550, 1553-54 (11th Cir. 1992)(concluding defendant was prejudiced by counsel's actions which prevented defendant from testifying on his own behalf); <u>Sullivan v. Fairman</u>, 819 F.2d 1382, 1392-1393 (7th Cir. 1987). Accordingly, Roane is granted relief on his claim that he was denied effective assistance of counsel with regard to the murder of Douglas Moody.

2.    Actual Innocence

a.    "Claims of actual innocence, whether presented as freestanding ones, <u>see</u> <u>Herrera v. Collins</u>, 506 U.S. 390, 417, (1993), or merely as gateways to excuse a procedural default, <u>see</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 317 (1995), should not be granted casually." <u>Wilson v. Greene</u>, 155 F.3d 396, 404 (4th Cir. 1998). Here, the Court reviews Roane's claim under the more lenient standard for gateway claims set forth in <u>Schlup v. Delo</u>, 513 U.S. 298 (1995). The proper test for whether a petitioner has established that his case is "extraordinary" enough to fall into that "narrow class of cases," which "implicat[e] a fundamental miscarriage of justice," is whether that petitioner has shown that, "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." <u>Id.</u> at 315, 327; <u>see</u> <u>also</u> <u>O'Dell v. Netherland</u>, 95 F.3d 1214, 1249-50 (4th Cir. 1996)(en banc). It is not, however, this Court's "independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." <u>Schlup</u>, 513 U.S. at 329. This standard is more demanding than the standard for demonstrating prejudice under <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984). <u>Schlup</u>, 513 U.S. at 327 n. 45; <u>Sullivan v. Freeman</u>, 819 F.2d 1382, 1392-4 (7th Cir. 1987).

b.    The Supreme Court has emphasized that to be credible a claim of actual innocence must be supported with "new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." <u>Schlup</u>, 513 U.S. at 324. The Court then must evaluate "petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" <u>Id.</u> at 328 (quoting Friendly, <u>Is Innocence Irrelevant? Collateral Attack on Criminal Judgments</u>, 38 U. Chi. L. Rev. 142, 160 (1970)).

d.    Viewed alongside the other evidence, Roane's new evidence fails to demonstrate that no reasonable juror would have convicted Roane of the offenses related to the murder of Douglas Moody. <u>See</u> <u>Wilson v. Greene</u>, 155 F.3d 396, 404-05 (4th Cir. 1998). Roane's assertion of innocence relies primarily on the testimony of three witnesses, Demetrius Rowe, Sandra Reavis, and James Roane, none of whom are particularly trustworthy. <u>See</u>

<u>Schlup</u>, 513 U.S. at 324. As discussed above, Rowe's testimony appears to be a fabrication and would carry no exculpatory weight with a reasonable juror. <u>See</u> Findings of Fact 43-47. Indeed, the only impact Rowe's testimony would have upon a reasonable juror would be to view with greater skepticism Roane's proffered alibi. Both Roane and Reavis testified that Linwood Chiles drove them to the hotel in his station wagon. Rowe testified that she saw Roane and Reavis leave to go to the hotel, not in Chiles' station wagon, but in a cab. <u>See</u> Finding of Fact 40.

Next, a reasonable juror would have to weigh the testimony of Reavis and Roane. The credibility of their testimony is enhanced by the fact that they both agreed on the basic details of the alibi. For example, both Roane and Reavis testified that they were accompanied to the hotel by Carmella Cooley and Linwood Chiles and that Chiles and Cooley left them alone at the hotel for the night. A juror also would consider significant that hotel records confirmed Roane's statement that Linwood Chiles had paid cash for a room early in the evening on January 12, 1992. However, the value of those records would be diminished by the fact that according to Berkley and Greene, Reavis and Roane continued to employ Chiles as chauffeur after the time of check-in and used his services to depart the scene of the murder. Thus, acceptance of Roane's alibi would turn primarily on whether a juror believed the naked testimony of Reavis and Roane that they did not leave the hotel room until after Moody had been killed.

A reasonable juror would regard with skepticism Reavis' testimony because she was Roane's lover and his lackey in the criminal enterprise and two witnesses had placed her at the murder scene in the company of Roane. Such skepticism would be furthered deepened in light of the late hour of Reavis' testimony and her inability to recall when she first told someone that she was at the hotel with Roane when Doug Moody was murdered. <u>See</u> Finding of Fact 40. <u>Cf.</u> <u>Herrera v. Collins</u>, 506 U.S. 390, 423 (1993)(O'Connor, J.)(concurring)(noting that courts treat last minute affidavits with some skepticism, because "[i]t seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him."). Finally, a juror would be confronted by correspondence between Roane and Reavis which indicated Reavis' desire that Roane tailor his story to exonerate her. <u>See</u> Finding of Fact 41. All these circumstances, along with Reavis' demeanor, would cause a juror to harbor serious doubts about Reavis' veracity.

Roane's self-serving testimony of an alibi unsupported by a credible, unbiased witness or firm objective proof is not the sort of evidence one would deem inherently reliable or trustworthy. <u>See</u> <u>Schlup</u>, 513 U.S. at 324. However, Roane's demeanor at the evidentiary hearing and his ability to recall many of the specific details of the events surrounding the murder of Douglas Moody lent some credence to his testimony. <u>See</u> Finding of Fact 38. Nevertheless, Roane's thin alibi, even when coupled with Gina Taylor's testimony, and the evidence suggesting third parties wished to do Moody harm, is not sufficiently compelling to preclude many a reasonable juror from finding Roane guilty of murdering Moody in light of the formidable direct and circumstantial evidence of Roane's guilt.

Three credible witnesses placed Roane at or around the scene of the murder: Robert Davis testified that he saw Tipton and Roane in the vicinity of the murder shortly

after the murder[4], Finding of Fact 12; Denise Berkley gave a detailed account of the events leading up to the murder and actually saw Roane stab Moody; and Pepsi Greene's compelling testimony largely corroborated the details of Berkley's account and placed the bloody murder weapon in Roane's hand immediately following the slaying. A reasonable juror would tend to credit the foregoing testimony in light of Greene and Berkley's demeanor and because their accounts were largely consistent with each other, the evidence at the crime scene, and the autopsy. Findings of Fact 9-15. Furthermore, Roane's new evidence of innocence does not diminish the substantial evidence that indicated Roane stabbed Moody to death as part of a plan to take over the drug traffic in the Newtowne area. See Findings of Fact 1-8. Specifically, that evidence demonstrated that Roane was involved in the initial planning to take over the drug trade in the Newtowne area. In furtherance of that plan, the day after Moody was killed, Roane participated in executing Moody's superior in the drug trade, Peyton Maurice Johnson. Then, roughly two weeks later, Roane participated in killing another individual who was an obstacle to the plan to take over the drug trade in Newtowne area, Louis Johnson. Roane's assertion that he spent the night of Moody's murder languishing in a hotel room with his girlfriend, does not sit comfortably alongside Roane's proven participation in the other aspects of the plan to take over the drug trade in the Newtowne area. Accordingly, Roane has failed to demonstrate that, in light of all the evidence, no reasonable juror would have found him guilty of the charges related to the murder of Douglas Moody. Claim VIII will be dismissed.

An appropriate Order will issue.

James R. Spencer
United States District Judge

Richmond, Virginia
Date: 5-1-03

---

[4] Moody was shot and stabbed. Davis testified that Roane had acquired a firearm shortly before Moody was murdered.

are hereby vacated and the case is remanded for further proceedings consistent with this opinion.

*VACATED and REMANDED*



**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**James H. ROANE, Jr., Defendant–
Appellee.**

**United States of America,
Plaintiff–Appellee,**

v.

**James H. Roane, Jr., Defendant–
Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Cory Johnson, Defendant–Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Richard Tipton, Defendant–Appellant.**

**Nos. 03–13, 03–25, 03–26, and 03–27.**

United States Court of Appeals,
Fourth Circuit.

Argued: May 6, 2004.

Decided: Aug. 9, 2004.

**Background:** Defendants were convicted of multiple offenses arising from drug trafficking scheme, including capital murders, and were sentenced to death. After convictions and sentences were affirmed on direct appeal, 90 F.3d 861, defendants moved to vacate sentences. The United States District Court for the Eastern District of Virginia, James R. Spencer, J., granted relief to one defendant as to claims arising from one of charged murders, on basis that his counsel was ineffective in investigating alibi defense, and denied other claims. Defendants appealed, and government appealed from grant of relief.

**Holdings:** The Court of Appeals, King, Circuit Judge, held that:

(1) counsel was not ineffective in failing to object to allegedly discriminatory use of peremptory challenges against female prospective jurors;

(2) claimed ineffectiveness of counsel in failing to request certain instructions was not prejudicial;

(3) alleged presentation of perjured testimony by prosecution did not provide basis for relief;

(4) prosecution did not violate its duties under *Brady*;

(5) counsel was not ineffective in presenting mitigating evidence at sentencing;

(6) defendant was not mentally retarded, and thus ineligible for execution; and

(7) counsel did not perform deficiently in making investigation into defendant's potential alibi defense.

Affirmed in part and reversed in part.

**1. Criminal Law ☞1139, 1158(1)**

In its consideration of district court's rulings on motion to vacate sentence, Court of Appeals reviews its legal conclusions de novo and its findings of fact for clear error. 28 U.S.C.A. § 2255.

**2. Criminal Law ☞1139**

Court of Appeals reviews de novo mixed questions of law and fact addressed by the district court in ruling on motion to vacate sentence, including the issue of whether a lawyer's performance was constitutionally adequate. U.S.C.A. Const. Amend. 6; 28 U.S.C.A. § 2255.

**3. Criminal Law ⊂⊃1155**

Court of Appeals reviews for abuse of discretion a district court's decision to deny a post-trial request to interview jurors.

**4. Criminal Law ⊂⊃1147**

Court of Appeals reviews for abuse of discretion district court's rulings on a discovery request made in connection with motion to vacate sentence. 28 U.S.C.A. § 2255.

**5. Criminal Law ⊂⊃1439**

Claims by defendants that had already been addressed and rejected on direct appeal could not be raised in their motions to vacate sentence, where no intervening change in the warranted reconsideration of claims. 28 U.S.C.A. § 2255.

**6. Criminal Law ⊂⊃1433(2)**

Claim of impermissible gender discrimination by prosecution in its use of peremptory challenges against female potential jurors, which was addressed on direct appeal, could not be raised by defendants in motion to vacate sentence. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2255.

**7. Criminal Law ⊂⊃641.13(2.1)**

Failure of counsel to object to prosecution's allegedly discriminatory use of peremptory challenges against female prospective jurors as resulting in impermissible gender-based discrimination, in violation of equal protection clause, did not constitute ineffective assistance, where at time of trial, Supreme Court had not yet extended rationale of *Batson* to gender-based peremptory challenges, and Court of Appeals for circuit in which trial was held had explicitly rejected attempts to extend *Batson* to gender. U.S.C.A. Const. Amends. 6, 14.

**8. Controlled Substances ⊂⊃40**

To convict a defendant of participating in a continuing criminal enterprise (CCE), government is required to prove five elements: (1) defendant committed a felony violation of the federal drug laws, (2) such violation was part of a continuing series of violations of the drug laws, (3) the series of violations were undertaken by defendant in concert with five or more persons, (4) defendant served as an organizer or supervisor, or in another management capacity with respect to those other persons, and (5) defendant derived substantial income or resources from the continuing series of violations. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**9. Criminal Law ⊂⊃641.13(2.1)**

Failure of counsel for defendants convicted of participating in a continuing criminal enterprise (CCE) to request instruction that jury was required to unanimously agree on three predicate violations supporting continuing series element of crime did not result in prejudice, and thus could not support grant of relief based on ineffective assistance of counsel, where reviewing court on direct appeal determined that defendants were not prejudiced by lack of such an instruction. U.S.C.A. Const. Amend. 6; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**10. Criminal Law ⊂⊃872.5**

Jury need not unanimously agree on which five persons were organized, supervised, or managed by the defendant in order to convict defendant of participating in a continuing criminal enterprise (CCE). Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**11. Criminal Law ⏣641.13(2.1)**

Counsel for defendants charged with participating in a continuing criminal enterprise (CCE) was not ineffective in failing to request special unanimity instruction on the CCE charge regarding the identities of the "five or more persons" that each defendant was alleged to have supervised, as unanimous agreement on the identity of each supervisee is not required to support CCE conviction. U.S.C.A. Const.Amend. 6; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**12. Criminal Law ⏣641.13(2.1)**

Failure of counsel for defendants charged with participating in a continuing criminal enterprise (CCE) to request instruction that certain categories of persons, such as drug kingpins, cannot as a matter of law be supervisees, and that certain types of relationships, such as buyer-seller, cannot constitute supervision, for purposes of CCE charge, did not constitute ineffective assistance, where court gave instruction regarding definition of terms "organizer," "supervisory position," and "position of management" as used in CCE statute. U.S.C.A. Const.Amend. 6; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**13. Controlled Substances ⏣40**

Proof that a defendant charged with participating in a continuing criminal enterprise (CCE) exercised some degree of control over others is not required to show that he acted as an organizer. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(c), 21 U.S.C.A. § 848(c).

**14. Criminal Law ⏣706(2)**

To prevail on claim that prosecution knowingly introduced perjured testimony, in violation of due process clause, defen-

dant is required to demonstrate that (1) the testimony was false, (2) the prosecution knew the testimony was false, and (3) there is a reasonable probability that the false testimony could have affected the verdict. U.S.C.A. Const.Amend. 5.

**15. Constitutional Law ⏣268(9)**

    **Criminal Law ⏣706(2)**

Defendants failed to establish that prosecution knew or should have known that allegedly perjured testimony of prosecution witness during trial on drug and murder charges was false, as required to demonstrate that prosecution had engaged in prosecutorial misconduct in violation of due process clause by presenting such testimony. U.S.C.A. Const.Amend. 5.

**16. Criminal Law ⏣1655(7)**

Conclusory accusations that the government should have known that a statement was false, without more, do not warrant an evidentiary hearing or offer escape from summary judgment, for purposes of motion to vacate sentence in which defendant alleges that government knowingly presented perjured testimony in violation of due process clause. U.S.C.A. Const. Amend. 5; 28 U.S.C.A. § 2255.

**17. Constitutional Law ⏣268(9)**

    **Criminal Law ⏣706(2)**

No showing was made by defendants who were convicted of murder and drug offenses that allegedly perjured testimony presented by government affected the outcome of their trial, as required to establish due process violation arising from presentation of such testimony, where government presented extensive trial evidence of defendants' gang-related activities and involvement with drugs. U.S.C.A. Const. Amend. 5.

**18. Criminal Law ⟜1550**

Defendants charged with murder failed to show that testimony of witness regarding murder was false, as required to prevail on motion to vacate sentence in which they alleged that government had presented perjured testimony in violation of due process clause; witness's testimony was consistent with the facts observed at the crime scene. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2255.

**19. Criminal Law ⟜700(6)**

Murder defendant failed to show that prosecution was aware that prosecution witness had denied receiving a knife from defendant, as required to establish *Brady* violation based on prosecution's failure to disclose such information. U.S.C.A. Const. Amend. 5.

**20. Criminal Law ⟜700(2.1)**

Where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine.

**21. Criminal Law ⟜700(2.1)**

Information actually known by the defendant falls outside the ambit of the *Brady* rule. U.S.C.A. Const.Amend. 5.

**22. Criminal Law ⟜700(3)**

Defendant obviously knew who he was with on night of charged murder, so that failure of prosecution to disclose statements by witnesses which allegedly provided defendant with an alibi did not constitute *Brady* violation. U.S.C.A. Const. Amend. 5.

**23. Criminal Law ⟜1590**

Good cause for discovery exists in connection with motion to vacate sentence where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief. 28 U.S.C.A. § 2255.

**24. Criminal Law ⟜1590**

District court did not abuse its discretion by denying defendants' requests for discovery, apart from authorizing forensic testing of knife found at murder scene, in connection with motions to vacate sentence filed by defendants convicted of drug and murder charges, where court carefully considered each claim asserted by the defendants, and assessed whether they had shown good cause for discovery. 28 U.S.C.A. § 2255.

**25. Criminal Law ⟜1590**

Defendants who were convicted on drug and murder charges failed to proffer any evidence that jurors engaged in misconduct, or that they were improperly exposed to outside influences, and thus, district court properly denied defendants' request for leave to interview jurors in connection with their motions to vacate sentence. 28 U.S.C.A. § 2255.

**26. Jury ⟜131(8)**

A "*Witherspoon* inquiry" during voir dire seeks to determine whether a potential juror would always refuse to impose the death penalty, while a "reverse-*Witherspoon* inquiry" is utilized to determine the existence of pro-death-penalty bias on the part of a prospective juror.

> See publication Words and Phrases for other judicial constructions and definitions.

**27. Criminal Law ⟜641.13(1)**

Under deficient performance prong of *Strickland* test for ineffective assistance of counsel claims, court applies a strong presumption that a trial counsel's strategy and tactics fall within the wide range of reasonable professional assistance.

**28. Criminal Law ⊗641.13(1)**

For a lawyer's trial performance to be deficient, and thus to constitute ineffective assistance, his errors must have been so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. U.S.C.A. Const. Amend. 6.

**29. Criminal Law ⊗641.13(1)**

For purposes of ineffective assistance claim, reasonableness of a lawyer's trial performance must be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of reasonableness is highly deferential. U.S.C.A. Const. Amend. 6.

**30. Criminal Law ⊗641.13(1)**

To establish prejudice arising from counsel's deficient performance, defendant must show that there is a "reasonable probability," or a probability sufficient to undermine confidence in the outcome, that, but for counsel's unprofessional errors, the result of the proceeding would have been different. U.S.C.A. Const.Amend. 6.

> See publication Words and Phrases for other judicial constructions and definitions.

**31. Criminal Law ⊗641.13(6)**

Claimed ineffectiveness of counsel for defendants charged with murder and drug offenses in failing to adequately investigate their alleged gang activities in New York and New Jersey, which purportedly would have led to the discovery of impeaching evidence on certain prosecution witnesses, did not result in prejudice, as would support relief based on ineffective assistance, where substantial negative repercussions would have resulted to defendants from introduction of such impeachment evidence. U.S.C.A. Const.Amend. 6.

**32. Criminal Law ⊗641.13(2.1)**

Claimed ineffectiveness of counsel for capital murder defendants in failing to request a specific "reverse-*Witherspoon*" inquiry of all prospective jurors to determine the existence of pro-death-penalty bias did not result in prejudice, where reviewing court on direct appeal found that trial court's inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would always vote for death penalty. U.S.C.A. Const.Amend. 6.

**33. Jury ⊗131(8)**

A capital defendant has the right to an voir dire inquiry sufficient to ensure—within the limits of reason and practicality—a jury none of whose members would unwaveringly impose death after a finding of guilt, and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law.

**34. Criminal Law ⊗641.13(7)**

Counsel for capital murder defendants were not ineffective in failing to present mitigating evidence at sentencing regarding the prison conditions defendants would face if sentenced to life imprisonment without the possibility of parole, where if such evidence had been introduced prosecution would simply have been afforded another opportunity to remind jurors that defendants had a proven inclination to engineer murders from behind prison walls. U.S.C.A. Const.Amend. 6.

**35. Criminal Law ⊗641.13(2.1)**

Attorneys for capital murder defendant were not deficient in failing to urge jury to acquit defendant on basis of testimony of pathologist that defendant, who was right-handed, could not have been victim's murder, based on location of stab wounds, where pathologist's testimony did not suggest that defendant could not have stabbed victim in manner which actually occurred. U.S.C.A. Const.Amend. 6.

**36. Criminal Law ☞641.13(6)**

Counsel for capital murder defendant was not ineffective in failing to interview and call as a witness individual who allegedly would have contradicted prosecution witness who claimed that he had driven defendant and accomplice to individual's house shortly after murder, where there was no evidence that defendant had advised counsel that individual could contradict witness's testimony. U.S.C.A. Const. Amend. 6.

**37. Criminal Law ☞641.13(6)**

Defendant's failure to inform counsel that prospective witnesses could exonerate him from charges of involvement in murder precluded claim that counsel was ineffective in failing to call witnesses as alibi witnesses. U.S.C.A. Const.Amend. 6.

**38. Criminal Law ☞641.13(7)**

Counsel was not ineffective in failing to present adequate mitigation evidence regarding defendant's unfortunate childhood during penalty phase of capital murder trial, where counsel did present extensive mitigating evidence, which was sufficiently compelling to convince jury to return non-death verdicts on three of six capital counts against him, despite existence of numerous and weighty aggravating factors. U.S.C.A. Const.Amend. 6.

**39. Criminal Law ☞641.13(7)**

Counsel for capital murder defendant was not ineffective in failing to contest—and indeed, in effectively conceding—sufficiency of government's proof of the aggravating factor that murder involved substantial planning and premeditation, where evidence of planning and premeditation was ample, and best hope for defendant was to emphasize evidence in mitigation rather than challenge prosecution's solid case on aggravating factor. U.S.C.A. Const.Amend. 6.

**40. Criminal Law ☞641.13(2.1)**

Capital murder defendant was not prejudiced by claimed ineffectiveness of his trial attorney in waiving defendant's right to be present during portions of jury selection process; defendant made no suggestion of prejudice beyond conclusory assertion of presumptive prejudice. U.S.C.A. Const.Amend. 6.

**41. Sentencing and Punishment ☞1642**

Capital murder defendant was not mentally retarded, and thus ineligible for execution; psychologist who examined defendant testified that his IQ was 77, which is above level which places person in mentally retarded category, and that he was aware of significance of score above that level and double-checked his numbers and consulted colleagues before reaching his conclusion. Immigration and Nationality Act, § 408($l$), 21 U.S.C.A. § 848($l$).

**42. Criminal Law ☞641.13(7)**

Counsel for capital murder defendant was not ineffective in failing to assert at sentencing possibility that IQ-score inflation had allowed defendant's IQ to be assessed at just above level which would allow him to be classified as mentally retarded, and thus ineligible for death penalty, where counsel was presented with mental health report, which he had no obligation to second-guess. U.S.C.A. Const. Amend. 6; Immigration and Nationality Act, § 408($l$), 21 U.S.C.A. § 848($l$).

**43. Criminal Law ☞641.13(6)**

To provide effective assistance, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, and a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to

counsel's judgments. U.S.C.A. Const. Amend. 6.

**44. Criminal Law ⬡1139, 1158(1)**

Court of Appeals reviews de novo district court's conclusion in connection with motion to vacate sentence that defense counsel was constitutionally ineffective, and defers to its findings of fact unless they are clearly erroneous. U.S.C.A. Const.Amend. 6.

**45. Criminal Law ⬡641.13(6)**

Counsel for capital murder defendant did not perform deficiently in making investigation into defendant's potential alibi defense, where upon learning of information that could provide an alibi defense, counsel had interviewed potential alibi witness but determined that her incomplete memory and apparent hostility would make her a poor witness, and went to hotel and performed unsuccessful search for hotel records for single night in question that could provide additional support for alibi. U.S.C.A. Const.Amend. 6.

**46. Criminal Law ⬡641.13(6)**

A criminal defense lawyer possesses a duty to conduct a pretrial investigation that is reasonable under prevailing professional norms.

**47. Criminal Law ⬡641.13(6)**

Strategic decision of defense counsel on the extent of his investigation into an alibi defense must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

**48. Criminal Law ⬡641.13(1)**

In considering ineffective assistance of counsel claim, court is obligated by law to make every effort to avoid the distorting effects of hindsight, and should evaluate counsel's performance from counsel's perspective at the time of the alleged error

and in light of all the circumstances. U.S.C.A. Const.Amend. 6.

———

Nos. 03–13 & 03–25. **ARGUED:** Robert John Erickson, Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C., for Appellant/Cross–Appellee. Paul Francis Enzinna, Baker Botts, Washington, D.C., for Appellee/Cross–Appellant. **ON BRIEF:** Paul J. McNulty, United States Attorney, Alexandria, Virginia; G. Wingate Grant, Assistant United States Attorney, Richmond, Virginia, for Appellant/Cross Appellee. Michael J. Barta, Jamie Kilberg, Cheryl Crumpton, Baker Botts, Washington, D.C., for Appellee/Cross–Appellant. No. 03–26. **ARGUED:** Barbara Lynn Hartung, Richmond, Virginia, for Appellant. Robert John Erickson, Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C., for Appellee. **ON BRIEF:** Edward E. Scher, Thorsen & Scher, L.L.P., Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Alexandria, Virginia; G. Wingate Grant, Assistant United States Attorney, Richmond, Virginia, for Appellee. No. 03–27. **ARGUED:** Stephen Atherton Northup, Troutman Sanders, L.L.P., Richmond, Virginia, for Appellant. Robert John Erickson, Criminal Division, Appellate Section, United States Department of Justice, Washington, D.C., for Appellee. ON BRIEF: **ON BRIEF:** Frederick R. Gerson, Robinson & Gerson, P.C., Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Alexandria, Virginia; G. Wingate Grant, Assistant United States Attorney, Richmond, Virginia, for Appellee.

Before WILKINSON, KING, and DUNCAN, Circuit Judges.

Affirmed in part and reversed in part by published opinion. Judge KING wrote the opinion, in which Judge WILKINSON and Judge DUNCAN joined.

### OPINION

KING, Circuit Judge:

In February 1993, James Roane, Cory Johnson, and Richard Tipton were convicted in the Eastern District of Virginia for an array of criminal activity, including several capital murders, arising out of drug-trafficking operations in and near Richmond. Each received at least one death sentence for his crimes, plus various terms of imprisonment. After unavailing direct appeals to this Court, *United States v. Tipton*, 90 F.3d 861 (4th Cir.1996), Roane, Johnson, and Tipton (the "Defendants") sought habeas corpus relief in the district court. The Government sought summary judgment on their claims, which the district court awarded, except for two claims raised by Roane. *See United States v. Tipton*, No. 3:92CR68 (E.D.Va. May 1, 2003) (the "Opinion"). After discovery proceedings and an evidentiary hearing on Roane's remaining two claims, the court granted relief on his Sixth Amendment claim of ineffective assistance of counsel ("IAC claim"), vacating Roane's convictions and sentences relating to the murder of Douglas Moody. *See United States v. Roane*, No. 3:92CR68 (E.D.Va. May 1, 2003) (the "Roane Opinion"). Finally, the court rejected Roane's claim of actual innocence of the Moody murder. *Id.*

We are now presented with four separate appeals, which we have consolidated. In Appeal No. 03–13, the Government appeals the district court's award of relief to Roane on his Sixth Amendment IAC claim. In No. 03–25, Roane cross-appeals the court's rulings in favor of the Government on certain of his other claims. And in Nos. 03–26 and 03–27, Johnson and Tipton

appeal the award of summary judgment to the Government on certain of their claims. As explained below, we affirm the rulings in favor of the Government in Nos. 03–25, 03–26, and 03–27, and we reverse the award of relief to Roane in No. 03–13.

### I.

#### A.

In our comprehensive 1996 opinion rejecting the Defendants' direct appeals, Judge Phillips aptly summarized the relevant facts underlying the prosecution of Johnson, Tipton, and Roane. *See Tipton*, 90 F.3d at 868–70. Because we are unable to improve on that summary, it is set forth *in haec verba:*

> Recounted in summary form and in the light most favorable to the Government, the core evidence revealed the following. Tipton, Roane, and Cory Johnson were principal "partners" in a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. The conspiracy's operations began in Trenton, New Jersey where Johnson and Tipton, both from New York City, became members. In August of 1990, the conspiracy expanded its operations to Richmond, Virginia where Roane joined the conspiracy in November of 1991. The Trenton-based operation came to an end on June 4, 1991 when police confiscated a large quantity of crack cocaine and firearms. In late 1991, the conspiracy's operations were expanded from the Central Gardens area of Richmond to a second area in Richmond called Newtowne.

> During the period of the conspiracy's operation, its "partners", including appellants, obtained wholesale quantities of powdered cocaine from suppliers in New York City, converted it by "cooking" [it] into crack cocaine, then packaged it, di-

vided it among themselves, and distributed it through a network of 30–40 street level dealers, "workers." Typically, the appellants and their other partners in the conspiracy's operations took two-thirds of the proceeds realized from street-level sales of their product.

Over a short span of time in early 1992, Tipton, Cory Johnson, and Roane were variously implicated in the murders of ten persons within the Richmond area—all in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the "partners."

On January 4, 1992, Tipton and Roane drove Douglas Talley, an underling in disfavor for mishandling a drug transaction, to the south side of Richmond. Once there, Roane grabbed Talley from the rear while Tipton stabbed him repeatedly. The attack lasted three to five minutes and involved the infliction of eighty-four stab wounds to Talley's head, neck, and upper body that killed him.

On the evening of January 13, 1992, Tipton and Roane went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, where Tipton shot Moody twice in the back. After Moody fled by jumping through a window, both Tipton and Roane pursued. Roane, armed with a military-style knife retrieved from an apartment where the knife was kept for co-conspirator Curtis Thorne, caught up with Moody in the front yard of the apartment where he stabbed him eighteen times, killing him.

On the night of January 14, 1992, Roane, Cory Johnson, and a third person retrieved a bag of guns that they had left at an apartment earlier that day.

Roane then located Peyton Johnson, another rival drug dealer, at a tavern. Shortly after Roane left the tavern, Cory Johnson entered with another person and fatally shot Peyton Johnson with a semiautomatic weapon.

On January 29, 1992, Roane pulled his car around the corner of an alley, got out of the vehicle, approached Louis Johnson, whom appellant Johnson thought had threatened him while acting as bodyguard for a rival dealer, and shot him. Cory Johnson and co-conspirator Lance Thomas then got out of Roane's car and began firing at Louis Johnson. As Louis Johnson lay on the ground, either Cory Johnson or Thomas shot him twice at close range. Louis Johnson died from some or all of these gunshot wounds.

On the evening of February 1, 1992, Cory Johnson and Lance Thomas were told that Roane had gone to the apartment of Torrick Brown, with whom Roane had been having trouble. Johnson and Thomas armed themselves with semiautomatic weapons and went to the apartment where they joined appellant Roane outside. The three then knocked on Brown's door and asked his half-sister, Martha McCoy, if Brown was there. She summoned Brown to the door and Cory Johnson, Roane, and Thomas opened fire with semiautomatic weapons, killing Brown and critically wounding McCoy.

In late January, 1992, after being threatened by Cory Johnson for not paying for a supply of crack cocaine, Dorothy Armstrong went to live with her brother, Bobby Long. On February 1, Cory Johnson learned from Jerry Gaiters the location of Long's house. Thereafter, Tipton and an unidentified "young fellow" picked up Gaiters and Cory Johnson who were then driven by

Tipton to a house where the group obtained a bag of guns. After dropping off the unidentified third party, the group proceeded to Long's house. Upon arriving at Long's house, Cory Johnson and Gaiters got out of the car and approached the house. While Tipton waited in the car, Cory Johnson and Gaiters went to the front door. When Long opened the door, Cory Johnson opened fire, killing both Dorothy Armstrong and one Anthony Carter. Bobby Long fled out the front door, but was fatally shot by Cory Johnson in the front yard.

In early February 1992, Cory Johnson began to suspect that Linwood Chiles was cooperating with the police. On February 19, 1992, Johnson borrowed Valerie Butler's automobile and arranged to meet with Chiles. That night, Chiles, Curtis Thorne, and sisters Priscilla and Gwen Greene met Cory Johnson and drove off together in Chiles's station wagon. Chiles parked the car in an alley, and Tipton soon drove in behind it in another car, got out, and came up alongside the stationwagon. With Tipton standing by, Cory Johnson told Chiles to place his head on the steering wheel and then shot Chiles twice at close range. Additional shots were fired, killing Thorne and critically wounding both of the Greene sisters. The autopsy report indicated that Thorne had been hit by bullets fired from two different directions.

Tipton was charged under 21 U.S.C. § 848(e) and 18 U.S.C. § 2 with capital murder for eight of these killings (Talley, Moody, Louis Johnson, Long, Carter, Armstrong, Thorne, and Chiles); Cory Johnson, with seven (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson); and Roane, with three, (Moody, Louis Johnson, and Peyton Johnson).

The jury convicted Tipton of six of the eight capital murders with which he was charged under § 848(e) (Talley, Armstrong, Long, Carter, Chiles, and Thorne). One of the other two § 848(e) charges was dismissed (Louis Johnson) and the other resulted in acquittal (Moody). Tipton was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a [continuing criminal enterprise ("CCE")] (21 U.S.C. § 848(a)), eight counts of committing acts of violence (the eight killings charged under § 848(e)) in the aid of racketeering activity (18 U.S.C. § 1959), two counts of using a firearm in relation to a crime of violence or a drug-trafficking crime (18 U.S.C. § 924(c)), and two counts of possessing cocaine base with intent to distribute (21 U.S.C. § 841(a)(1)).

The jury convicted Cory Johnson of all seven of the capital murders with which he was charged under § 848(e) (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson). He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), eleven counts of committing acts of violence (including the seven killings charged under § 848(e)) in aid of racketeering activity (18 U.S.C. § 1959), five counts of using a firearm in relation to a crime of violence or drug-trafficking offense (18 U.S.C. § 924(c)), and two counts of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

The jury convicted Roane of all three of the capital murders with which he was charged under § 848(e) (Moody, Peyton Johnson, and Louis Johnson.) He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE

(21 U.S.C. § 848(a)), five counts of committing acts of violence (including the three killings charged under § 848(e)) in aid of racketeering activity (18 U.S.C. § 1959), four counts of using a firearm in relation to a crime of violence or a drug trafficking offense (18 U.S.C. § 924(c)), and one count of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

Following a penalty hearing on the capital murder counts, the jury recommended that Cory Johnson be sentenced to death on all of the seven § 848(e) murders of which he had been convicted; that Tipton be sentenced to death for three of the six § 848(e) murders of which he was convicted (Talley, Chiles, and Thorne); and that Roane be sentenced to death for one of the three of which he was convicted (Moody). The district court sentenced Johnson, Tipton, and Roane to death in accordance with the jury's recommendations pursuant to 21 U.S.C. § 848(*l*), and imposed various sentences of imprisonment upon each of the appellants for the several noncapital counts on which they were convicted and for those capital murder counts on which Tipton and Roane had been convicted but were not given death sentences.

On appellants' motion, the district court refused to order execution of the several death sentences on the grounds that Congress had neither directly authorized the means by which the death sentences imposed under § 848 should be carried out, nor properly delegated to the Attorney General the authority to issue the implementing regulations that were invoked by the Government. In consequence, the district court stayed execution of the death sentences it had imposed until such time as Congress had authorized the means of execution. *Id.*

When the Defendants initially appealed their convictions and sentences to this Court, the Government cross-appealed the district court's stay of their death sentences. In our *Tipton* opinion, we analyzed and disposed of approximately sixty issues, including challenges by the Defendants to aspects of the jury-selection process, the trial's guilt phase, and the trial's penalty phase. *See id.* at 870–901. In rejecting nearly all these challenges, we affirmed the convictions and sentences of the Defendants, except for their convictions for violating 21 U.S.C. § 846 (conspiracy to commit drug offenses), which we vacated on double jeopardy grounds. Finally, on the Government's cross-appeal, we vacated the stay of their death sentences and remanded for the executions to proceed in accordance with regulations promulgated by the Attorney General. *Id.* at 901–03.

## B.

Following our decision in *Tipton*, the Defendants persisted in seeking relief from their convictions and sentences. On May 8, 1998, they sought leave to interview jurors, pursuant to Local Rule 83.5 of the district court, which was denied. *Johnson v. Pruett*, No. 3:97CV895 (E.D. Va. June 10, 1998). On June 1, 1998, the Defendants sought relief under 28 U.S.C. § 2255, filing motions to vacate, set aside, or correct their sentences.[1] The Government sought summary judgment on these motions, and the Defendants, in June 1999, requested leave to conduct discovery. The court granted the discovery request in

---

1. Pursuant to § 2255 of Title 28, a federal prisoner claiming his "sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed the sentence to vacate, set aside or correct the sentence."

part, authorizing Tipton to conduct certain forensic testing. *Johnson v. Pruett,* No. 3:97CV895 (E.D.Va. May 3, 2000).

In its Opinion disposing of the § 2255 motions, the district court awarded summary judgment to the Government except on Roane's claims that: (1) he was denied effective assistance of counsel in connection with the Moody murder, and (2) he was actually innocent of that murder. *See* Opinion at 114. The Defendants thereafter filed a joint motion to alter the Opinion, which the court denied. *United States v. Tipton,* No. 3:92CR68 (E.D.Va. July 15, 2003). Johnson and Tipton then moved for the issuance of certificates of appealability, which the district court awarded on November 26, 2003, as to all claims raised in their § 2255 motions. *United States v. Tipton,* No. 3:92CR68 (E.D.Va. Nov. 26, 2003). Johnson and Tipton have filed timely appeals, and we possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).

### C.

On June 21, 2002, the district court conducted an evidentiary hearing on Roane's IAC claim and on his claim of actual innocence. In the Roane Opinion of May 1, 2003, the court made findings of fact regarding the representation rendered by Roane's trial attorney. *See* Roane Opinion at 2–8. In so doing, the court first addressed the evidence implicating Roane in the Moody murder, finding as follows:

- Denise Berkley testified that on the night of the Moody murder, she watched Roane stab Moody "18 or 19 times" while Moody pleaded for his life; that she then saw Sandra Reavis, Roane, Curt Thorne, Linwood Chiles, and Priscilla "Pepsi" Greene leave the scene of the murder in Chiles's station wagon; and that Roane took the knife he used to stab Moody and gave it to Pepsi Greene, asking her to get rid of it;

- Pepsi Greene testified that she heard two or three shots and then saw Roane and Tipton exit the house from which the shots were fired; that Roane then directed her to get him a knife; and that later that night, Roane returned the knife, then covered with blood, and told her to get rid of it; and

- Robert Davis testified that, immediately following the Moody murder, he saw Tipton and Roane by the steps near his house and heard them stating, "Yeah, I got him, I got him ... we can't stay out here, man. This is hot anyway."

*Id.* at 3–4. Importantly, the court found the testimony of these witnesses to be "credible and ... corroborated by the physical evidence of murder including the autopsy and the crime scene video." *Id.* at 4. Indeed, the court found Greene's testimony to be "particularly compelling." *Id.*

The court then focused on the evidence of Gina Taylor, who observed the Moody murder. Taylor had testified at trial that Roane was not involved. *Id.* The court found, however, that the value of Taylor's evidence was undermined by (1) her acknowledgment that she could not identify the assailant's gender and that she did not see his face, (2) the fact that she was evasive on cross-examination, and (3) her acknowledgment that she had "kind of" dated Tipton. *Id.*

The court then made findings regarding Roane's alibi for the Moody murder. According to the court, Roane had advised his lawyer prior to trial of the following: (1) he did not participate in the murder of Moody; (2) on January 12, 1992—the night of the murder—he was in a Howard Johnson hotel room with codefendant Sandra Reavis; (3) he and Reavis were driven to the hotel by Linwood Chiles; (4) Carmella Cooley accompanied them to the hotel; and (5) Chiles had registered and paid

cash for the hotel room. *Id.* at 5. The court found that the lawyer, David Baugh, "was convinced that Roane did not participate in the Moody murder" and that the hotel was a "couple of miles from where Douglas Moody was murdered." *Id.*

In addressing Mr. Baugh's pretrial investigation into Roane's alibi, the court found the following: (1) Mr. Baugh interviewed Cooley, who said that she had once accompanied Roane and Reavis to the Howard Johnson but could not verify the date; (2) Mr. Baugh concluded that Cooley's ignorance of the date and apparent hostility would make her a bad witness; (3) Mr. Baugh contacted the hotel seeking records of Linwood Chiles renting a room on January 12, 1992; (4) when the hotel manager advised that there were no such records, Mr. Baugh went to the hotel and personally sought to locate such records; (5) Mr. Baugh limited his search to the name "Linwood Chiles," and searched only for records of January 12, 1992; and (6) Mr. Baugh found no records of Linwood Chiles being registered at the hotel on January 12, 1992. *Id.*

The court analyzed the sufficiency of Mr. Baugh's pretrial investigation and concluded that it was constitutionally deficient. In so ruling, it found that: (1) an investigator hired by Roane's habeas corpus lawyer went to the Howard Johnson and looked through boxes of occupancy records for three hours; (2) the investigator found a card with the name "Chiles, Linwood" from the night of January 2, 1992, and a card with the name "Chiles, Larry" from the night of January 12, 1992; (3) in his trial preparation, Mr. Baugh could have subpoenaed the Howard John-

son records, or he could have devoted more effort to searching for them; (4) if Mr. Baugh had utilized the subpoena process or searched more diligently, he could have located the records found by the investigator; and (5) Roane was amenable to testifying in his own defense but was advised by Mr. Baugh not to testify unless his alibi defense could be objectively corroborated. *Id.* at 5–6.

Finally, the court made several findings on the evidence presented in the habeas corpus evidentiary hearing, to the following effect: (1) Roane's testimony was "tenable but not compelling"; (2) although Reavis confirmed Roane's alibi, her testimony was "flat and unpersuasive"; (3) because she would not waive her Fifth Amendment rights, Reavis would not have testified at trial; (4) Demetrius Rowe testified that, at about 8:30 p.m. on the night of the Moody murder, Reavis told Rowe that she was going to a hotel with Roane; (5) Rowe saw Reavis and Roane leave the area—not in Chiles's station wagon (as Roane claimed) but in a cab; (6) Rowe witnessed the murder of Moody and was sure Roane was not present; (7) Rowe did not provide anyone with this information before trial; and (8) to the extent it exculpated Roane, Rowe's evidence was "not credible" and "would carry no weight with a jury." *Id.* at 7.

Assessing all these findings in the context of the case, the court concluded that Mr. Baugh was constitutionally ineffective in his investigation of Roane's alibi. It therefore vacated Roane's convictions and sentences on the three counts related to the Moody murder, that is, Counts Five, Six, and Seven.[2] *Id.* at 13. Finally, the

---

**2.** On Count Five, Roane was convicted of killing Moody while engaged in or working in furtherance of a CCE, in violation of 21 U.S.C. § 848(e)(1)(A). On Count Six, Roane was convicted of using a firearm in relation to

the killing of Moody, in violation of 18 U.S.C. § 924(c). And on Count Seven, Roane was convicted of killing Moody in order to maintain or increase his position in a racketeering enterprise, in violation of 18 U.S.C. § 1959.

court denied relief on Roane's claim of actual innocence.[3] *Id.*

The Government appealed the court's ruling in favor of Roane on his IAC claim, and Roane sought a certificate of appealability on certain of the claims resolved against him, which the district court issued. *United States v. Tipton,* No. 3:92CR68 (E.D.Va. Nov. 26, 2003). Roane then cross-appealed, and we possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).

## II.

[1–4] In our consideration of the district court's rulings, we review its legal conclusions de novo and its findings of fact for clear error. *Monroe v. Angelone,* 323 F.3d 286, 299 (4th Cir.2003); *see also Quesinberry v. Taylor,* 162 F.3d 273, 276 (4th Cir.1998). We review de novo mixed questions of law and fact addressed by the district court—including the issue of whether a lawyer's performance was constitutionally adequate. *Smith v. Angelone,* 111 F.3d 1126, 1131 (4th Cir.1997). We review for abuse of discretion the district court's decision to deny a post-trial request to interview jurors, *United States v. Gravely,* 840 F.2d 1156, 1159 (4th Cir. 1988), as well as its rulings on a discovery request. *See Thomas v. Taylor,* 170 F.3d 466, 474 (4th Cir.1999).

## III.

The Defendants raise multiple issues on appeal, and the district judge has awarded a certificate of appealability on each of them.[4] Under the applicable statute, an appeal may not be taken from a final order of a district court in a § 2255 proceeding unless a certificate of appealability has been issued. 28 U.S.C. § 2253(c)(1)(B). A certificate of appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right," *id.* § 2253(c)(2), and the judge must specify the issues on which the certificate has been granted, *id.* § 2253(c)(3). In this instance, the district judge issued certificates of appealability to the Defendants and explained, "[u]pon consideration of the Defendants' claims and the arguments offered in support thereof, the Court concludes that the issues for which the Defendants seek a certificate of appealability are adequate to deserve encouragement to proceed further." *United States v. Tipton,* No. 3:92CR68 (E.D.Va. Nov. 26, 2003).

[5] Although some of the issues raised on appeal are common to the Defendants, certain issues pertain to only two of the Defendants or solely to a particular defendant.[5] Each of their contentions, however, falls into one of six categories:

(1) claims that the prosecution unconstitutionally discriminated against women in the jury selection process;

(2) challenges to their § 848 CCE convictions—including claims that the trial court erred in failing to instruct and counsel were ineffective in failing to request an instruction that (a) the jury had to unanimously agree on which predicate violations constituted a "continuing series"; (b) the jury had to unanimously agree on the identities of the "five or

---

**3.** Roane does not appeal the court's rejection of his claim of actual innocence.

**4.** In Part III of this opinion, we spell out and address those issues raised by the Defendants in Nos. 03–25, 03–26, and 03–27. In Part IV, we address the Government's appeal (No. 03–

13) from the award of relief to Roane on his IAC claim.

**5.** When all three Defendants have raised the same issue on appeal, we refer to "the Defendants." Otherwise, we identify by name the defendant raising a particular issue.

more persons" that each Defendant supervised; and (c) certain categories of persons and certain types of relationships cannot constitute supervision;

(3) claims of prosecutorial misconduct during trial—including claims that (a) the prosecution knowingly introduced perjured testimony from witnesses Gregg Scott, Maurice Saunders, and Hussone Jones; and (b) the prosecution improperly withheld exculpatory evidence regarding witnesses "Wildman" Stevens, John Knight, and Stoodie Green;

(4) challenges to the court's conduct of the habeas corpus proceedings—including (a) challenges to the standard employed by the court in assessing the Defendants' discovery requests; (b) the contention that the court abused its discretion in granting summary judgment without allowing further discovery; and (c) Johnson and Tipton's claim that the court erroneously denied their motion for leave to interview jurors;

(5) IAC claims not otherwise addressed—including (a) that their lawyers should have further investigated their alleged gang activities in New York and

New Jersey; (b) Johnson and Tipton's claim that their lawyers should have requested a voir dire inquiry on whether prospective jurors had a tendency to favor the death penalty; (c) Johnson and Tipton's claim that their lawyers failed to present mitigating evidence regarding prison conditions; (d) Tipton's claims that his lawyers failed to present adequate defenses to the Talley and Stoney Run murders;[6] (e) Tipton's claim that his lawyers failed to present an adequate case-in-mitigation; (f) Roane's claim that his lawyers conceded certain aggravating factors; and (g) Roane's claim that his lawyers waived his right to attend the voir dire proceedings; and

(6) Johnson's Eighth Amendment claim that he is mentally retarded and cannot constitutionally be executed, and that his counsel were ineffective in failing to address this issue at sentencing and on direct appeal.[7]

We assess these various issues in turn.[8]

### A.

[6] At trial, the Government utilized two of its peremptory challenges to strike men from the jury panel, and it used eight

---

6. In the Talley murder, Tipton and Roane had driven Douglas Talley to Richmond's southside in January 1992, where Tipton stabbed Talley eighty-four times in the head, neck, and upper body. In the Stoney Run murders, Cory Johnson and Tipton, in February 1992, shot into Linwood Chiles's stationwagon, killing Chiles and Curtis Thorne, and seriously wounding the Greene sisters, Priscilla ("Pepsi") and Gwen.

7. The Defendants raise four other claims that were already addressed and rejected on direct appeal. Those claims are: (1) Defendants' contention that they were denied their rights to "justice without discrimination," in violation of 21 U.S.C. § 848(*o*) and the Fifth and Eighth Amendments, *see Tipton*, 90 F.3d at 891 n. 16; (2) Johnson and Tipton's contention that § 848(h) constitutes an unconstitutional delegation of legislative authority to

prosecutors by allowing them to allege non-statutory aggravating factors, *see id.* at 895; (3) Johnson and Tipton's claim that the evidence at trial was insufficient to show that they supervised five or more persons, as required by § 848, *see id.* at 890; and (4) Johnson and Tipton's claim of misconduct by juror Cooke due to mid-trial publicity, *id.* at 891 n. 16. Because the Defendants have not pointed to any change in the law that warrants our reconsideration of these claims, we agree with the district court that they cannot relitigate these issues. *See* Opinion at 2–3; *see Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir.1976) (explaining that defendant cannot relitigate issues previously rejected on direct appeal).

8. The Defendants also maintain that, pursuant to *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), their death

peremptory challenges to strike prospective women jurors. The Defendants, however, failed to object at trial to the Government's use of its peremptory challenges. After trial, but before Defendants' direct appeal, the Supreme Court held that intentional gender discrimination by use of peremptory challenges contravenes the Equal Protection Clause. *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (extending its holding in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) from racial discrimination to gender discrimination). The Defendants, in their direct appeal, raised the issue of sex discrimination in jury selection. In rejecting their claim, we explained that they had produced no evidence to support their claim, other than "raw figures" of men versus women stricken by the prosecution, and such raw figures were insufficient to make a prima facie showing of gender discrimination. *Tipton*, 90 F.3d at 881 & n. 11. Because we addressed this issue on direct appeal in *Tipton*, the Defendants cannot raise their *J.E.B.* claim again in these § 2255 proceedings.[9]

[7] The Defendants also maintain that the failure of their counsel to object to the prosecution's use of its peremptory challenges constitutes ineffective assistance of counsel. At the time of their trial, however, the Supreme Court had not granted certiorari in *J.E.B.*, and the Ninth Circuit was the only federal appellate court to extend the *Batson* principle to gender discrimination. *See United States v. De Gross*, 960 F.2d 1433, 1437–43 (9th Cir. 1992) (en banc). Indeed, we had explicitly rejected attempts to extend *Batson* to gender. *See United States v. Hamilton*, 850 F.2d 1038, 1042 (4th Cir.1988) ("[W]e reject appellants' suggestion that the Equal Protection Clause compels us to extend *Batson* to apply to peremptory challenges exercised on the basis of gender."). In light of this precedent, the Defendants are unable to demonstrate that their counsel's failure to object to the prosecution's use of peremptory strikes against prospective female jurors fell below the range of professionally competent performance. *See United States v. McNamara*, 74 F.3d 514, 517 (4th Cir.1996) (explaining counsel not deficient for following controlling circuit precedent at time of trial). Accordingly, we must affirm the court's ruling on the IAC claims premised on the lack of an objection at trial to the prosecution's use of its peremptory strikes.

### B.

[8] We turn next to the Defendants' multiple claims of error regarding their

---

sentences are constitutionally invalid under the Fifth Amendment because the Indictment failed to allege the statutory aggravating factors under 21 U.S.C. § 848(n)(1)-(12) that define eligibility for the death penalty. *See Ring*, 536 U.S. at 589, 122 S.Ct. 2428 (explaining that a capital defendant is entitled, under the Sixth Amendment, to a jury determination of any fact that increases the maximum penalty from life imprisonment to death); *United States v. Higgs*, 353 F.3d 281, 297 (4th Cir.2003) (explaining that *Ring* dictates that any factor required to be submitted to the jury must be included in the indictment pursuant to the Fifth Amendment Indictment Clause). After oral argument in this case, the Court held that "*Ring* announced a new pro-

cedural rule that does not apply retroactively to cases already final on direct review." *Schriro v. Summerlin*, ___ U.S. ___, ___, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004). And although *Schriro* involved the Sixth Amendment aspect of *Ring*, its reasoning— that *Ring* is procedural and does not classify as a rule worthy of retroactive effect—applies equally here.

9. Because we have already considered Defendants' *J.E.B.* claim on direct appeal and therefore will not reconsider it, we do not reach the district court's conclusion that the claim was defaulted by Defendants' failure to raise it at trial. *See* Opinion at 12.

convictions on the CCE counts. In order to convict a defendant of a CCE offense, the Government is required to prove five elements:

(1) [the] defendant committed a felony violation of the federal drug laws; (2) such violation was part of a continuing series of violations of the drug laws; (3) the series of violations were undertaken by defendant in concert with five or more persons; (4) defendant served as an organizer or supervisor, or in another management capacity with respect to those other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

*United States v. Ricks,* 882 F.2d 885, 890–91 (4th Cir.1989); *see also* 21 U.S.C. § 848(c). On appeal here, and in their § 2255 proceedings in district court, the Defendants focus on the second, third, and fourth of these elements.

### 1.

In their direct appeals, the Defendants asserted that the trial court had plainly erred in failing to instruct the jury that it was required to unanimously agree on three predicate violations supporting the "continuing series" element of § 848(c).[10] Assuming that unanimity was required, we rejected this claim and explained that "the record plainly indicates that appellants could have suffered no actual prejudice from the lack of a special unanimity instruction on the predicate violation element" because "[b]y its verdict, it is clear that the jury unanimously found each guilty of at least five predicate violations. . . ." *Tipton,* 90 F.3d at 885.

After we rendered our *Tipton* decision, the Supreme Court confirmed what we had assumed there. It held that, in a CCE prosecution, the jury must unanimously agree on the specific violations that make up the "continuing series." *Richardson v. United States,* 526 U.S. 813, 816, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). The Defendants now contend that the trial court's failure to give the *Richardson* instruction constitutes a structural defect in their trial and that they are therefore not required to show prejudice. In the alternative, they assert that they have demonstrated prejudice. Johnson and Tipton also maintain that their lawyers were ineffective in failing to object to the lack of a unanimity instruction. As explained below, we agree with the district court that these claims lack merit.

We have recognized that a trial court's failure to give a *Richardson* instruction is a procedural defect rather than a structural one. *United States v. Stitt,* 250 F.3d 878, 883 (4th Cir.2001) (rejecting assertion that *Richardson* error is structural defect); *United States v. Brown,* 202 F.3d 691, 699 (4th Cir.2000) (same). As explained in *Stitt,* a trial court's failure to give a *Richardson* instruction is subject to harmless error analysis, and a defendant raising such an issue must therefore demonstrate prejudice. *Stitt,* 250 F.3d at 883. We ruled on the Defendants' direct appeal that the trial court's failure to give a *Richardson*-type instruction did not prejudice them, *see Tipton,* 90 F.3d at 885, and we must therefore affirm the district court on this point.

[9] In addition to their substantive *Richardson* claims, Johnson and Tipton maintain that their counsel's failure to request a *Richardson*-type instruction at trial constitutes ineffective assistance, in violation of the Sixth Amendment. Again,

---

**10.** In *Richardson v. United States,* 526 U.S. 813, 818, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), the Court assumed, without deciding, that the necessary number to make up a "continuing series" is three. The parties do not dispute this number here.

our decision on direct appeal forecloses this contention. In order to prevail on an IAC claim, a defendant must demonstrate that: (1) counsel's performance was deficient; and (2) such deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because we decided in *Tipton* that the Defendants were not prejudiced by the lack of a *Richardson* instruction, Johnson and Tipton are unable to satisfy the second prong of *Strickland*. Accordingly, we affirm the court's ruling on this claim as well.

### 2.

[10] Relying on *United States v. Jerome*, 942 F.2d 1328, 1330–31 (9th Cir. 1991), Johnson and Tipton next contend that they were entitled to a special unanimity instruction on the CCE charge regarding the identities of the "five or more persons" that each of them was alleged to have supervised. *See* 21 U.S.C. § 848(c). Not only has this claim been inexcusably defaulted by Johnson and Tipton's failure to raise it either at trial or on direct appeal, it also fails because, in *Stitt*, we held that *Richardson* did not change the rule "that the jury need not unanimously agree on which five persons were organized, supervised, or managed by the defendant." *Stitt*, 250 F.3d at 886.

[11] Johnson and Tipton nevertheless claim that their attorneys were constitutionally ineffective in failing to raise this unanimity issue at trial. Because *Stitt* stands for the proposition that unanimous agreement on the identity of each supervisee is not required, we agree with the district court that the lawyers were not ineffective in failing to seek such an instruction. *See* Opinion at 21–25.

### 3.

[12] Johnson and Tipton next contend that the trial court erred in failing to instruct—and counsel were ineffective in failing to request—that certain categories of persons (i.e., drug kingpins) cannot as a matter of law be supervisees, and that certain types of relationships (i.e., buyer-seller) cannot constitute supervision. *See United States v. Barona*, 56 F.3d 1087, 1096–97 (9th Cir.1995) (finding error in failing to instruct that certain individuals who were on list of potential supervisees given to jury were incapable, as a legal matter, of counting as supervisees). This claim has been defaulted by the failure of Johnson and Tipton to raise it either at trial or on direct appeal. *See Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). Like the district court, *see* Opinion at 19, 21–25, however, we will briefly examine this claim in order to assess the contention that counsel's failure to raise it in a timely manner resulted from constitutionally ineffective representation.

[13] The trial court gave the following instruction regarding the supervision element of § 848(c):

> [t]he term "organizer" and the term "supervisory position" and "position of management" are to be given their usual and ordinary meanings. These words imply the exercise of power or authority by a person who occupies some position of management or supervision.

*See* Opinion at 19–20. We upheld this very instruction in *United States v. Hall*, 93 F.3d 126, 130 (4th Cir.1996), two months after our decision in *Tipton*. In *Hall*, the defendant maintained that the jury should have been instructed that he could have neither supervised nor organized individuals with whom he had only a buyer-seller relationship. *Id.* As we explained in *Hall*, [j]urors are competent to

understand and apply ordinary concepts like organizer, supervisor and management." *Id.* at 131. This jury, like the one in *Hall*, was fully capable of understanding the term "supervision." Accordingly, Johnson and Tipton were not prejudiced by the lack of such an instruction, and their counsel were not ineffective in failing to request a more detailed instruction regarding these terms.[11]

### C.

We turn next to the contentions of Johnson and Tipton that their trial was prejudiced by multiple instances of prosecutorial misconduct. They contend that the prosecution knowingly introduced false testimony at trial, in contravention of their due process rights, from witnesses Gregg Scott, Maurice Saunders, and Hussone Jones. And Tipton asserts that the Government contravened the principles of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding from them exculpatory evidence pertaining to the witnesses "Wildman" Stevens, John Knight, and Stoodie Greene. We assess these claims in turn.

### 1.

[14] First, Johnson and Tipton contend that the prosecution knowingly introduced perjured testimony from Gregg Scott, Maurice Saunders, and Hussone Jones.

In order to prevail on such a claim, Johnson and Tipton are required to demonstrate that: (1) the testimony was false, *see Boyd v. French,* 147 F.3d 319, 329–30 (4th Cir.1998); (2) the Government knew the testimony was false, *see Thompson v. Garrison,* 516 F.2d 986, 988 (4th Cir.1975); and (3) there is a reasonable probability that the false testimony could have affected the verdict, *Boyd,* 147 F.3d at 330. As explained below, we agree with the district court that this claim must be rejected.

#### a.

[15] In support of this habeas corpus claim, Johnson and Tipton submitted affidavits from various gang members in New York, asserting that Gregg Scott had lied at trial when he: (1) testified that the New York Boyz (a gang of which Johnson and Tipton were allegedly members) met to discuss retaliating against individuals who threatened other members of the gang; and (2) testified that he received guns from a man known as "Light."[12] Although Johnson and Tipton raised a factual issue on the falsity of these statements, they offered no proof that the Government knew or should have known this testimony to be false. Opinion at 33–35. And the fact that the evidence may have benefitted the Government is not enough. Such " '[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice' to

---

**11.** Johnson and Tipton also maintain that the trial court erred in failing to instruct, and that counsel were ineffective in failing to request an instruction, that the Government must prove "management" in order to satisfy the CCE statute's "organizer" or "supervisor" element. This contention ignores our precedent that proof that a CCE defendant exercised some degree of control over others is not required to show that he acted as an organizer. *See Butler,* 885 F.2d at 201. Even if proof of control were required, the trial court properly instructed the jury that supervision constitutes the "exercise of power and

authority by a person who occupies some position of management." Accordingly, this contention is without merit.

**12.** Johnson and Tipton also submitted affidavits that Greg Scott lied when he: (1) said that he grew up at 155th and Amsterdam in New York; and (2) described the New York Boyz as a gang. The district court found that these statements simply constitute differences of opinion, rather than statements of fact. *See* Opinion at 33. Johnson and Tipton do not contest this finding on appeal.

stave off summary judgment or entitle a habeas petitioner to an evidentiary hearing, because none of these would be admissible evidence at an evidentiary hearing." *Id.* at 35 (quoting *United States v. Aiello,* 814 F.2d 109, 113 (2d Cir.1987)). We therefore affirm the district court's ruling on this claim.

b.

[16] Johnson and Tipton next assert that the Government knew, or that it should have known, that Maurice Saunders testified falsely at trial when he claimed that he saw Light during two trips to New York, and that Light could not have been in New York because he was in fact incarcerated elsewhere during Saunders's visits. Again, Johnson and Tipton proffer no evidence that the Government, at the time of trial, knew or should have known of Light's incarceration. *See Horton v. United States,* 983 F.Supp. 650, 654–55 (E.D.Va.1997) (rejecting assertion that, for *Brady* purposes, federal prosecutor is charged with knowledge of state prison records). And conclusory accusations that the Government should have known that a statement was false, without more, do not warrant an evidentiary hearing or offer escape from summary judgment. *See Aiello,* 814 F.2d at 113–14.

[17] In any event, Johnson and Tipton have made no showing that such testimony about Light's incarceration, even if untrue, could have affected the outcome of their trial. As the district court explained in denying their IAC claim regarding the prosecution's failure to discover Light's incarceration, the Government presented extensive trial evidence of Johnson and Tipton's New York connections and gang-related activities. Opinion at 39 (explaining that the proffered testimony of Light's incarceration does not negate the following: "Anthony Howlen's testimony that Johnson and Tipton were part of the New York Boyz and sliced him with razors when he interfered with their attempts to sell drugs in New Jersey; the repeated references to the New York Boyz during the course of the Richmond based activities; Tipton's threats to invoke the assistance of his New York associates if retaliatory actions were required; the appearance of New York Boyz Lance Thomas and Hess in Richmond; and the repeated trips by Tipton and Johnson from Richmond to New York to obtain drugs"). We therefore affirm the district court on this claim.

c.

[18] Johnson and Tipton also contend that the witness Hussone Jones lied when he testified about the murder of Douglas Talley. Jones testified at trial that he watched from his own car as Tipton stabbed Talley in Talley's car. Johnson and Tipton assume that this testimony was false because there were no street lights in the area of the crime, and they contend it was too dark for Jones to see anything. The district court found, however, that Jones was within ten to twenty feet of Talley's car, and that the car was illuminated by its dome light. The dome light was lit because, after initially being stabbed, Talley's arms and head prevented the car door from closing. Opinion at 54–55. Jones's testimony was consistent with the facts observed at the crime scene, and Johnson and Tipton have failed to make the requisite showing of falsity.

2.

Tipton also asserts that the prosecution improperly withheld exculpatory evidence from his counsel, in violation of due process and *Brady,* regarding the witnesses "Wildman" Stevens, John Knight, and

Stoodie Green. In order to establish a *Brady* violation, Tipton was required to demonstrate that the information at issue was "favorable to the accused"; that it was "suppressed by the [Government], either willfully or inadvertently"; and that prejudice to the defense ensued. *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The district court held that Tipton failed to establish a *Brady* violation, *see* Opinion at 57, 63–64, and we agree.

[19] Tipton contends, first of all, that the prosecutors knew, and yet failed to disclose, that the witness Stevens had denied receiving a knife from Tipton, and that this information would have refuted Jones's testimony that Tipton gave Stevens a bloody knife on the night of the Talley murder. As for this claim, the district court found that there was no evidence that Stevens actually conveyed this information to the prosecution. *Id.* at 57. Accordingly, this contention fails under the second *Brady* prong.

[20–22] Second, Tipton asserts that the prosecutors knew of, and yet also failed to disclose, statements by the witnesses John Knight and Stoodie Green providing Tipton an alibi on the night of the Stoney Run murders. Tipton's *Brady* claims must fail, however, because, "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine." *United States v. Wilson,* 901 F.2d 378, 381 (4th Cir.1990). We have explained that information actually known by the defendant falls outside the ambit of the *Brady* rule. *Fullwood v. Lee,* 290 F.3d 663, 686 (4th Cir.2002). Obviously, Tipton knew who he was with on the evening of the Talley murder—he had no need for the Government to provide him with such information. Thus, no *Brady*

violation has been shown, and we affirm the district court's ruling on the issue.

### D.

We turn next to the Defendants' multiple challenges to the district court's conduct of their habeas corpus proceedings. These contentions include (1) their challenge to the standard utilized by the court in assessing their discovery requests; (2) their contention that the court abused its discretion in awarding summary judgment to the Government without first according them an opportunity to conduct discovery; and (3) their assertion that the denial of their motion for leave to interview jurors was erroneous.

### 1.

[23, 24] Other than authorizing Tipton to conduct forensic testing of a knife found at the Talley murder scene, the court denied the Defendants' broad motions for authority to conduct discovery in their habeas corpus proceedings. *Johnson v. Pruett,* No. 3:97CV895 (E.D.Va. May 3, 2000). Pursuant to Rule 6(a) of the Rules Governing § 2255 Proceedings, a prisoner may engage in discovery only "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants him leave to do so, but not otherwise." The Defendants contend that the district court utilized an incorrect legal standard in assessing their discovery requests. And the Defendants assert that, regardless of the standard employed, such discovery should have been authorized. We are constrained to disagree.

In denying the request for discovery, the court explained the standard it was utilizing:

> The Supreme Court determined in *Harris v. Nelson,* 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), and its

progeny, *Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997), that 'good cause' for discovery exists when a petition for habeas corpus establishes a prima facie case for relief. *See Harris v. Nelson*, 394 U.S. at 290, 89 S.Ct. 1082. Specifically, discovery is warranted, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09, 117 S.Ct. 1793 (citing *Harris*, 394 U.S. at 299–300, 89 S.Ct. 1082).

*Johnson v. Pruett*, No. 3:97CV895 (E.D.Va. May 3, 2000). The Defendants assert that the court, in ruling against them, improperly applied a stringent "prima facie" standard under *Harris*, instead of a more forgiving "good cause" standard authorized by *Bracy*. This contention is incorrect. In *Bracy*, the Court cited with approval the discovery standard articulated in *Harris*, merely clarifying the definition of "good cause." *See Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir.1998) (observing that *Bracy* approved the *Harris* standard); *see also Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir.2000) ("[T]he *Bracy* decision does not lower the grade for discovery in habeas cases, but rather it merely reasserts the standards of *Harris v. Nelson* . . . ."). Here, the district court properly applied the good cause standard outlined in *Harris* and *Bracy*, and it did not abuse its discretion in deciding that the Defendants had not shown good cause for the bulk of their discovery requests. The court carefully considered each claim asserted by the Defendants,

and it assessed whether the Defendants had shown good cause for discovery. *See Johnson v. Pruett*, No. 3:97CV895, at 3–12 (E.D.Va. May 3, 2000). Because the court applied the proper standard and did not abuse its discretion, we affirm its rulings on this issue.[13]

### 2.

Johnson and Tipton next contend that the district court abused its discretion in denying their claims of juror misconduct without first granting them leave to interview the jurors. According to Johnson and Tipton, the jurors were exposed to extraneous information during trial, including extensive media coverage, which clouded their judgment.

We have already assessed and disposed of at least one aspect of this claim. During trial, two jurors admitted reading an inflammatory article about the Defendants. One of those jurors was excused by the trial court, but the other, Mr. Cooke, advised the court that the article would not affect his consideration of the case, and he continued to serve. On direct appeal, the Defendants contended that Cooke should have been removed from the jury because he had been exposed to mid-trial adverse publicity. We specifically considered this claim and found no error in the court's decision with regard to Cooke. *Tipton*, 90 F.3d at 891 n. 16. In addition, we agree with the district court that Johnson and Tipton's remaining media-related claims with respect to the jury have been procedurally defaulted by their failure to raise them either at trial or on direct appeal. *See* Opinion at 3.

---

**13.** The district court alternatively held that the Defendants were precluded from further discovery by their failure to comply with Federal Rule of Civil Procedure 56(f), which requires a civil litigant opposing summary judgment to attest in an affidavit that he cannot oppose summary judgment without conducting discovery. We need not reach this basis for denial of discovery because the court did not abuse its discretion in finding that the Defendants had failed to demonstrate good cause.

**[25]** As to their non-media-related juror misconduct claims, the district court carefully explained that they are so speculative as to be "insufficient to survive summary dismissal, much less summary judgment." *United States v. Tipton*, No. 3:92CR68, at 3 (E.D.Va. July 15, 2003). Throughout the trial, the court gave cautionary instructions to the jury concerning both media coverage and other possible outside influences, repeatedly reminding the jurors to avoid such external sources of information. Johnson and Tipton have provided us with nothing to suggest that the jurors violated these instructions. And as we observed in *Gravely*, "[r]equests to impeach jury verdicts by posttrial contact with jurors are disfavored." 840 F.2d at 1159. Before proceeding down the path of impeaching a jury verdict, a § 2255 movant must make a threshold showing of improper outside influence. *Id.* In this instance, the court did not abuse its discretion in finding that no such showing had been made. *Id.* (explaining that denial of jury investigation is subject to abuse of discretion review). Put simply, Johnson and Tipton have failed to proffer any evidence that the jurors engaged in misconduct or that they were improperly exposed to outside influences. We therefore affirm the court's rulings on the Defendants' request to interview the jurors. *See* Opinion at 3; *United States v. Tip-ton*, No. 3:92CR68, at 3 (E.D.Va. July 15, 2003).

### E.

**[26]** The Defendants also assert multiple other IAC claims, contending that: (1) their lawyers should have further investigated their alleged gang activities in New York and New Jersey; (2) Johnson's and Tipton's lawyers should have requested a "reverse*Witherspoon*" inquiry;[14] (3) Johnson's and Tipton's lawyers failed to present mitigating evidence regarding prison conditions; (4) Tipton's lawyers failed to present adequate defenses to the Talley and Stoney Run murders; (5) Tipton's lawyers failed to make an adequate case-in-mitigation; (6) Roane's lawyers conceded certain aggravating factors; and (7) Roane's lawyers waived his right to voir dire.

As we have explained, the Court in *Strickland* established that an IAC claim has two prongs: (1) that counsel's performance was deficient; and (2) that such deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. 2052. A defendant asserting an IAC claim must therefore satisfy both prongs, and a failure of proof on either prong ends the matter. *See Williams v. Kelly*, 816 F.2d 939, 946–47 (4th Cir.1987).

**[27–29]** Under the first prong of *Strickland*, we apply a "strong presumption" that a trial counsel's strategy and tactics fall "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. For a lawyer's trial performance to be deficient, his errors must have been so serious that he was not "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052. And the reasonableness of a lawyer's trial performance must be "evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of reasonable-

---

**14.** *See Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). *Witherspoon* authorized a voir dire inquiry to determine whether a potential juror would always refuse to impose the death penalty. Conversely, a "reverse-*Witherspoon*" voir dire inquiry is utilized to determine the existence of pro-death-penalty bias on the part of a prospective juror. *See Morgan v. Illinois*, 504 U.S. 719, 729–34, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

ness is highly deferential." *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *see also Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

[30] In order to establish prejudice under *Strickland* 's second prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* As explained below, we agree with the district court that the Defendants' remaining IAC claims lack merit, standing alone or viewed in the aggregate.

### 1.

[31] First of all, the Defendants maintain that their lawyers should have further investigated their alleged gang activities in New York and New Jersey, and that this failure constitutes constitutionally ineffective assistance. They assert that such an investigation would have led to the discovery of impeaching evidence on certain prosecution witnesses—i.e., that Light was in jail when Saunders supposedly saw him in New York, and that Scott's testimony about gang-related retaliation was false.

Notwithstanding whether counsel's investigation was reasonable, the Defendants have failed to establish prejudice under *Strickland* 's second prong. As the district court explained, substantial negative repercussions would have resulted to the Defendants from the introduction at trial of such impeachment evidence. Opinion at 38. Many of the purported impeaching witnesses had acknowledged being involved in illegal drug transactions with Johnson and Tipton and in pooling their money with Johnson and Tipton to purchase drugs, and Light did not deny that he was a regular source of Tipton's for

crack cocaine. *Id.* In addition, none of this evidence would have undermined the overwhelming evidence before the jury that the Defendants were involved in a CCE in the Richmond area, and that their enterprise had distributed illegal drugs and killed on several occasions in order to ensure its success. Accordingly, the Defendants could not have been prejudiced by any purported omissions of their counsel in this regard, and these claims must be rejected.

### 2.

[32, 33] Johnson and Tipton next contend that, under the principle established in *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), their counsel were constitutionally ineffective in failing to request a specific "reverse-*Witherspoon* " inquiry of all prospective jurors. Under *Morgan,* a capital defendant has the right to an "inquiry sufficient to ensure—within the limits of reason and practicality—a jury none of whose members would 'unwaveringly impose death after a finding of guilt' and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law." *Tipton,* 90 F.3d at 878 (quoting *Morgan,* 504 U.S. at 733, 112 S.Ct. 2222). Johnson and Tipton contend that their lawyers failed to ensure that each prospective trial juror was specifically asked whether he or she would always impose a sentence of death. On direct appeal, however, this Court foreclosed the prejudice prong of this contention when, in considering a separate contention concerning voir dire, we concluded that "the district court's inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would *always* vote for the death penalty." *Id.* at 879. Accordingly, Johnson and Tipton are unable to satisfy *Strickland* 's second prong, and their counsel

were not constitutionally ineffective for failing to request a reverse-*Witherspoon* inquiry.

### 3.

[34]  Johnson and Tipton next contend that their lawyers were constitutionally ineffective for failing to present mitigating evidence regarding the prison conditions they would face if sentenced to life imprisonment without the possibility of parole. This contention is made in response to a point argued by the prosecutor during closing: "Ask yourself, should they be punished beyond incarceration?  I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment. But think about each and every day of their existence in jail.  They will wake up, bathe, be fed.  They will be able to watch TV, read books.  They will be able to use the telephone to talk to their loved ones." Essentially, Johnson and Tipton contend that, had their lawyers explained to the jury that actual prison conditions were more difficult than this benign description would suggest, the jury may have seen a life sentence as sufficient punishment and rejected the death penalty.

As the district court correctly explained, if the lawyers had introduced evidence of prison conditions, the prosecution would simply have been afforded another opportunity to remind the jurors that Johnson and Tipton possessed a "proven inclination to engineer murders from behind prison walls."  Opinion at 77.  And the Government could have drawn the stark contrast between prison life and the living conditions of the incapacitated Greene sisters who were critically wounded during the Stoney Run murders.  Accordingly, the lawyers acted reasonably in deciding not to describe prison conditions as mitigating evidence.

### 4.

Tipton next asserts that his counsel were ineffective in their defense of him on the Talley murder counts (Counts Three and Four), and on the Stoney Run murder counts (Counts Twenty-four and Twenty-five).  We reject both of these contentions.

### a.

[35]  Tipton maintains that, based on pathologist Dr. Fierro's testimony, Tipton, who is right-handed, could not have been Talley's murderer.  Accordingly, Tipton contends that Hussone Jones's eyewitness testimony must have been false and that his counsel were ineffective in failing to exploit this fact.  We disagree.  The district court expressly found that "Dr. Fierro's testimony did not suggest that Tipton, who was initially sitting on the right of Talley, could not stab Talley on the right side of his body.... Such a diffusion of wounds is consistent with Jones' description...."  Opinion at 55.  In light of this factual finding, counsel were not deficient in failing to urge the jury to absolve Tipton on the basis of Dr. Fierro's testimony.

[36]  Tipton also contends that defense counsel were ineffective in failing to interview and call as a witness "Wildman" Stevens, who, according to an affidavit submitted during the § 2255 proceedings, would have contradicted Jones's testimony that Jones drove Tipton and Roane to Stevens's house immediately after Talley's murder.  As the district court found, however, there was no evidence that Tipton had advised his counsel that Stevens could contradict Jones's description.  *Id.* at 58; *see Lackey v. Johnson,* 116 F.3d 149, 152 (5th Cir. 1997) (explaining lawyer not ineffective for failing to discover evidence that client knew but withheld).  And as the court explained, Tipton's counsel had no reason to believe that it would be fruitful

to interview Stevens, considering the fact that the evidence indicated that Stevens was simply another member of the CCE. Opinion at 58. Accordingly, we affirm the court's determination that counsel were not ineffective in defending Tipton on the Talley murder counts.

### b.

[37] Tipton also contends that his counsel failed to mount an adequate defense to the Stoney Run murder counts. In particular, Tipton contends that counsel should have called John Knight and Stoodie Green as alibi witnesses. Again, we agree with the district court's denial of this IAC claim. As the court explained, "[c]onspicuously absent from the record is any evidence from Tipton that he told counsel that Stoodie Green or Knight could exonerate him from involvement in the Stoney Run murders." Opinion at 64. We agree with the court that Tipton's counsel was not constitutionally ineffective in his defense of the Stoney Run murders.

### 5.

[38] Tipton claims that his attorney failed to present an adequate case-in-mitigation at the penalty phase of his trial. In particular, Tipton relies on the absence of evidence from his mother, his paternal grand-mother, and an older woman in whose home he resided in early 1992—specifically contending that these witnesses could have testified to Tipton's unfortunate childhood. Again, we agree with the district court that "[t]he record refutes such a claim," in that counsel presented extensive evidence through both lay and expert witnesses, and succeeded in convincing the jurors to find twelve mitigating factors, a number of which pertained to Tipton's difficult childhood and his mental deficiencies. Opinion at 77–80. Indeed, the mitigating evidence in the trial's penalty phase was sufficiently compelling to convince the jury to return non-death verdicts on three of the six capital counts against Tipton, despite the existence of numerous and weighty aggravating factors. In light of the compelling mitigation case presented by Tipton's counsel in the trial's penalty phase, the court correctly concluded that their performance was not constitutionally deficient and that Tipton was not prejudiced by the absence of additional witnesses.

### 6.

[39] Roane maintains that his trial counsel rendered ineffective assistance at the trial's penalty phase in failing to contest—and indeed, in effectively conceding—the sufficiency of the Government's proof of the aggravating factor that the murder of Moody involved substantial planning and premeditation. According to Roane, this concession was error because there was no evidence that he manifested a premeditated intent to kill Moody or that there was substantial planning, or any planning at all. The district court disagreed, and we agree with the district court. The court found that the evidence of substantial planning and premeditation was ample and that, in light of that evidence, "[t]he best hope for Roane was to emphasize the evidence in mitigation rather than challenge the prosecution's solid case on the substantial planning aggravating factor." Opinion at 71; *see Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir.1997) (concluding that it was reasonable for counsel to concede client's culpability in order to establish credibility with jury); *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995) (concluding counsel reasonably conceded defendant's guilt of kidnapping to retain credibility for penalty phase). Because the performance of Roane's counsel

was not constitutionally deficient, we affirm the district court.

### 7.

[40] Relying on *Near v. Cunningham,* 313 F.2d 929, 931 (4th Cir.1963), Roane maintains that a capital defendant may not waive his presence at trial and that his trial attorney was necessarily deficient when, after consulting with Roane, he waived Roane's right to be present during portions of the jury selection process. Roane contends that he was prejudiced as a result because, had he been present throughout voir dire, he would have insisted on using peremptory strikes to remove three jurors who ultimately served on the jury. He maintains that, had those strikes been utilized, the outcome of the trial's penalty phase would likely have been different.

Again, our decision on direct review forecloses this contention. In applying plain error review to Roane's waiver-of-presence claim, we observed that Roane did not offer anything to suggest that he was prejudiced by his intermittent absences from jury voir dire beyond the conclusory assertion that he was presumptively prejudiced. *Tipton,* 90 F.3d at 875–76. Accordingly, Roane is unable to satisfy the second prong of *Strickland,* and we need not consider this issue further.

### F.

Johnson maintains that he is mentally retarded and that, under federal law, he cannot be executed. He further contends that his counsel were ineffective for failing to argue this point during sentencing. The district court rejected these contentions, *see* Opinion at 80–84, and we agree.

### 1.

[41] Under federal law, "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 21 U.S.C. § 848(*l*); *see also Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that execution of mentally retarded defendant constitutes cruel and unusual punishment under Eighth Amendment). The district court found, based on data of the American Association on Retardation, that an IQ of 75 or below places a person in the retarded category. *Id.* at 80. At the penalty phase of Johnson's trial, Dr. Dewey Cornell, a psychologist, testified that, on October 10, 1992, he had administered a Wechsler Adult Intelligence Scale Test ("WAIS Test"). Johnson exhibited an IQ of 77, which indicated a "generally impaired intelligence," placing him "just above the level of mental retardation." Importantly, Dr. Cornell testified that he knew the significance of finding Johnson's IQ to be above 75 (i.e., this finding would render Johnson death-eligible), and that he double-checked his numbers and consulted colleagues before reaching this conclusion.

Despite Dr. Cornell's evidence, Johnson asserts that he is in fact mentally retarded. In support of this proposition, Johnson points to evidence offered during the penalty phase that his IQ was somewhere between 69 and 74 in 1985, and he relies on a 1996 publication concluding that the WAIS test tends to inflate IQ scores over the years:

> Individuals appear to gain 3–5 IQ points over a ten year period. Since the WAIS–R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105–107 points rather than the accepted value of 100.

*Id.* at 81 (quoting The Psychological Corporation, *An Introduction to the Wechsler Adult Intelligence Scale,* (3d ed.1996)). Based on these authorities, Johnson main-

tains that his actual IQ is below 75 and that his score of 77 is a product of score inflation. As the district court explained, however, Dr. Cornell's evidence that he double-checked his findings and consulted with colleagues before concluding that Johnson was not mentally retarded "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument." *Id.* at 81–82. Accordingly, Johnson is not barred from execution due to mental retardation.

### 2.

[42, 43] Johnson next contends that his counsel was ineffective for failing to assert possible IQ-score inflation at sentencing. We agree with the district court that Johnson's trial attorney was not ineffective for failing to raise this issue. Under *Strickland,* "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. And "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* In this instance, Johnson's lawyer was presented with a mental health report, and he was under no mandate to second-guess

that report. *See Wilson v. Greene,* 155 F.3d 396, 403 (4th Cir.1998) (rejecting inmate's claim that counsel should have pursued mental health defenses where psychological report indicated inmate was competent to stand trial). In these circumstances, Johnson's counsel was not constitutionally ineffective in this respect.

### IV.

Finally, we turn to the Government's appeal in No. 03–13, challenging the district court's ruling that Roane's counsel, David Baugh, was constitutionally ineffective for failing to properly investigate Roane's alibi defense for the Moody murder. *See* Roane Opinion at 2–11. The court found that Mr. Baugh's investigation into Roane's potential alibi failed both prongs of *Strickland,* i.e., (1) his performance was deficient, and (2) his deficient performance prejudiced the defense. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Because the district court erred in concluding that Mr. Baugh's representation of Roane was deficient under the first prong of *Strickland,* we reverse its vacatur of Roane's convictions and sentences on Counts Five, Six, and Seven.[15]

The district court concluded that Mr. Baugh had a duty to investigate Roane's

---

**15.** Because Mr. Baugh's performance was not deficient under *Strickland,* we need not decide whether his performance prejudiced the defense. *See Williams v. Kelly,* 816 F.2d 939, 946–47 (4th Cir.1987). We express our considerable doubt, however, on whether prejudice could have ensued here. The court found the testimony of all three witnesses who implicated Roane in the Moody murder—Berkley, Davis, and Pepsi Greene—to be credible and corroborated by physical evidence. And Greene's testimony was deemed to be "particularly compelling." Roane Opinion at 4. Conversely, the court found the testimony of the potential alibi witnesses to be much less credible—Reavis's testimony was "flat and unpersuasive," and she would not have

testified at trial anyway; Roane's testimony was "tenable" but "not compelling"; Rowe's testimony was "not credible" and "would carry no weight with a jury"; and Cooley could not remember the date on which she went to a hotel with Roane. *Id.* at 5–7. It would be difficult for this testimony (not to mention the fact that Roane would have been subject to cross-examination about the other murders and his extensive criminal record), plus one motel receipt, in someone else's name, placing Roane a mere two miles away from the murder scene, to create a reasonable probability that, but for the lack of such evidence, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

potential alibi. As the court explained, Mr. Baugh possessed information suggesting that Roane might be telling the truth about staying at the Howard Johnson hotel the night of Moody's murder—(1) Gina Taylor, an eyewitness, claimed that Roane did not commit the murder; (2) Mr. Baugh had received a detailed account of the alibi from Roane, who had been candid about his participation in other crimes; and (3) Carmella Cooley acknowledged that she had visited a hotel with Roane. *See* Roane Opinion at 9. Armed with this information, we agree that Mr. Baugh had reason to believe that the hotel records could generate an alibi for Roane, and Mr. Baugh was therefore obliged to make a reasonable investigation of them. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052 (explaining that attorney has duty to make reasonable investigation or to make reasonable decision not to investigate). We part company with the district court, however, on its conclusion that Mr. Baugh failed to fulfill this duty.

[44, 45] We review de novo the district court's conclusion that Mr. Baugh was constitutionally ineffective, *Smith v. Angelone,* 111 F.3d 1126, 1131 (4th Cir.1997), and we defer to its findings of fact unless they are clearly erroneous. As the district court found, Mr. Baugh, in keeping with his obligation to investigate: (1) interviewed Cooley, who stated that she once accompanied Roane and Reavis to the Howard Johnson but could not verify the date; (2) concluded that Cooley's ignorance of the date and apparent hostility would make her a poor witness; (3) thereafter contacted the Howard Johnson and asked for records of Linwood Chiles renting a room on the evening of January 12, 1992; (4) went to the hotel himself and attempted to locate the records; (5) limited his search to the name "Linwood Chiles," and searched only for records from January 12,

1992; and (6) found no record of Linwood Chiles being registered at the hotel on the evening of January 12, 1992. Roane Opinion at 5. At this point, Mr. Baugh made the strategic choice to focus on Roane's misidentification defense, with Gina Taylor as his lead witness.

The district court concluded that Mr. Baugh's investigation of the alibi was constitutionally insufficient because he "did not follow through and seek the records with the vigor demanded by the situation." *Id.* at 9. According to the court, "reasonably competent counsel would have filed a subpoena demanding all records held by the hotel pertaining to a Mr. Chiles for January of 1992 or spent a few hours going through all the records at the hotel to assure himself that no records corroborative of his client's alibi existed." *Id.* With all respect to the district court, we disagree.

[46–48] As the Supreme Court has explained, a criminal defense lawyer possesses a duty to conduct a pretrial investigation that is "reasonable[ ] under prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; *see also Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). And the strategic decision of Roane's lawyer on the extent of his investigation into the alibi defense "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *see also Byram v. Ozmint,* 339 F.3d 203, 209 (4th Cir.2003) (same); *Tucker v. Ozmint,* 350 F.3d 433, 441–42 (4th Cir.2003) (same). We are obligated by law to make "every effort to avoid the distorting effects of hindsight," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, and we should evaluate Mr. Baugh's performance "from counsel's perspective at the time of the alleged error and in light of all the circumstances...." *Kimmelman v. Mor-*

*rison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

Applying these principles to this situation, Mr. Baugh's performance was constitutionally reasonable and thorough. He interviewed Carmella Cooley, who could not remember when she stayed at a hotel with Roane. He called the hotel and requested records of Linwood Chiles from the *only relevant night*—the night of the murder. And when that search was not fruitful, he went to the hotel and searched for the records himself. Only after this final step in his investigation did Mr. Baugh turn to and focus on Roane's misidentification defense. In these circumstances, we decline to act as a Monday-morning quarterback and second-guess Mr. Baugh's efforts, simply because we are now armed with more information and the benefit of hindsight.

Furthermore, the authorities relied upon by the district court miss the mark, involving situations in which a lawyer has failed to investigate a defense *at all* or has performed an investigation so minimal that no strategic reason could be given for the failure to investigate further. *See, e.g., United States v. Russell,* 221 F.3d 615, 621 (4th Cir.2000) (finding ineffective representation when lawyer failed to investigate defendant's criminal record after defendant advised counsel that his convictions had been overturned); *Hooper v. Garraghty,* 845 F.2d 471, 474–75 (4th Cir.1988) (explaining counsel deficient in failing to investigate insanity defense, after learning from client, client's family, and prison psychologist of client's insanity); *Hoots v. Allsbrook,* 785 F.2d 1214, 1219–20 (4th Cir. 1986) (finding lawyer's decision not to interview eyewitnesses unreasonable); *Nealy v. Cabana,* 764 F.2d 1173, 1174 (5th Cir.1985) (finding counsel ineffective in failing to seek evidence from witnesses when client claimed those witnesses committed crime). Unlike the circumstances

underlying those decisions, this case does not involve a situation where counsel neglected to investigate, or where his investigation was so cursory that we can now—eleven years on and with the benefit of hindsight—declare it constitutionally unreasonable.

As the Sixth Circuit aptly explained in *Coe v. Bell,* 161 F.3d 320 (6th Cir.1998), what the lawyer did not miss is "just as (or more) important as what the lawyer missed." *Id.* at 342. Here, Mr. Baugh was diligent and highly effective in his representation of Roane during this litigation—he conferred with Roane, he investigated the crime scene, he located an eyewitness to the Moody murder who provided a physical description of a murderer dissimilar to Roane, he learned that Moody's mother had advised the police that another man had been searching for Moody hours before his murder, and he aggressively and professionally cross-examined the Government's witnesses. Mr. Baugh investigated the possible Moody alibi—a weak one at that—but when the investigation proved unfruitful, he put on a strong misidentification defense. According a "heavy measure of deference" to Mr. Baugh, as we must, his representation of Roane was not constitutionally ineffective. We therefore reverse the vacatur of Roane's convictions and sentences on Counts Five, Six, and Seven.

V.

Pursuant to the foregoing, we affirm the award of summary judgment to the Government in Nos. 03–25, 03–26, and 03–27, and we reverse the district court's award of relief to Roane in No. 03–13.

*AFFIRMED IN PART AND REVERSED IN PART*



# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**Case No. _____**

_____

**In re James H. Roane, Jr.,**

**Movant.**

_____

**APPLICATION TO FILE SECOND OR SUCCESSIVE
MOTION PURSUANT TO 28 U.S.C. §§ 2244(b) and 2255(h)**

_____

**CAPITAL § 2255 PROCEEDINGS**

Peter Williams
Assistant Federal Defender
Federal Community Defender Office
  for Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

Paul F. Enzinna
Law Office of Paul F. Enzinna, LLC
5425 Wisconsin Avenue, Suite 600
Chevy Chase, MD 20815
(240) 718-4500

May 20, 2016

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ............................................................................................................1

PROCEDURAL HISTORY...............................................................................................3

STATUTES INVOLVED ..................................................................................................5

ARGUMENT ...................................................................................................................6

    I.  PURSUANT TO *JOHNSON*, § 924(c)(3)(B)'S
       RESIDUAL CLAUSE IS UNCONSTITUTIONALLY VAGUE. ..................7

      A.  *Johnson* Expressly Rejected the "Ordinary Case" Approach to
           Determining Whether a Crime Is Intrinsically Violent...........................8

      B.  *Johnson* Renders § 924(c)(3)(B) Unconstitutionally Vague. ...................9

    II.  KILLING UNDER § 848(e)(1)(A) AND MURDER
        UNDER § 1959(a) DO NOT QUALIFY AS CRIMES
        OF VIOLENCE UNDER THE FORCE CLAUSE
        OF § 924(c)(3)(A)...............................................................................12

      A.  Killing Under 21 U.S.C. § 848(e)(1)(A) Does Not Qualify as a
           Crime of Violence under the Force Clause of § 924(c)(3)(A).................13

      B.  Murder in Aid of Racketeering Activity Does Not Qualify as a
           Crime of Violence under the Force Clause of § 924(c)(3)(A)..................16

    III.  MR. ROANE HAS MADE A SUFFICIENT SHOWING OF
         POSSIBLE MERIT TO FILE A SUCCESSIVE MOTION
         IN DISTRICT COURT. ........................................................................19

CONCLUSION ...............................................................................................20

i

# TABLE OF AUTHORITIES

**Cases**

*Begay v. United States*, 553 U.S. 137 (2008) ...............................................................8

*Bennett v. United States*, 119 F.3d 468 (7th Cir. 1997)..................................... 3, 19

*Chambers v. United States*, 555 U.S. 122 (2009).......................................................10

*Descamps v. United States*, 133 S. Ct. 2276 (2013) ..................................................13

*Duarte v. United States*, 289 F. Supp. 2d 487 (S.D.N.Y. 2003)..............................17

*Garcia v. Gonzales*, 455 F.3d 465 (4th Cir. 2006) ............................................ 16, 17

*In re Roane*, 132 S. Ct. 390 (2011) ...............................................................................4

*In re Roane*, No. 09-8 (4th Cir. July 13, 2010)............................................................4

*In re Williams*, 330 F.3d 277 (4th Cir. 2003) ...................................................... 3, 19

*Johnson (Curtis) v. United States*, 559 U.S. 133 (2010) .........................................15

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ........................................... passim

*Roane v. United States*, 520 U.S. 1253 (1997) ............................................................4

*Roane v. United States*, 546 U.S. 810 (2005) ..............................................................4

*Taylor v. United States*, 495 U.S. 575 (1990).............................................................8

*United States v. Aragon*, 983 F.2d 1306 (4th Cir. 1993) .........................................10

*United States v. Ayala*, 601 F.3d 256 (4th Cir. 2010)...............................................10

*United States v. Bell*, No. 15–00258,
    2016 WL 344749 (N.D. Cal. Jan. 28, 2016) ...........................................................12

*United States v. Chandler*, 950 F. Supp. 1545 (N.D. Ala. 1996) ...........................14

*United States v. Cruz-Rodriguez*, 625 F.3d 274 (5th Cir. 2010) .............................15

*United States v. Edmundson*, No. 13–CR–15,
    2015 WL 9311983 (D. Md. Dec. 23, 2015) .............................................................12

*United States v. Fuertes*, 805 F.3d 485 (4th Cir. 2015)............................... 11, 13, 14

*United States v. Lattanaphom*, No. 99–CR–00433,
    2016 WL 393545 (E.D. Cal. Feb. 2, 2016) ..............................................................12

*United States v. McNeal*, No. 14–4871,
    2016 WL 1178823 (4th Cir. Mar. 28, 2016) ............................................. 11, 13, 16

ii

*United States v. Naughton*, 621 F. App'x 170 (4th Cir. 2015)................................14

*United States v. Perez-Vargas*, 414 F.3d 1282 (10th Cir. 2005)............................15

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004)...........................................4

*United States v. Roane*, No. 92-68 (E.D. Va. May 1, 2003)....................................4

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)............................................3

*United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012)..............................15

*United States v. Vinson*, 805 F.3d 120 (4th Cir. 2015)...........................................16

*United States v. Whitfield*, 548 F. App'x 70 (4th Cir. 2013) .................................18

*United States v. Williams*, 342 F.3d 350, 356 (4th Cir. 2003)................................17

*Welch v. United States*, 136 S. Ct. 1257 (2016)......................................................1, 4

*Whitfield v. United States*, 135 S. Ct. 785 (2015)...................................................18

*Whitfield v. United States*, No. 3:16–cv–00027,
2016 WL 427942 (W.D.N.C. Feb. 3, 2016)......................................................18

**Statutes**

18 U.S.C. § 1111(a) ................................................................................................16

18 U.S.C. § 1959(a) ................................................................................................2

18 U.S.C. § 924(c) ..................................................................................................2

18 U.S.C. § 924(e)(2)(B)(ii) ...................................................................................1

21 U.S.C. § 848(e)(1)(A) ................................................................................. 2, 14

28 U.S.C. § 2255(h)(2)............................................................................................1

Violent Crime Control and Law Enforcement Act of 1994,
Pub. L. 103-322 (1994) ....................................................................................5

**Rules**

4th Cir. Loc. R. 22(d).............................................................................................1

**Other Authorities**

Supplemental Brief for the United States, *Johnson v. United States*, 135 S. Ct.
2551, 2015 WL 1284964 (Mar. 20, 2015) .......................................................11

iii

James H. Roane, Jr., through counsel, respectfully moves for an order authorizing the United States District Court for the Eastern District of Virginia to consider a second motion to set aside his conviction and sentence pursuant to 28 U.S.C. § 2255(h)(2) and Local Rule 22(d).

## **INTRODUCTION**

This Court may authorize a second or successive motion under 28 U.S.C. § 2255 if the motion is based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." § 2255(h)(2). Mr. Roane's attached, proposed second § 2255 motion (Appendix A) is based on the "new rule of constitutional law" announced in *Johnson v. United States*, 135 S. Ct. 2551 (2015); (2) the rule was "made retroactive to cases on collateral review by the Supreme Court" in *Welch v. United States*, 136 S. Ct. 1257 (2016); and (3) the rule was previously unavailable. *See Welch*, 136 S. Ct. at 1264. This Court should therefore authorize Mr. Roane to file the attached motion in the District Court.

In *Johnson*, the Supreme Court ruled that the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(ii), was unconstitutionally vague because its definition of a violent felony "required courts to assess the hypothetical risk posed by an abstract generic version of the [underlying] offense." *Welch*, 136 S. Ct. at 1262. While leaving undisturbed the

1

"many laws that 'require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion,*'" *id*. (quoting *Johnson*, 135 S. Ct. at 2561 (emphasis in *Johnson*)), the Court found the ACCA residual clause unconstitutionally vague because it required courts to envision conduct that a crime involves in the "ordinary case"  and "to judge whether that abstraction presents a serious risk of potential injury," *Johnson*, 135 S. Ct. at 2557.

Mr. Roane was convicted of four counts of using a firearm in the commission of a crime of violence.  *See* 18 U.S.C. § 924(c). The four counts alleged use of a firearm in the course of killings, three of which were alleged to have been committed in furtherance of a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848(e)(1)(A), and all four of which were alleged to have been committed in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a).

To qualify as a crime of violence, these underlying offenses must fall under either § 924(c)(3)(A)'s "force clause" or under § 924(c)(3)(B)'s "residual clause." Mr. Roane's convictions cannot be upheld under § 924(c)(3)(B)'s residual clause because its definition of a crime of violence requires the same "ordinary case" approach that the Supreme Court deemed unconstitutional in *Johnson*.  The plain language of § 924(e)(2)(B)(ii) and § 924(c)(3)(B) is similar, and this Court and courts nationwide have recognized that the provisions are analogous.  Mr. Roane's convictions likewise cannot be upheld under the force clause because killing in

2

furtherance of a CCE and murder in aid of racketeering activity may each be committed without the intentional use of violent physical force that this clause requires. Accordingly, after *Johnson*, Mr. Roane's four convictions under § 924(c) are void for vagueness in violation of his right to due process.

As set forth below, Mr. Roane makes a *prima facie* showing that his proposed claim falls within the scope of § 2255(h)(2), which is "'simply a sufficient showing of possible merit to warrant a fuller exploration by the district court.'" *In re Williams*, 330 F.3d 277, 281 (4th Cir. 2003) (quoting *Bennett v. United States*, 119 F.3d 468, 469–70 (7th Cir. 1997)). He respectfully requests that the Court authorize him to file the proposed successive § 2255 motion.

## **PROCEDURAL HISTORY**

Following a jury trial, Mr. Roane was convicted in 1993 of several counts, including the four § 924(c) counts at issue in this application and three counts of killing in furtherance of a CCE. He received life sentences on two of the CCE counts and a death sentence on the third. The four § 924(c) counts were based on four killings. For three of the killings, the jury found both that Mr. Roane committed the acts in furtherance of a CCE and in aid of racketeering activity. For the fourth killing, of Torrick Brown, Jr., the jury found only that it was committed in aid of racketeering activity. *See* Verdict Sheet, (Appendix B). This Court affirmed. *United States v. Tipton*, 90 F.3d 861, 869-70 (4th Cir. 1996). The U.S.

3

Supreme Court denied certiorari. *Roane v. United States*, 520 U.S. 1253 (1997).

Mr. Roane subsequently filed a motion under 28 U.S.C. § 2255 in the district court and was granted relief as to the CCE count that served as the basis for his death sentence. *See* Order, *United States v. Roane*, No. 92-68 (E.D. Va. May 1, 2003). This Court reversed and denied relief. *United States v. Roane*, 378 F.3d 382, 411 (4th Cir. 2004). Again, the U.S. Supreme Court denied certiorari. *Roane v. United States*, 546 U.S. 810 (2005).

In 2009, Mr. Roane presented this Court with newly discovered evidence demonstrating that Mr. Roane is actually innocent of the CCE killing for which he received a death sentence. This Court denied leave to file a successive motion under § 2255. Order, *In re Roane*, No. 09-8 (4th Cir. July 13, 2010). Mr. Roane also filed an original habeas petition in the U.S. Supreme Court, which was denied. *In re Roane*, 132 S. Ct. 390 (2011).

On June 26, 2015, the Supreme Court held in *Johnson v. United States*, 135 S. Ct. 2551 (2015), that the residual clause of the Armed Career Criminal Act of 1984 ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(ii), is unconstitutionally void for vagueness in violation of the Fifth Amendment's guarantee of due process. On April 18, 2016, the Court held that Johnson applies retroactively to cases on collateral review. *Welch v. United States*, 136 S. Ct. 1257 (2016).

Mr. Roane now applies to file a second or successive motion under

4

§ 2255(h)(2).  Pursuant to § 2255(f) & (h), this application is timely, as it is filed within one year of the date that *Johnson* was decided.

**STATUTES INVOLVED**

**21 U.S.C. § 848(e)(1)(A)**

Section 848(e)(1)(A), in pertinent part, provides:

In addition to the other penalties set forth in this section—

**(A)** any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

**18 U.S.C. § 1959(a)**

Section 1959(a), in pertinent part, provides:

Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—

(1) for murder, by death[1] or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a

---

[1] Congress amended the statute to authorize death sentences in 1994, after Mr. Roane's trial.  *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322 , § 6003(a)(12) (1994).

5

fine under this title, or both

## 18 U.S.C. § 924

Section 924(c)(1)(A), in pertinent part, provides:

[A] person who, during and in relation to a crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence [be punished in accordance with this statute].

Section 924(c)(3) defines "crime of violence" as follows:

(3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and–

(A) has an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

## ARGUMENT

Mr. Roane sets forth below a *prima facie* case that the alleged crimes of violence—killing in furtherance of a CCE and murder in aid of racketeering activity—underlying his four convictions for the use of a firearm during a crime of violence do not qualify as crimes of violence under 18 U.S.C. § 924(c).  Section 924(c) defines a crime of violence in two alternate clauses: the force clause under § 924(c)(3)(A) and the residual clause under § 924(c)(3)(B).  Mr. Roane first

6

shows that, under *Johnson*, the residual clause of § 924(c)(3)(B) is void for vagueness. The validity of Mr. Roane's four § 924(c) convictions thus depends on one of these crimes qualifying as a crime of violence under the force clause. However, under case law from within and outside this circuit, killing in furtherance of a CCE and murder in aid of racketeering activity are not categorically crimes of violence under the force clause of § 924(c)(3)(A). Consequently, after *Johnson*, Mr. Roane's convictions, and any sentences that they impacted, are unconstitutional and invalid.

## I. PURSUANT TO *JOHNSON*, § 924(c)(3)(B)'S RESIDUAL CLAUSE IS UNCONSTITUTIONALLY VAGUE.

Under the reasoning of *Johnson v. United States*, 135 S. Ct. 2551 (2015), the residual clause of § 924(c)(3)(B) is void for vagueness. In *Johnson*, the Supreme Court analyzed the ACCA residual clause, 18 U.S.C. § 924(e)(2)(B)(ii) (defining a violent felony as one that "involves conduct that presents a serious potential risk of physical injury to another"), which parallels in all material respects § 924(c)(3)(B)'s residual clause (defining a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used"). As § 924(c)(3)(B) suffers from the same flaws that compelled the Supreme Court to declare § 924(e) unconstitutionally vague, § 924(c)(3)(B) is unconstitutional as well. Consequently, Mr. Roane's four

7

§ 924(c) convictions and any sentences they affected cannot be upheld under the residual clause.

### A. *Johnson* Expressly Rejected the "Ordinary Case" Approach to Determining Whether a Crime Is Intrinsically Violent.

In *Johnson*, the Supreme Court held that the residual clause of § 924(e)(2)(B)(ii) is unconstitutionally vague because the process by which courts categorize convictions as violent is unacceptably "wide ranging" and "indeterminate." *Johnson*, 135 S. Ct. at 2557. The Court began by reaffirming that, under *Taylor v. United States*, 495 U.S. 575 (1990), the residual clause requires the categorical approach to determine whether a particular statute is a crime of violence. *Johnson*, 135 S. Ct. at 2557, 2562. Courts must therefore assess whether a crime is a violent felony "'in terms of how the law defines the offense and not in terms of how an individual might have committed it on a particular occasion.'" *Id.* at 2562 (quoting *Begay v. United States*, 553 U.S. 137, 141 (2008)).

The Court observed that, under its precedents, the residual clause "require[d] a court to picture the kind of conduct that the crime involves 'in the ordinary case,' and to judge whether that abstraction presents a serious risk of potential injury." *Johnson*, 135 S. Ct. at 2557 (citation omitted). But "grave uncertainty" abounds in determining "how to estimate the risk posed by a crime" in the "judicially

8

imagined 'ordinary case'" because "[t]he residual clause offers no reliable way to choose between . . . competing accounts of what 'ordinary' . . . involves." *Id*. The Court thus concluded that the process of determining what is embodied in the "ordinary case" is fatally flawed and unconstitutionally vague. *Id*. at 2557–58.

This flaw alone established the residual clause's unconstitutional vagueness, but a closely related defect exacerbated the problem. *Id*. The residual clause lacked a meaningful gauge for determining when the quantum of risk under the "ordinary case" of a particular statute was enough to constitute a "serious potential risk of physical injury." *Id*. at 2558. Although the level of risk required under the residual clause could arguably be similar to that of the enumerated offenses (burglary, arson, extortion, or crimes involving use of explosives), *Johnson* rejected the notion that comparing the risk posed by an "ordinary case" to the risk posed by enumerated offenses would cure the constitutional problem. *Id*. The Court held that the indeterminacy, unpredictability, and arbitrariness inherent in the "ordinary case" analysis is more than the "Due Process Clause tolerates." *Id*. Thus, *Johnson* not only invalidated the ACCA residual clause; it invalidated the "ordinary case" analysis in determining the violence inherent in crimes. *See id*.

**B. *Johnson* Renders § 924(c)(3)(B) Unconstitutionally Vague.**

The residual clause in § 924(c) suffers the same defects as the ACCA residual clause in § 924(e). The language of the provisions is similar; the federal

9

courts treat the provisions the same; and both provisions depend on the now-abrogated "ordinary case" analysis.

Section 924(e) defines a "violent felony" to include those that involve "a serious potential risk" of "physical injury" to another person.  Section 924(c) defines a "crime of violence" to include those that involve "a substantial risk" that "physical force" may be used against a person or property.  Both provisions thus define violent crimes according to their intrinsic risk that they may involve physical force or injury.  Although the risk at issue in § 924(e) is a risk of physical injury, and the risk in § 924(c) is that physical force will be used, this difference is immaterial under *Johnson*'s rationale.  The Supreme Court's holding did not turn on the type of risk at issue but rather on how courts assess and quantify the risk intrinsic in a crime.

Federal courts have recognized that § 924(e)'s residual clause is similar to § 924(c)(3)(B) and to the identical provision in 18 U.S.C. § 16(b).  *See, e.g.*, *Chambers v. United States*, 555 U.S. 122, 133 n.2 (2009) (Alito, J., concurring) (Section 16(b) "closely resembles ACCA's residual clause"); *United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on ACCA case to interpret the definition of crime of violence under § 924(c)(3)(B)); *United States v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same).

Under § 924(c), just as under § 924(e), a court must first picture the

10

"ordinary case" and then decide if it categorically qualifies as a crime of violence by assessing the intrinsic risk posed. *See United States v. McNeal*, No. 14–4871, 2016 WL 1178823, at *8 (4th Cir. Mar. 28, 2016) ("In determining whether an offense is a crime of violence under either [the force clause or the residual clause], we utilize the categorical approach, which focuses solely on the elements of the offense, rather than on the facts of the case."); *United States v. Fuertes*, 805 F.3d 485, 498–99 (4th Cir. 2015) (explaining that, to determine whether a predicate offense qualifies as a crime of violence under § 924(c), courts must use the categorical approach and look to the statutory definition of the offense).

Indeed, in litigating *Johnson*, the United States agreed that the residual clauses in § 924(e) and § 924(c) posed the same problem. After noting that the definitions of crime of violence in the residual clauses of § 924(c) and § 16(b) are identical, the Solicitor General stated:

> Although Section 16 refers to the risk that *force* will be used rather than that *injury* will occur, it is equally susceptible to petitioner's central objection to the residual clause: Like the ACCA, Section 16 requires a court to identify the ordinary case of the commission of the offense and to make a commonsense judgment about the risk of confrontations and other violent encounters.

Supplemental Brief for the United States, *Johnson v. United States*, 135 S. Ct. 2551, 2015 WL 1284964, at *22–23 (Mar. 20, 2015) (emphasis in original). The Solicitor General's analysis was undoubtedly correct. The residual clauses in both

11

§ 924(c) and § 924(e) require an "ordinary case" analysis to assess the predicate offense, and both require speculation about how risky that ordinary case is.

Because this is the same defect that rendered § 924(e) unconstitutional, the residual clause in § 924(c) is also unconstitutional, as federal courts have recognized. *United States v. Bell*, No. 15–00258, 2016 WL 344749, at *11–*13 (N.D. Cal. Jan. 28, 2016); *United States v. Lattanaphom*, No. 99–CR–00433, 2016 WL 393545, at *3–*6 (E.D. Cal. Feb. 2, 2016); *United States v. Edmundson*, No. 13–CR–15, 2015 WL 9311983, at *2–*6 (D. Md. Dec. 23, 2015).

In light of *Johnson*, Roane's convictions for the use of a firearm during a crime of violence under § 924(c) cannot rest upon any alleged crime of violence qualifying under the unconstitutionally vague residual clause of § 924(c)(3)(B).

## II.    KILLING UNDER § 848(e)(1)(A) AND MURDER UNDER § 1959(a) DO NOT QUALIFY AS CRIMES OF VIOLENCE UNDER THE FORCE CLAUSE OF § 924(c)(3)(A).

Because § 924(c)(3)(B)'s residual clause is unconstitutionally vague in light of *Johnson*, Mr. Roane's four convictions under § 924(c) must qualify as crimes of violence under § 924(c)(3)(A)'s force clause to remain valid. However, the alleged crimes of violence in this case, killing under § 848(e)(1)(A) and murder under § 1959(a), do not qualify as crimes of violence under the force clause.

To determine whether a predicate offense qualifies as a crime of violence under § 924(c), this Court must use the categorical approach. *See Descamps v.*

12

*United States*, 133 S. Ct. 2276, 2283 (2013); *McNeal*, 2016 WL 1178823, at *8 ; *Fuertes*, 805 F.3d at 498. This approach requires that courts "look only to the statutory definitions – i.e., the elements – of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a crime of violence. *Descamps*, 133 S. Ct. at 2283 (citation omitted).

Applying the categorical approach, killing in furtherance of a CCE and murder in aid of racketeering activity fail to qualify as crimes of violence under § 924(c)(3)(A)'s force clause. Killing in furtherance of a CCE is not a crime of violence because it does not categorically require the use of any force by the defendant, nor the use of violent physical force at all, both of which are required under the force clause. Murder in aid of racketeering activity does not qualify because it may be accomplished without either intent to use force or the use of violent physical force. Because these underlying offenses do not require the government to prove that the defendant intentionally used violent physical force, they do not qualify as crimes of violence under the force clause of § 924(c)(3)(A).

### A. Killing Under 21 U.S.C. § 848(e)(1)(A) Does Not Qualify as a Crime of Violence under the Force Clause of § 924(c)(3)(A).

Killing in furtherance of a CCE, in violation of 21 U.S.C. § 848(e)(1)(A), does not categorically qualify as a crime of violence under § 924(c)(3)(A) for at least two reasons: (a) the killing may be accomplished without any use of force by

the defendant; and (b) the killing may be accomplished without the use of *violent physical* force.

First, the force clause requires more than just the application of force by *someone* against an individual. "Rather, the relevant inquiry is whether there is a substantial risk that the *defendant* will use physical force against the victim in completing the crime." *Fuertes*, 805 F.3d at 500 (emphasis in original). Thus, it is not enough that the defendant's actions may cause another person to apply force against the victim. *Id.*; *see United States v. Naughton*, 621 F. App'x 170, 177 (4th Cir. 2015) (holding that *Fuertes* "foreclosed" argument that use of force by others could be sufficient under force clause).

Section 848(e)(1)(A) provides, in pertinent part, that a defendant may be found guilty if, in furtherance of a CCE, he either "intentionally kills" *or* "counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." The plain language thus allows for a conviction in cases in which a party other than the defendant commits all acts necessary to complete the killing. Courts have accordingly applied § 848(e)(1)(A) to cases where third parties perpetrated killings at the defendants' behest. *See, e.g.*, *United States v. Chandler*, 950 F. Supp. 1545, 1553 (N.D. Ala. 1996) (describing murder-for-hire plot to where defendant paid third party to kill man who threatened his marijuana-distribution business). Because § 848(e)(1)(A) allows for conviction

14

where a third party is the individual applying force (if any), killing in furtherance of a CCE cannot qualify as a crime of violence under the force clause.

Second, killing under § 848(e)(1)(A) fails to qualify as a crime of violence under § 924(c)(3)(A)'s force clause because the offense does not require the use of violent physical force at all. "Physical force" means "*violent* force – that is, force capable of causing physical pain or injury to another person." *Johnson (Curtis) v. United States*, 559 U.S. 133, 140 (2010) (emphasis in original). This Court has recognized that "a crime may result in death or serious injury without involving use of physical force." *United States v. Torres-Miguel*, 701 F.3d 165, 168 (4th Cir. 2012) (emphasis in original). Instead, as courts around the country have recognized, crimes that involve intentional injury or killing may be accomplished by a variety of means that do not include the use of violent physical force. *See id.* at 168-69 (California offense of willfully threatening to commit a crime that will result in death or great bodily injury does not contain element equating to threat of violent force under U.S.S.G.§ 2L1.2); *United States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010) (same as *Torres-Miguel,* noting that poisoning does not require use of physical force); *United States v. Perez-Vargas*, 414 F.3d 1282, 1286 (10th Cir. 2005) ("[S]everal examples [exist] of third degree assault that would not use or threaten the use of physical force: . . . intentionally placing a barrier in front of a car causing an accident, or intentionally exposing someone to hazardous

15

chemicals.").

Because killing in furtherance of a CCE requires neither the use of force by the defendant nor the use of any violent physical force, a violation of § 848(e)(1)(A) does not qualify as a crime of violence under the force clause.

**B. Murder in Aid of Racketeering Activity Does Not Qualify as a Crime of Violence under the Force Clause of § 924(c)(3)(A).**

Murder in aid of racketeering activity under § 1959(a) also does not categorically qualify as a crime of violence under § 924(c)(3)(A) for at least two reasons: (a) the murder may be accomplished without intent, and, as with killing in furtherance of a CCE, (b) the murder may be accomplished without the use of violent physical force.

As to intent, this Court has held that the use of physical force required of a crime of violence must involve a level of intent beyond mere recklessness or negligence. *United States v. Vinson*, 805 F.3d 120, 125 (4th Cir. 2015); *see also McNeal*, 2016 WL 1178823, at *12; *Garcia v. Gonzales*, 455 F.3d 465, 469 (4th Cir. 2006) ("[R]ecklessness, like negligence, is not enough to support a determination that a crime is a 'crime of violence.'").

The federal definition of murder applicable to § 1959(a) is found at 18 U.S.C. § 1111(a). It provides, in pertinent part:

> **(a)** Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any

16

other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree.

Any other murder is murder in the second degree.

This Court has recognized that, although "murder [under § 1111] requires a showing of malice aforethought," "[t]o prove malice, the Government does not have to show an intent to kill or injure." *United States v. Williams*, 342 F.3d 350, 356 (4th Cir. 2003). Because an intent to kill or even to injure is not required, the mens rea required to sustain a murder conviction under § 1111 is "not enough to support a determination that a crime is a 'crime of violence.'" *Garcia*, 455 F.3d at 469; *see also Duarte v. United States*, 289 F. Supp. 2d 487, 491 (S.D.N.Y. 2003) (noting that section 1959(a) "draws no distinction between murder in the first and second degrees" and thus can be satisfied by proof of either). Because murder under § 1111 (and § 1959(a)) does not categorically involve a specific intentional use of physical force, it is not a crime of violence under the force clause.

As to quantum of force, this Court has recognized that deaths occurring during the commission of a felony, without the use of any violent physical force by the defendant, can support convictions of murder under § 1111. For example, if a bystander suffers a heart attack while a defendant is committing or even merely attempting to commit a predicate felony, the defendant could be charged and convicted of murder despite having never used or threatened violent physical force.

17

*See United States v. Whitfield*, 548 F. App'x 70, 71–72 (4th Cir. 2013) (per curiam) (upholding district court's finding under sentencing guidelines that victim was killed under circumstances constituting murder under § 1111 because death occurred during perpetration of a burglary or robbery); *Whitfield v. United States*, No. 3:16–cv–00027, 2016 WL 427942, at *1 (W.D.N.C. Feb. 3, 2016) (noting "[u]pon seeing [defendant] enter her home, [the victim] became extremely agitated and began to cry and experience shortness of breath," defendant "ordered her from the hallway into another room and instructed her to sit down," and later "it was found that [the victim] had died from a heart attack."). Similarly, an accidental death occurring during a felony that resulted from only slightly offensive touching (such as when a bystander falls to their death after being recklessly but only slightly brushed aside by a defendant in the act of committing a felony) would sustain a murder conviction but not involve the use of "force capable of causing physical pain or injury to another person," *Johnson*, 559 U.S. at 140, required to constitute a crime of violence.[2] The lack of violent physical force required provides a second reason why murder in aid of racketeering activity does not qualify as a crime of violence.

---

[2] A defendant could also be convicted of murder based upon intentional conduct that did not involve the use of violent physical force, as described fully in Section II.A, *supra*.

18

### III.　MR. ROANE HAS MADE A SUFFICIENT SHOWING OF POSSIBLE MERIT TO FILE A SUCCESSIVE MOTION IN DISTRICT COURT.

This Court should grant Mr. Roane's application to file a second or successive motion pursuant to 28 U.S.C. § 2255(h) because he has made "'a sufficient showing of possible merit to warrant a fuller exploration by the district court.'" *In re Williams*, 330 F.3d 277, 281 (4th Cir. 2003) (quoting *Bennett v. United States*, 119 F.3d 468, 469–70 (7th Cir. 1997)).

The residual clause of § 924(c)(3)(B) is now unconstitutional in light of *Johnson*. Mr. Roane's four convictions under § 924(c) cannot be sustained under the force clause of § 924(c)(3)(A), and neither can any of his sentences which were affected by the illegal convictions. At a minimum, Mr. Roane has shown that these issues are of possible merit to warrant full exploration in district court. *See Williams*, 330 F.3d at 281.

Indeed, this "'showing of possible merit'" relates only to whether the claims in this application satisfy the requirements for filing a second or successive motion, "not the possibility that the claims will ultimately warrant a decision in favor of the applicant." *Id.* at 282. While "this determination may entail a cursory glance at the merits," the "focus of the inquiry must always remain on the [§ 2255(h)(2)] standards"—that is, whether Mr. Roane's claim relies on a new rule of constitutional law made retroactive by the Supreme Court. *Id.* Mr. Roane has

19

satisfied this standard by showing that, in light of the new rule of constitutional law announced by the Supreme Court in *Johnson* and made retroactive by the Court in *Welch*, he can now raise a claim of possible merit in district court that his convictions under § 924(c) are invalid.

## CONCLUSION

Because Mr. Roane has presented a *prima facie* claim that the requirements of 28 U.S.C. § 2255(h)(2) are satisfied, he respectfully requests that his application be granted and that he be authorized to file a second § 2255 motion.


Respectfully Submitted,

/s/ Peter Williams

Peter Williams                                    Paul F. Enzinna
Assistant Federal Defender                        Law Office of Paul F. Enzinna, LLC
Federal Community Defender Office                 5425 Wisconsin Avenue, Suite 600
  for Eastern District of  Pennsylvania           Chevy Chase, MD 20815
601 Walnut Street, Suite 545 West                 (240) 718-4500
Philadelphia, PA 19106
(215) 928-0520


Counsel for James H. Roane, Jr.

Dated:  May 20, 2016

20

## Certificate of Service

I, Peter Williams, hereby certify that on this 20th day of May 2016, I

submitted the foregoing Application for filing with service via first-class mail to:

Dana J. Boente
United States Attorney for the Eastern District of Virginia
919 E. Main St.
Suite 1900
Richmond, VA  23219


/s/ Peter Williams
Peter Williams

# Appendix A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
|  | : |  |
| THE UNITED STATES OF AMERICA | : |  |
|  | : | Crim. No. 3:92CR68-03 |
| v. | : |  |
|  | : | Civil No. _____ |
| JAMES H. ROANE, JR. | : |  |
|  | : |  |
|  | : |  |

**MOTION TO VACATE CONVICTION AND SENTENCE
PURSUANT TO 28 U.S.C. § 2255**

James H. Roane, Jr., a prisoner in the custody of the United States sentenced

to death and housed at the United States Penitentiary, Terre Haute, Indiana,

respectfully moves this Court to vacate his convictions and sentences pursuant to

28 U.S.C. § 2255. In support of this motion, Mr. Roane states the following:

**INTRODUCTION**

In *Johnson v. United States*, 135 S. Ct. 2551 (2015), the Supreme Court held

that the residual clause of the Armed Career Criminal Act of 1984 ("ACCA"), 18

U.S.C. § 924(e)(2)(B)(ii), is unconstitutionally vague because its definition of a

violent felony "required courts to assess the hypothetical risk posed by an abstract

generic version of the [underlying] offense." *Welch v. United States*, 136 S. Ct.

1257, 1262 (2016). While leaving undisturbed the "many laws that 'require

1

gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*,'" *id.* (quoting *Johnson*, 135 S. Ct. at 2561 (emphasis in *Johnson*)), the Court found the clause impermissibly vague because it required courts to envision conduct that a crime involves in the "ordinary case" and "to judge whether that abstraction presents a serious risk of potential injury," *Johnson*, 135 S. Ct. at 2557.

Mr. Roane was convicted of four counts of using a firearm in the commission of a crime of violence. *See* 18 U.S.C. § 924(c). Specifically, the four counts alleged use of a firearm in the course of killings, three of which were alleged to have been committed in furtherance of a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848(b)(1)(A), and all four of which were alleged to have been committed in furtherance of racketeering activity, in violation of 18 U.S.C. § 1959(a).

To qualify as a crime of violence, these underlying offenses must fall under either § 924(c)(3)(A)'s "force clause" or under § 924(c)(3)(B)'s "residual clause." Mr. Roane's convictions cannot be upheld under § 924(c)(3)(B)'s residual clause, because its definition of a crime of violence requires the same "ordinary case" approach that the Supreme Court deemed unconstitutional in *Johnson*. The plain language of § 924(e)(2)(B)(ii) and § 924(c)(3)(B) is similar, and the Fourth Circuit and courts nationwide have recognized that the provisions are analogous. Mr.

2

Roane's convictions likewise cannot be upheld under the force clause because killing in furtherance of a CCE and murder in furtherance of racketeering activity may each be committed without the intentional use of physical force that this clause requires. Accordingly, after *Johnson*, Mr. Roane's four convictions under § 924(c) are void for vagueness in violation of the Fifth Amendment's guarantee of due process. These convictions are unconstitutional and illegal.

## **PROCEDURAL HISTORY**

Following a jury trial in the Eastern District of Virginia, Mr. Roane was convicted in 1993 of several counts, including the four § 924(c) counts at issue in this motion and three counts of killing in furtherance of a CCE. He received life sentences on two of the CCE counts and a death sentence on the third. The four § 924(c) counts were based on four killings. For three of the killings, the jury found both that Mr. Roane committed the acts in furtherance of a CCE and in aid of racketeering activity. For the fourth killing, of Torrick Brown, Jr., the jury found only that it was committed in aid of racketeering activity. *See* Verdict Sheet, (Exhibit 1). The Fourth Circuit affirmed. *See United States v. Tipton*, 90 F.3d 861, 869-70 (4th Cir. 1996). The U.S. Supreme Court denied certiorari. *Roane v. United States*, 520 U.S. 1253 (1997).

Mr. Roane subsequently filed a motion under 28 U.S.C. § 2255 in this Court and was granted relief as to the CCE count that served as the basis for his death

3

sentence. *See* Order, *United States v. Roane*, No. 92-68 (E.D. Va. May 1, 2003). The Fourth Circuit reversed and denied relief. *United States v. Roane*, 378 F.3d 382, 411 (4th Cir. 2004). Again, the U.S. Supreme Court denied certiorari. *Roane v. United States*, 546 U.S. 810 (2005).

In 2009, Mr. Roane presented the Fourth Circuit with newly discovered evidence demonstrating that Mr. Roane is actually innocent of the CCE killing for which he received a death sentence. The court denied leave to file a successive motion under § 2255. Order, *In re Roane*, No. 09-8 (4th Cir. July 13, 2010). Mr. Roane also filed an original habeas petition in the U.S. Supreme Court, which was denied. *In re Roane*, 132 S. Ct. 390 (2011).

On June 26, 2015, the Supreme Court held in *Johnson v. United States*, 135 S. Ct. 2551 (2015), that the residual clause of the Armed Career Criminal Act of 1984 ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(ii), is unconstitutionally void for vagueness in violation of the Fifth Amendment's guarantee of due process. On April 18, 2016, the Court held that Johnson applies retroactively to cases on collateral review. *Welch v. United States*, 136 S. Ct. 1257 (2016).[1]

---

[1] This motion was attached as Appendix A to Mr. Roane's Application to File Second or Successive Motion Pursuant to 28 U.S.C. §§ 2244(b) and 2255(h), which was filed in the Fourth Circuit on May 20, 2016.

4

## **ARGUMENT**

The alleged crimes of violence—killing in furtherance of a CCE and murder in aid of racketeering activity—underlying Mr. Roane's four convictions for the use of a firearm during a crime of violence do not qualify as crimes of violence under 18 U.S.C. § 924(c). Section 924(c) defines a crime of violence in two alternate clauses: the force clause under § 924(c)(3)(A) and the residual clause under § 924(c)(3)(B). Mr. Roane first shows that, under *Johnson*, the residual clause of § 924(c)(3)(B) is void for vagueness. The validity of Mr. Roane's four § 924(c) convictions thus depends on one of these crimes qualifying as a crime of violence under the force clause. However, under case law from within and outside this circuit, killing in furtherance of a CCE and murder in aid of racketeering activity are not categorically crimes of violence under the force clause of § 924(c)(3)(A). Consequently, after *Johnson*, Mr. Roane's convictions—and the sentences they affect, including his death sentence—are unconstitutional and invalid.

## I.   **PURSUANT TO *JOHNSON*, § 924(c)(3)(B)'S RESIDUAL CLAUSE IS UNCONSTITUTIONALLY VAGUE.**

Under the reasoning of *Johnson v. United States*, 135 S. Ct. 2551 (2015), the residual clause of § 924(c)(3)(B) is void for vagueness. In *Johnson*, the Supreme Court analyzed the ACCA residual clause, 18 U.S.C. § 924(e)(2)(B)(ii) (defining a violent felony as one that "involves conduct that presents a serious potential risk of

5

physical injury to another"), which parallels in all material respects § 924(c)(3)(B)'s residual clause (defining a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used").  As § 924(c)(3)(B) suffers from the same flaws that compelled the Supreme Court to declare § 924(e) unconstitutionally vague, § 924(c)(3)(B) is unconstitutional as well.  Consequently, Mr. Roane's four § 924(c) convictions cannot be upheld under the residual clause.

**A. *Johnson* Expressly Rejected the "Ordinary Case" Approach to Determining Whether a Crime Is Intrinsically Violent.**

In *Johnson*, the Supreme Court held that the residual clause of § 924(e)(2)(B)(ii) is unconstitutionally vague because the process by which courts categorize convictions as violent is unacceptably "wide ranging" and "indeterminate." *Johnson*, 135 S. Ct. at 2557.  The Court began by reaffirming that, under *Taylor v. United States*, 495 U.S. 575 (1990), the residual clause requires the categorical approach to determine whether a particular statute is a crime of violence.  *Johnson*, 135 S. Ct. at 2557, 2562.  Courts must therefore assess whether a crime is a violent felony "'in terms of how the law defines the offense and not in terms of how an individual might have committed it on a particular occasion.'"  *Id.* at 2562 (quoting *Begay v. United States*, 553 U.S. 137, 141 (2008)).

6

The Court observed that, under its precedents, the residual clause "require[d] a court to picture the kind of conduct that the crime involves 'in the ordinary case,' and to judge whether that abstraction presents a serious risk of potential injury." *Johnson*, 135 S. Ct. at 2557 (citation omitted). But "grave uncertainty" abounds in determining "how to estimate the risk posed by a crime" in the "judicially imagined 'ordinary case'" because "[t]he residual clause offers no reliable way to choose between . . . competing accounts of what 'ordinary' . . . involves." *Id*. The Court thus concluded that the process of determining what is embodied in the "ordinary case" is fatally flawed and unconstitutionally vague. *Id*. at 2557–58.

This flaw alone established the residual clause's unconstitutional vagueness, but a closely related defect exacerbated the problem. *Id*. The residual clause lacked a meaningful gauge for determining when the quantum of risk under the "ordinary case" of a particular statute was enough to constitute a "serious potential risk of physical injury." *Id*. at 2558. Although the level of risk required under the residual clause could arguably be similar to that of the enumerated offenses (burglary, arson, extortion, or crimes involving use of explosives), *Johnson* rejected the notion that comparing the risk posed by an "ordinary case" to the risk posed by enumerated offenses would cure the constitutional problem. *Id*. The Court held that the indeterminacy, unpredictability, and arbitrariness inherent in the "ordinary case" analysis is more than the "Due Process Clause tolerates." *Id*.

7

Thus, *Johnson* not only invalidated the ACCA residual clause; it invalidated the "ordinary case" analysis in determining the violence inherent in crimes. *See id.*

**B. *Johnson* Renders § 924(c)(3)(B) Unconstitutionally Vague.**

The residual clause in § 924(c) suffers the same defects as the ACCA residual clause in § 924(e). The language of the provisions is similar; the federal courts treat the provisions the same; and both provisions depend on the now-abrogated "ordinary case" analysis.

Section 924(e) defines a "violent felony" to include those that involve "a serious potential risk" of "physical injury" to another person. Section 924(c) defines a "crime of violence" to include those that involve "a substantial risk" that "physical force" may be used against a person or property. Both provisions thus define violent crimes according to their intrinsic risk that they may involve physical force or injury. Although the risk at issue in § 924(e) is a risk of physical injury, and the risk in § 924(c) is that physical force will be used, this difference is immaterial under *Johnson*'s rationale. The Supreme Court's holding did not turn on the type of risk at issue but rather on how courts assess and quantify the risk intrinsic in a crime.

Federal courts have recognized that § 924(e)'s residual clause is similar to § 924(c)(3)(B) and to the identical provision in 18 U.S.C. § 16(b). *See, e.g.,* *Chambers v. United States*, 555 U.S. 122, 133 n.2 (2009) (Alito, J., concurring)

8

(Section 16(b) "closely resembles ACCA's residual clause"); *United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on ACCA case to interpret the definition of crime of violence under § 924(c)(3)(B)); *United States v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same); *see also United States v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA residual clause and § 16(b) as "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930–31 (8th Cir. 2014) (ACCA's definition of a violent felony is "virtually identical to § 16(b)"); *United States v. Williams*, 537 F.3d 969, 971 (8th Cir. 2008) ("The present case involves the term 'crime of violence' whereas the Supreme Court in *Begay* interpreted the term 'violent felony.' We have never recognized a distinction between the two.").

Under § 924(c), just as under § 924(e), a court must first picture the "ordinary case" and then decide if it categorically qualifies as a crime of violence by assessing the intrinsic risk posed. *See United States v. McNeal*, No. 14–4871, 2016 WL 1178823, at *8 (4th Cir. Mar. 28, 2016) ("In determining whether an offense is a crime of violence under either [the force clause or the residual clause], we utilize the categorical approach, which focuses solely on the elements of the offense, rather than on the facts of the case."); *United States v. Fuertes*, 805 F.3d 485, 498–99 (4th Cir. 2015) (explaining that, to determine whether a predicate

9

offense qualifies as a crime of violence under § 924(c), courts must use the categorical approach and look to the statutory definition of the offense).[2]

Indeed, in litigating *Johnson*, the United States agreed that the residual clauses in § 924(e) and § 924(c) posed the same problem. After noting that the definitions of crime of violence in the residual clauses of § 924(c) and § 16(b) are identical, the Solicitor General stated:

> Although Section 16 refers to the risk that *force* will be used rather than that *injury* will occur, it is equally susceptible to petitioner's central objection to the residual clause: Like the ACCA, Section 16 requires a court to identify the ordinary case of the commission of the offense and to make a commonsense judgment about the risk of confrontations and other violent encounters.

Supplemental Brief for the United States, *Johnson v. United States*, 135 S. Ct. 2551, 2015 WL 1284964, at *22–23 (Mar. 20, 2015) (emphasis in original). The Solicitor General's analysis was undoubtedly correct. The residual clauses in both

---

[2]*Accord United States v. Serafin*, 562 F.3d 1105, 1107 (10th Cir. 2009) (explaining the court employs a "categorical approach" when determining whether a crime qualifies as a crime of violence for purposes of § 924(c), and does not consider the particular facts of conviction); *United States v. Acosta*, 470 F.3d 132, 135 (2d Cir. 2006) (same); *United States v. Jennings*, 195 F.3d 795, 797–98 (5th Cir. 1999) (same); *United States v. Amparo*, 68 F.3d 1222 (9th Cir. 1995) ("This circuit has adopted a categorical approach to determining which offenses are included under section 924(c) as 'crimes of violence'"); *United States v. Moore*, 38 F.3d 977, 980 (8th Cir. 1994) (explaining, when analyzing whether a predicate crime falls within the residual clause of § 924(c), "the question is not whether the particular facts constitute a crime of violence, but whether [the predicate crime itself] is a crime of violence," and in making this determination, courts must look to the elements of the crime, not the particular facts of the crime, to determine whether "by its nature" there is a "substantial risk that physical force will be used).

10

§ 924(c) and § 924(e) require an "ordinary case" analysis to assess the predicate offense, and both require speculation about how risky that ordinary case is.

Because this is the same defect that rendered § 924(e) unconstitutional, the residual clause in § 924(c) is also unconstitutional, as various federal courts have recognized.[3]  *United States v. Bell*, No. 15–00258, 2016 WL 344749, at \*11–\*13 (N.D. Cal. Jan. 28, 2016); *United States v. Lattanaphom*, No. 99–CR–00433, 2016 WL 393545, at \*3–\*6 (E.D. Cal. Feb. 2, 2016); *United States v. Edmundson*, No. 13–CR–15, 2015 WL 9311983, at \*2–\*6 (D. Md. Dec. 23, 2015).

Consequently, in light of *Johnson*, Roane's convictions for the use of a firearm during a crime of violence under § 924(c) cannot rest upon any alleged crime of violence qualifying under the unconstitutionally vague residual clause of § 924(c)(3)(B).

## II.   KILLING UNDER § 848(e)(1)(A) AND MURDER UNDER § 1959(a) DO NOT QUALIFY AS CRIMES OF VIOLENCE UNDER THE FORCE CLAUSE OF § 924(c)(3)(A).

Because § 924(c)(3)(B)'s residual clause is unconstitutionally vague in light of *Johnson*, Mr. Roane's four convictions under § 924(c) must qualify as crimes of violence under § 924(c)(3)(A)'s force clause to remain valid.   However, the

---

[3] The Seventh and Ninth Circuits have also held that the residual clause of § 16, which is identical to the residual clause in § 924(c), is sufficiently similar to the residual clause in § 924(e) and thus unconstitutionally vague. *See United States v. Vivas-Cejas*, 808 F.3d 719, 720 (7th Cir. 2015); *Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015).

11

alleged crimes of violence in this case, killing under § 848(e)(1)(A) and murder under § 1959(a), do not qualify as crimes of violence under the force clause.

To determine whether a predicate offense qualifies as a crime of violence under § 924(c), this Court must use the categorical approach. *See Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013); *United States v. McNeal*, No. 14–4871, 2016 WL 1178823, at *8 (4th Cir. Mar. 28, 2016); *Fuertes*, 805 F.3d at 498. This approach requires that courts "look only to the statutory definitions – i.e., the elements – of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a crime of violence. *Descamps*, 133 S. Ct. at 2283 (citation omitted); *see also McNeal*, 2016 WL 1178823, at *8 ("In determining whether an offense is a crime of violence under either clause [of § 924(c)], we utilize the categorical approach, which focuses solely on the elements of the offense, rather than on the facts of the case.").

Applying the categorical approach, killing in furtherance of a CCE and murder in aid of racketeering activity fail to qualify as crimes of violence under § 924(c)(3)(A)'s force clause. Killing in furtherance of a CCE is not a crime of violence because it does not categorically require the use of any force by the defendant, nor the use of violent physical force at all, both of which are required under the force clause. Murder in aid of racketeering activity does not qualify because it may be accomplished without either intent to use force or the use of

12

violent physical force. Because these underlying offenses do not require the government to prove that the defendant used violent physical force, they do not qualify as crimes of violence under the force clause of § 924(c)(3)(A). *See, e.g., United States v. Jordan*, 812 F.3d 1183, 1186 (8th Cir. 2016) (A crime "does not qualify as a violent felony under the force clause" if "the government need not prove violent physical force . . . This is what separates the force clause from the residual clause.").[4]

## A. Killing Under 21 U.S.C. § 848(e)(1)(A) Does Not Qualify as a Crime of Violence under the Force Clause of § 924(c)(3)(A).

Killing in furtherance of a CCE, in violation of 21 U.S.C. § 848(e)(1)(A), does not categorically qualify as a crime of violence under § 924(c)(3)(A) for at least two reasons: (a) the killing may be accomplished without any use of force by the defendant; and (b) the killing may be accomplished without the use of *violent physical* force.

First, the force clause requires more than just the application of force by someone against an individual. "Rather, the relevant inquiry is whether there is a substantial risk that the *defendant* will use physical force against the victim in completing the crime." *Fuertes*, 805 F.3d at 500 (emphasis in original). Thus, it is not enough that the defendant's actions may cause another person to apply force

---

[4] In *Jordan*, the Eighth Circuit analyzed the force clause under § 924(e), which is materially identical to the force clause found in § 924(c).

13

against the victim. *Id.*; *accord United States v. Naughton*, 621 F. App'x 170, 177 (4th Cir. 2015) (holding that *Fuertes* "foreclosed" argument that use of force by others could be sufficient under force clause).

Section 848(e)(1)(A) provides, in pertinent part, that a defendant may be found guilty if, in furtherance of a CCE, he either "intentionally kills" *or* "counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." The plain language thus allows for a conviction in cases in which a party other than the defendant commits all acts necessary to complete the killing. Courts have accordingly applied § 848(e)(1)(A) to cases where third parties perpetrated killings at the defendants' behest. *See, e.g.*, *United States v. Cooper*, 19 F.3d 1154, 1157-58 (7th Cir. 1994) (detailing inducement-to-kill charge against capital defendant who had member of his drug ring kill FBI informant); *United States v. Chandler*, 950 F. Supp. 1545, 1553 (N.D. Ala. 1996) (describing murder-for-hire plot where defendant paid third party to kill man who threatened his marijuana-distribution business). Because § 848(e)(1)(A) allows for conviction where a third party is the individual applying force (if any), killing in furtherance of a CCE cannot qualify as a crime of violence under the force clause.

Second, killing under § 848(e)(1)(A) fails to qualify as a crime of violence under § 924(c)(3)(A)'s force clause because the offense does not require the use of

14

violent physical force at all. "Physical force" means "*violent* force – that is, force capable of causing physical pain or injury to another person." *Johnson (Curtis) v. United States*, 559 U.S. 133, 140 (2010) (emphasis in original). But the Fourth Circuit has recognized that "a crime may result in death or serious injury without involving use of physical force." *United States v. Torres-Miguel*, 701 F.3d 165, 168 (4th Cir. 2012) (emphasis in original). Instead, as courts around the country have recognized, crimes that involve intentional injury or killing may be accomplished by a variety of means that do not include the use of violent physical force. *See id.* at 168-69 (California offense of willfully threatening to commit a crime that will result in death or great bodily injury does not contain element equating to threat of violent force under U.S.S.G.§ 2L1.2); *United States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010) (same as *Torres-Miguel,* noting that poisoning does not require use of physical force); *United States v. Perez-Vargas*, 414 F.3d 1282, 1286 (10th Cir. 2005) ("[S]everal examples [exist] of third degree assault that would not use or threaten the use of physical force: . . . intentionally placing a barrier in front of a car causing an accident, or intentionally exposing someone to hazardous chemicals."); *Chrzanoski v. Ashcroft*, 327 F.3d 188, 195 (2d Cir. 2003) (individual could be convicted of intentional assault in third degree for injury caused not by physical force, but by guile, deception, or even deliberate omission).

15

Because killing in furtherance of a CCE requires neither the use of force by the defendant nor the use of any violent physical force, a violation of § 848(e)(1)(A) does not qualify as a crime of violence under the force clause of § 924(c)(3)(A).

### B. Murder in Aid of Racketeering Activity Under 18 U.S.C. § 1959(a) Does Not Qualify as a Crime of Violence under the Force Clause of § 924(c)(3)(A).

Murder in aid of racketeering activity under § 1959(a) also does not categorically qualify as a crime of violence under § 924(c)(3)(A) for at least two reasons: (a) the murder may be accomplished without intent, and, as with killing in furtherance of a CCE, (b) the murder may be accomplished without the use of violent physical force.

As to intent, the Fourth Circuit has held that the use of physical force required of a crime of violence must involve a level of intent beyond mere recklessness or negligence. *United States v. Vinson*, 805 F.3d 120, 125 (4th Cir. 2015); *see also McNeal*, 2016 WL 1178823, at *12 ("[T]o qualify as a crime of violence, an offense must require either specific intent or knowledge with respect to the use, threatened use, or attempted use of physical force."); *Garcia v. Gonzales*, 455 F.3d 465, 469 (4th Cir. 2006) ("[R]ecklessness, like negligence, is not enough to support a determination that a crime is a 'crime of violence.'"). The Supreme Court similarly has recognized that "the use . . . of physical force against

16

the person or property of another [] most naturally suggests a higher degree of intent than negligent or merely accidental conduct." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (citations and quotations omitted).

The federal definition of murder applicable to § 1959(a) is found at 18 U.S.C. § 1111(a). It provides:

> **(a)** Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

The Fourth Circuit has recognized that, although "murder [under § 1111] requires a showing of malice aforethought," "[t]o prove malice, the Government does not have to show an intent to kill or injure." *United States v. Williams*, 342 F.3d 350, 356 (4th Cir. 2003). Because an intent to kill or even to injure is not required, the mens rea required to sustain a murder conviction under § 1111 is "not enough to support a determination that a crime is a 'crime of violence.'" *Garcia*, 455 F.3d at 469; *see also Duarte v. United States*, 289 F. Supp. 2d 487, 491 (S.D.N.Y. 2003) (noting that section 1959(a) "draws no distinction between murder in the first and second degrees" and thus can be satisfied by proof of either). Because murder

17

under § 1111 (and hence § 1959(a)) does not categorically involve a specific intentional use of physical force, it is not a crime of violence under the force clause.

As to quantum of force, the Fourth Circuit has recognized that deaths occurring during the commission of a felony, without the use of any violent physical force by the defendant, can support convictions of murder under § 1111. For example, if a bystander suffers a heart attack while a defendant is committing or even merely attempting to commit a predicate felony, the defendant could be charged and convicted of murder despite having never used or threatened violent physical force. *See United States v. Whitfield*, 548 F. App'x 70, 71–72 (4th Cir. 2013) (per curiam) (upholding district court's finding under sentencing guidelines that victim was killed under circumstances constituting murder under § 1111 because death occurred during perpetration of a burglary or robbery), *aff'd*, *Whitfield v. United States*, 135 S. Ct. 785 (2015); *Whitfield v. United States*, No. 3:16–cv–00027, 2016 WL 427942, at *1 (W.D.N.C. Feb. 3, 2016) (noting "[u]pon seeing [defendant] enter her home, [the victim] became extremely agitated and began to cry and experience shortness of breath," defendant "ordered her from the hallway into another room and instructed her to sit down," and later "it was found that [the victim] had died from a heart attack"). Similarly, an accidental death occurring during a felony that resulted from only slightly offensive touching (such

18

as when a bystander falls to their death after being recklessly but only slightly brushed aside by a defendant in the act of committing a felony) would sustain a murder conviction but not involve the use of "force capable of causing physical pain or injury to another person," *Johnson*, 559 U.S. at 140, required to constitute a crime of violence.[5]  The lack of violent physical force required provides a second reason why murder in aid of racketeering activity does not qualify as a crime of violence under the force clause.

### III.    MR. ROANE IS ENTITLED TO A COMPLETE RESENTENCING HEARING, INCLUDING RESENTENCING BY JURY ON THE CAPITAL COUNTS.

Once a court determines that certain of a defendant's convictions cannot stand, § 2255 "confers a 'broad and flexible' power to the district courts 'to fashion an appropriate remedy.'"  *United States v. Hillary*, 106 F.3d 1170, 1171 (4th Cir. 1997) (quoting *United States v. Garcia*, 956 F.2d 41, 45 (4th Cir. 1996)).  The court may "discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).  This Fourth Circuit has held that, where a § 924(c) count is vacated, "in most cases involving the mandatory consecutive . . . sentence, vacating that portion of the sentence radically changes the sentencing package."  *United States v. Smith*, 115 F.3d 241, 245 (4th

---

[5] A defendant could also be convicted of murder based upon intentional conduct that did not involve the use of violent physical force, as described fully in Section II.A, *supra*.

19

Cir. 1997) (citation omitted).  Thus, the most appropriate remedy in such cases is a complete resentencing on the remaining counts of conviction.  *Id.*  In the case of capital counts, any resentencing must be done by a jury, which alone has the power to find facts that make an individual death eligible.  *See Hurst v. Florida*, 136 S. Ct. 616, 619 (2016); *see also* 18 U.S.C. § 3593(b).

In this case, as described in *Smith*, the four illegal § 924(c) sentences radically change the entire sentencing package that was before the Court and the jury at Mr. Roane's original trial.  In light of the broad and equitable powers in § 2255(b), Mr. Roane respectfully requests that the Court vacate his death sentence and conduct a complete resentencing, including resentencing by jury on the capital counts.

## CONCLUSION

Mr. Roane's four convictions under § 924(c) are unconstitutional in light of the Supreme Court's holding in *Johnson*. The residual clause of § 924(c)(3)(B) is now unconstitutional in light of *Johnson*. Mr. Roane's four convictions under § 924(c) cannot be sustained under the force clause of § 924(c)(3)(A). Mr. Roane's claim in light of *Johnson* is properly based on a new rule of constitutional law that has been made retroactive by the Supreme Court and was previously unavailable. *See* 28 U.S.C. § 2255(h)(2). In light of *Johnson*, Mr. Roane's convictions for the use of a firearm during a crime of violence under 18 U.S.C. § 924(c) must be set aside because they are not supported by a valid crime of violence. And in light of the broad equitable powers in § 2255(b), the proper remedy is a complete resentencing, including resentencing by jury on the capital counts.

21

## **REQUEST FOR RELIEF**

Wherefore, based on the foregoing, Mr. Roane respectfully requests that the

Court grant him the following relief:

(1) Leave to amend this motion;

(2) Leave to file a Memorandum of Law in support of this motion;

(3) Should it assist the Court, a status conference to discuss the timing of the above; and

(4) A Writ of Habeas Corpus to vacate Mr. Roane's § 924(c) convictions and all of his sentences, including his death sentence.

Respectfully Submitted,


/s/ Peter Williams
Peter Williams
Federal Community Defender Office
  for Eastern District of  Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

Paul F. Enzinna
Law Office of Paul F. Enzinna, LLC
5425 Wisconsin Avenue, Suite 600
Chevy Chase, MD 20815
(240) 718-4500


Counsel for James H. Roane, Jr.

Dated:  May 20, 2016

22

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

UNITED STATES OF AMERICA )
)
v. )    Criminal Case No. 3:92CR68-03
)
JAMES H. ROANE, JR. )
  a.k.a. "J.R." )
)



## VERDICT

WE, THE JURY, FIND as follows:

Count 1:        Conspiracy to Distribute Controlled Substance

_____Guilty_____
(Guilty or Not Guilty)

Count 2:        Continuing Criminal Enterprise

Question:  Do you find that the government has proven, beyond a reasonable doubt, that a Continuing Criminal Enterprise existed as charged in the indictment?

Yes: __Yes__          No: _____

If you indicated above that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant, JAMES H. ROANE, JR., Not Guilty as to Count 2.

If you indicated that a Continuing Criminal Enterprise <u>did</u> exist, you must now determine whether defendant JAMES H. ROANE, JR. is Guilty or Not Guilty of the crime of engaging in that continuing criminal enterprise as charged in Count 2, and enter your finding below:

_____Guilty_____
(Guilty or Not Guilty)

467

Defendant JAMES H. ROANE, JR. is not charged in Counts 3-4 of the indictment.

Count 5:    Killing of Douglas Moody while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did not exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

Count 6:    Use of Firearm in Relation to Killing of Douglas Moody

_____Guilty_____
(Guilty or Not Guilty)

Count 7:    Killing of Douglas Moody to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 8:    Killing of Peyton Maurice Johnson while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did not exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

Count 9:    Use of Firearm in Relation to Killing of Peyton Maurice Johnson

_____Guilty_____
(Guilty or Not Guilty)

Count 10:          Killing of Peyton Maurice Johnson to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 11:          Killing of Louis J. Johnson, Jr., while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did not exist, you must find the defendant Not Guilty as to this Count).

_____Guilty_____
(Guilty or Not Guilty)

Count 12:          Use of Firearm in Relation to Killing of Louis J. Johnson, Jr.

_____Guilty_____
(Guilty or Not Guilty)

Count 13:          Killing of Louis J. Johnson, Jr., to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 14:          Killing of Torrick Brown, Jr., to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Count 15:          Use of Firearm in Relation to Killing of Torrick Brown, Jr., and Maiming of Martha McCoy

_____Guilty_____
(Guilty or Not Guilty)

Count 16:       Maiming of Martha McCoy to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Defendant JAMES H. ROANE, JR., is not charged in Counts 17-31 of the indictment.

Count 32:       Possession of Controlled Substance with Intent to Distribute  (on or about 2/2/92)

_____Guilty_____
(Guilty or Not Guilty)

Defendant JAMES H. ROANE, JR. is not charged in Count 33 of the indictment.

SO SAY WE ALL.

_____      __2/3/93_____
FOREPERSON'S SIGNATURE                      DATE

# Appendix B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

UNITED STATES OF AMERICA )
)
v. )    Criminal Case No. 3:92CR68-03
)
JAMES H. ROANE, JR. )
  a.k.a. "J.R." )
)

<u>**VERDICT**</u>



FEB - 3 1993

CLERK, U.S. DISTRICT COURT
RICHMOND, V.

WE, THE JURY, FIND as follows:

<u>Count 1</u>:    Conspiracy to Distribute Controlled Substance

        Guilty
        (Guilty or Not Guilty)

<u>Count 2</u>:    Continuing Criminal Enterprise

<u>Question</u>:  Do you find that the government has proven, beyond a reasonable doubt, that a Continuing Criminal Enterprise existed as charged in the indictment?

Yes:   Yes        No: _____

If you indicated above that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant, JAMES H. ROANE, JR., Not Guilty as to Count 2.

If you indicated that a Continuing Criminal Enterprise <u>did</u> exist, you must now determine whether defendant JAMES H. ROANE, JR. is Guilty or Not Guilty of the crime of engaging in that continuing criminal enterprise as charged in Count 2, and enter your finding below:

        Guilty
        (Guilty or Not Guilty)

467

Defendant JAMES H. ROANE, JR. is not charged in Counts 3-4 of the indictment.

Count 5:    Killing of Douglas Moody while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did not exist, you must find the defendant Not Guilty as to this Count).

_Guilty_
(Guilty or Not Guilty)

Count 6:    Use of Firearm in Relation to Killing of Douglas Moody

_Guilty_
(Guilty or Not Guilty)

Count 7:    Killing of Douglas Moody to Maintain or Increase Position in Racketeering Enterprise

_Guilty_
(Guilty or Not Guilty)

Count 8:    Killing of Peyton Maurice Johnson while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did not exist, you must find the defendant Not Guilty as to this Count).

_Guilty_
(Guilty or Not Guilty)

Count 9:    Use of Firearm in Relation to Killing of Peyton Maurice Johnson

_Guilty_
(Guilty or Not Guilty)

**Count 10:**    Killing of Peyton Maurice Johnson to Maintain or Increase Position in Racketeering Enterprise

<u>_____Guilty_____</u>
(Guilty or Not Guilty)

**Count 11:**    Killing of Louis J. Johnson, Jr., while Engaged In or Working in Furtherance of a Continuing Criminal Enterprise

(If you indicated, in response to the Question set forth under Count 2 above, that a Continuing Criminal Enterprise did <u>not</u> exist, you must find the defendant Not Guilty as to this Count).

<u>_____Guilty_____</u>
(Guilty or Not Guilty)

**Count 12:**    Use of Firearm in Relation to Killing of Louis J. Johnson, Jr.

<u>_____Guilty_____</u>
(Guilty or Not Guilty)

**Count 13:**    Killing of Louis J. Johnson, Jr., to Maintain or Increase Position in Racketeering Enterprise

<u>_____Guilty_____</u>
(Guilty or Not Guilty)

**Count 14:**    Killing of Torrick Brown, Jr., to Maintain or Increase Position in Racketeering Enterprise

<u>_____Guilty_____</u>
(Guilty or Not Guilty)

**Count 15:**    Use of Firearm in Relation to Killing of Torrick Brown, Jr., and Maiming of Martha McCoy

<u>_____Guilty_____</u>
(Guilty or Not Guilty)

Count 16:    Maiming of Martha McCoy to Maintain or Increase Position in Racketeering Enterprise

_____Guilty_____
(Guilty or Not Guilty)

Defendant JAMES H. ROANE, JR., is not charged in Counts 17-31 of the indictment.

Count 32:    Possession of Controlled Substance with Intent to Distribute  (on or about 2/2/92)

_____Guilty_____
(Guilty or Not Guilty)

Defendant JAMES H. ROANE, JR. is not charged in Count 33 of the indictment.

SO SAY WE ALL.

_____    ____2/3/93_____
FOREPERSON'S SIGNATURE                 DATE

FILED:  June 6, 2016

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

No. 16-6
(3:92-cr-00068-JRS-3)

_____

In re: JAMES H. ROANE, JR.

Movant

_____

O R D E R

_____

Movant has filed a motion under 28 U.S.C. § 2244 for an order authorizing the district court to consider a second or successive application for relief under 28 U.S.C. § 2255.

The court denies the motion.

Entered at the direction of Judge Wilkinson with the concurrence of Judge King and Judge Duncan.

For the Court

/s/ Patricia S. Connor, Clerk